# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BERNADINE LOWELL, RAYMOND LOWELL, AMIRAH GOODE, TONY GOODE, DOMONIQUE GOODE, AMBERLYNN HOWARD, MARY RITCH, BOBBIE MILLER, NORMAN ALLEN, HAILIE ROBINSON, MARIA CONLON, LORA MARTIN, MICHAEL MARTIN, JENNIFER TRIPP, PATRICIA SLEBODNIK, WILLIAM SLEBODNIK, JODY BARNES, DANIEL SLEBODNIK, SHARISE COLEMAN, LELAND DIMOND, PEGGY DIMOND, CHRISTOPHER YLLESCAS, LINDA BARNETT, LARRY BARNETT, E'VALA DAWSON, IVORY IHEGBORO, CHRISTOPHER DUPONT, MICHAEL TONER, WILLIE TYUS, LATISHA TYUS, TANZA TYUS, TIFFANY SHARP, JOCELYN GREENE, KAITLYN GREENE, AMANDA TALBERT, NEVIN WALLS, C.E. by and through his next friend Tiffany Olds, MARY RICH, KYLE ROUSH, KIRSTEN WALSHE, K.W. by and through her next friend Kirsten Walshe, JARRETT ANDREWS, DAVID BRYANT, GRACE ALLEN, MICHAEL ALLEN, CHRISTOPHER BERRY, RICHARD CARTER, JUNE RENDER, LAUREN GENOVESE, ELIZABETH WILLIAMSON, STEVEN WILLIAMSON, JEANINE JOHNSTON, STEPHEN TOWERY, MIKAIL BACON, SHEILA TURBETT, RICHARD TURBETT, JAIME TURBETT, KIM OLSEN, LAYNE OLSEN, QUINTIN HESS III, ETHAN RODERICK, KENNETH COMFORT II, REBECCA JOBE, CARL TOMLINSON SR., JORDAN TOMLINSON, LATHA TOMLINSON, CARL BARNARD, STEVEN GENTZ, JARED GENTZ, RACHEL GENTZ, JENIFER GORMAN, ANDREW DAHLMAN, VINCENT THOMPSON, LATONYA HOLMES, HEAVEN GRADY-GANGWER, DARNIECE MELTON-JEFFERSON, I.J. by and through his next friend Darniece Melton-Jefferson, MICHELE MCGARRAH, ORVILLE MCGARRAH, EMILIE MCGARRAH, JAMES MCGARRAH, CARLOS NEGRON MALDONADO, WILLIAM NEWLOVE, KENNETH HAND, RENEE HAND, ROBERT BAGWELL III, ELIZABETH ANDRADE, BETTY MARTINEZ, MADELINE ANDRADE, PABLO MARTINEZ III, | Case No.: 1:25-cv-00931 |

JENNIFER MEDINA, CHRISTOPHER VALADEZ,
JUANITA PEREZ, PABLO MARTINEZ JR., DENISE
MELETICHE, CHARLES RAVER, LUCAS
GONZALES III, TERRI TWIGG, CAROLYN
RESSLER, AARON TWIGG, THOMAS JENKINS,
TANISHA PIERCE, DAMOND SMITH JR.,
RONALD GRIDER, SHERRY GRIDER, VIRGINIA
GRIDER, JESSICA CHARLES, AUDREY BOWERS,
KRISTEN JOHNSON, HOLLY HIGGINS, JAMES
JOHNSON, ERIK JOHNSON, PETER JOHNSON,
WILLIAM JOHNSON, BRITTANY BALL, TREVON
CHAMBERS, O.M. by and through his next friend
Chelsea McLain, ROBERT MICKLER, VERONICA
ADAMSKI, CHRISTOPHER FINK, RICHARD
GOOD, JIM AUGUSTINO JACOBS, ICALYNN
ENGELMANN, NANETTE ZANOWICK, PAUL
ZANOWICK, NICOLE ZANOWICK-SMITH, LILLY
CAMPBELL, PHOUTHASITH DOUANGDARA,
ARIYAVANH DOUANGDARA, P.H. by and through
her next friend Candie Reagan, DOUGLAS
HAMBURGER, CHRISTOPHER HAMBURGER,
TRACY KENDALL LITMAN, ASHLEY SANDERS,
COREY PITTMAN, JOHN PITTMAN JR., GEAR
ROBINSON, VANCE VICKERS, DOUGLAS
GREEN, CLEVELAND DAVIS, MARIA BRISENO,
ASHLEY DYER, AMANDA BALLARD, KALEB
LEVY, ELIJAH SHEEK, JOSHUA YATES,
JENNIFER D'AUGUSTINE, PENNY
BATTERSHELL, RORY FOGARTY, CARLOS
MORGADO, VICTOR ATWELL, KIMBERLEE
ATWELL, KRISTA WILLIAMS, F.W. by and through
her next friend Krista Williams, V.W. by and through
her next friend Krista Williams, TRACEY PRESCOTT,
MONICA GILBERT, M.G. by and through her next
friend Monica Gilbert, CHRISTINA EILERS,
WILLIAM BURLEY, JESSY DAVIS, ZACHARY
MILLER, NICOLE PATTERSON, LETITIA
WILLIAMS, MARCIE ROBERTSON, CHARLES
MCEVOY, JOSEPH MCEVOY, KATLIN CROMER,
RYLAN GARZA, and CHARLENE CAKORA,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN,

Defendant.

**COMPLAINT FOR VIOLATION OF THE
<u>FOREIGN SOVEREIGN IMMUNITIES ACT</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

JURISDICTION AND VENUE ....................................................................................... 2

THE DEFENDANT.......................................................................................................... 2

FACTUAL ALLEGATIONS ........................................................................................... 4

I.    IRAN HAS LONG SUPPORTED TERRORISM THROUGHOUT THE MIDDLE
      EAST AND CENTRAL ASIA AS PART OF ITS FOREIGN POLICY .............................. 4

II.   THE TALIBAN IS PART OF AN AL-QAEDA-BACKED TERRORIST SYNDICATE
      THAT WAGED A DEADLY INSURGENCY AGAINST AMERICANS IN
      AFGHANISTAN ........................................................................................................ 9

      A.  The Taliban ........................................................................................................ 10

      B.  The Haqqani Network ........................................................................................ 14

      C.  Al-Qaeda ............................................................................................................ 23

      D.  The Kabul Attack Network ................................................................................ 32

III.  IRAN PROVIDED MATERIAL SUPPORT TO THE TALIBAN AND AFFILIATED
      TERRORIST GROUPS IN AFGHANISTAN ............................................................... 33

      A.  Iran Provided Material Support For Anti-American Terrorism In Afghanistan To
          Undermine The U.S. Mission There ................................................................... 33

      B.  Iran Provided The Taliban With Weapons, Explosives, and Lethal Substances ........ 41

      C.  Iran Provided The Taliban With Lodging, Training, Expert Advice or Assistance,
          Safehouses, Personnel, and Transportation ........................................................ 47

      D.  Iran Provided The Taliban With Financial Support............................................ 52

      E.  Iran Provided Material Support To Al-Qaeda .................................................... 54

IV.   THE TALIBAN KILLED AND INJURED PLAINTIFFS THROUGH TERRORIST
      ATTACKS FOR WHICH IRAN PROVIDED MATERIAL SUPPORT OR
      RESOURCES .......................................................................................................... 58

      A.  The June 2, 2007 Complex Attack in Kunar (Lowell Family) ................................... 58

      B.  The August 11, 2007 IED Attack in Paktia (Goode Family)....................................... 59

      C.  The August 28, 2007 Suicide Bombing Attack in Paktia (Howard Family) .............. 60

D.  The November 10, 2007 Direct Fire Attack in Nuristan (Mersman Family) ............. 60

E.  The December 12, 2007 IED Attack in Paktika (Blaney Family) .............................. 61

F.  The June 26, 2008 Complex Attack in Wardak (Hilton Family)................................ 62

G.  The August 15, 2008 Complex Attack in Wardak (Conlon Family)......................... 62

H.  The September 6, 2008 Small Arms Attack in Kunar (Dinterman Family) ............... 63

I.  The September 11, 2008 Small Arms Attack in Nuristan (Murdock Family)........... 64

J.  The September 11, 2008 Helicopter Attack in Zabul (Slebodnik Family)................ 65

K.  The September 29, 2008 IED Attack in Helmand (Nicholas Family)....................... 66

L.  The October 13, 2008 Complex Attack in Kandahar (Dimond Family) ................... 66

M.  The October 28, 2008 IED Attack in Nuristan (Yllescas Family)............................. 67

N.  The November 13, 2008 Suicide Bombing Attack in Nangarhar (Stiles Family) ...... 68

O.  The January 17, 2009 Complex Attack in Kunar (Dawson Family) ......................... 69

P.  The March 8, 2009 IED Attack in Paktia (Dupont Family) ...................................... 69

Q.  The March 27, 2009 Insider Attack in Balkh (Toner Family)................................... 70

R.  The June 21, 2009 Indirect Fire Attack in Parwan (Jones Family) .......................... 71

S.  The July 2, 2009 Small Arms Attack in Helmand (Sharp Family)............................ 71

T.  The July 7, 2009 IED Attack in Herat (Talbert Family)............................................ 72

U.  The August 1, 2009 IED Attack in Kandahar (Walls Family) .................................. 73

V.  The August 7, 2009 IED Attack in Wardak (Evans Family)..................................... 74

W.  The August 7, 2009 Complex Attack in Kapisa (Freeman Family) ......................... 74

X.  The August 16, 2009 Complex Attack in Herat (Roush Family) ............................. 75

Y.  The August 31, 2009 IED Attack in Kandahar (Walshe Family).............................. 76

Z.  The September 4, 2009 Complex Attack in Paktika (Andrews Family) ................... 76

AA. The September 9, 2009 Suicide Bombing Attack in Helmand (David Bryant)......... 77

BB. The September 12, 2009 IED Attack in Wardak (Allen Family).............................. 78

CC. The September 24, 2009 IED Attack in Zabul (Smith Family) ................................. 78

DD. The October 20, 2009 IED Attack in Helmand (Baker Family) ................................ 79

EE. The October 27, 2009 Complex Attack in Kandahar (Williamson Family) ............... 80

FF. The December 26, 2009 IED Attack in Nangarhar (Johnston and Towery Families) ................................................................................................................ 80

GG. The February 3, 2010 IED Attack in Khyber Pakhtunkhwa (Hartman Family) ........ 82

HH. The February 13, 2010 Small Arms Attack in Helmand (Turbett Family) ............... 82

II.   The March 4, 2010 IED Attack in Helmand (Olsen Family) ..................................... 83

JJ.   The May 6, 2010 Indirect Fire Attack in Wardak (Slack Family) ............................. 84

KK. The May 8, 2010 IED Attack in Helmand (Comfort Family) .................................... 85

LL. The May 18, 2010 Suicide Bombing Attack in Kabul (Tomlinson Family) .............. 85

MM. The May 19, 2010 IED Attack in Kandahar (Barnard Family) ................................ 86

NN. The June 9, 2010 RPG Attack in Helmand (Gentz Family) ..................................... 87

OO. The June 22, 2010 IED Attack in Nimruz (Dumaw Family) .................................... 87

PP. The June 25, 2010 Complex Attack in Parwan (Thompson Family) ......................... 88

QQ. The June 26, 2010 IED Attack in Wardak (Holmes Family) .................................... 89

RR. The July 2, 2010 IED Attack in Parwan (Grady Family) .......................................... 89

SS. The July 2, 2010 IED Attack in Kandahar (Jefferson Family) ................................... 90

TT. The July 4, 2010 Complex Attack in Kandahar (McGarrah Family) ......................... 91

UU. The July 10, 2010 Complex Attack in Kunar (Negron Family) ................................ 92

VV. The July 23, 2010 Small Arms Attack in Logar (Newlove Family) .......................... 92

WW. The July 24, 2010 IED Attack in Zabul (Hand Family) .......................................... 93

XX. The August 7, 2010 IED Attack in Kandahar (Andrade Family) .............................. 94

YY. The August 22, 2010 IED Attack in Kandahar (Millet-Meletiche Family) .............. 95

ZZ. The August 28, 2010 Rocket Propelled Grenade Attack in Nangarhar (Raver Family) ................................................................................................................ 96

AAA. The August 31, 2010 IED Attack in Logar (Alcaraz Family).................................. 96

BBB. The September 2, 2010 Small Arms Attack in Helmand (Twigg Family) .............. 97

CCC. The September 16, 2010 IED Attack in Kandahar (Johnson Family) ..................... 98

DDD. The September 18, 2010 Machine Gun Attack in Kunduz (Grider Family)........... 99

EEE. The September 18, 2010 Direct Fire Attack in Faryab (Harton Family) .............. 100

FFF. The October 4, 2010 IED Attack in Kandahar (Campbell Family) ........................ 100

GGG. The October 5, 2010 IED Attack in Kandahar (Johnson Family)......................... 101

HHH. The October 6, 2010 IED Attack in Helmand (Sockalosky Family) .................... 102

III. The October 14, 2010 IED Attack in Badghis (Billingsley Family) ........................ 102

JJJ. The November 29, 2010 Insider Attack in Nangarhar (McLain Family) ................. 103

KKK. The March 19, 2011 Small Arms Attack in Kandahar (Mickler Family) ............. 104

LLL. The March 29, 2011 Small Arms Attack in Kunar (Adamski Family) .................. 104

MMM. The April 16, 2011 Insider Attack in Laghman (Adkins Family)....................... 105

NNN. The April 27, 2011 Insider Attack in Kabul (Brown Family)............................... 106

OOO. The April 28, 2011 IED Attack in Helmand (Freeman Family) .......................... 107

PPP. The June 3, 2011 Sniper Attack in Helmand (Zanowick Family) ......................... 107

QQQ. The August 6, 2011 Helicopter Attack in Wardak (Campbell, Douangdara, Hamburger, Null, Pittman, Robinson, and Vickers Families) .................................. 108

RRR. The August 28, 2011 Complex Attack in Kandahar (Green Family) .................... 112

SSS. The September 18, 2011 IED Attack in Kandahar (Clark Family)......................... 113

TTT. The September 25, 2011 IED Attack in Laghman (Briseño-Alvarez Family)....... 114

UUU. The October 29, 2011 Suicide Bombing Attack in Kabul (Darrough Family)..... 115

VVV. The December 7, 2011 Small Arms Attack in Helmand (Levy Family) .............. 115

WWW.    The March 27, 2012 IED Attack in Helmand (D'Augustine Family)........... 116

XXX. The April 4, 2012 Suicide Bombing Attack in Faryab (Rosebrock Family) ........ 117

YYY. The May 6, 2012 IED Attack in Paktia (Fogarty Family) ................................... 118

ZZZ. The May 23, 2012 IED Attack in Kandahar (Morgado Family) ........................... 118

AAAA.    The September 14, 2012 Complex Attack in Helmand (Atwell Family) ..... 119

BBBB. The December 10, 2012 IED Attack in Kandahar (Williams Family) ............... 120

CCCC. The May 4, 2013 IED Attack in Kandahar (Prescott Family) ........................... 121

DDDD.    The May 14, 2013 IED Attack in Kandahar (Gilbert Family) .................... 121

EEEE. The June 2, 2013 IED Attack in Nimruz (Mullen Family) ................................. 122

FFFF. The July 30, 2013 Indirect Fire Attack in Logar (Burley Family) ...................... 123

GGGG.    October 5, 2013 IED Attack in Kandahar (Patterson Family) .................... 124

HHHH.    The November 3, 2013 Small Arms Attack in Logar (Robertson Family) .. 125

IIII. The August 22, 2015 Suicide Bombing Attack in Kabul (McEvoy and Sutton Families) ................................................................................................... 125

JJJJ. The July 29, 2019 Insider Attack in Kandahar (Kreischer Family) ...................... 127

KKKK.    The January 31, 2020 Kidnapping Attack in Kabul (Frerichs Family) ........ 127

CLAIM FOR RELIEF ......................................................................................................... 128

PRAYER FOR RELIEF ...................................................................................................... 129

## INTRODUCTION

1.      This lawsuit seeks damages under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, on behalf of American service members and civilians, and their family members, who were killed, wounded, or kidnapped while serving their country in the Islamic Republic of Afghanistan ("Afghanistan")[1] between approximately 2007 and 2020.

2.      While these men and women worked to rebuild post-war Afghanistan, they were attacked by Taliban and al-Qaeda terrorists.  The Islamic Republic of Iran ("Iran") sponsored those terrorist attacks in an effort to undermine American foreign policy in Afghanistan.  To that end, Iran supported the Taliban by, among other things, training Taliban terrorists how to attack Americans effectively and paying terrorists who killed U.S. forces.  Iran also provided the Taliban with sophisticated weapons that it used to kill and injure thousands of Americans.

3.      Iran's support for al-Qaeda was equally potent.  That support dates back decades and has included money, weapons, training, logistical assistance, and safe harbor for key al-Qaeda leaders.  In 2007, Osama bin Laden himself referred to Iran as al-Qaeda's "main artery for funds, personnel, and communication."  Iran's longstanding decision to back al-Qaeda despite sectarian differences between the two reflected Iran's overriding desire to foment anti-American terrorism around the world.  That decision, like the one to provide material support to the Taliban, paid dividends.  Iran's support for al-Qaeda's activities in Afghanistan substantially contributed to the terrorist violence that killed and injured Americans there.

4.      Iran's support for al-Qaeda complemented its support for the Taliban because of the close relationship between the two terrorist groups.  Although al-Qaeda and the Taliban were nominally separate groups, they acted together in a terrorist "syndicate" that planned and

---

[1] One attack, the February 3, 2010 IED Attack in Khyber Pakhtunkhwa, occurred in Pakistan, but occurred as a result of the activities described in this Complaint.  *See infra* Part IV.GG.

authorized terrorist violence throughout Afghanistan. That syndicate – which involved mafia-style meetings between leaders of the syndicate's various members – provided a superstructure that organized and facilitated a range of terrorist attacks in Afghanistan. By funneling material support to multiple members of that syndicate, Iran ensured that its policy of sponsoring anti-American terrorism in Afghanistan achieved maximum effect.

5.    Iran has been designated as a State Sponsor of Terrorism since 1984. Iran's agents include Hezbollah, the Islamic Revolutionary Guard Corps ("IRGC"), and the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF" or "Qods Force"), among others. Many of Iran's agents are designated as Foreign Terrorist Organizations ("FTOs") under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), Specially Designated Global Terrorists ("SDGTs") under 31 C.F.R. § 594.31, or both. As a designated State Sponsor of Terrorism – which routinely employs designated FTOs as instruments of its terrorist agenda – Iran is liable to Plaintiffs for the injuries it caused by deliberately supporting terrorist attacks in Afghanistan.

## JURISDICTION AND VENUE

6.    This Court has personal and subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2), and 1605A.

7.    Venue is proper in this District under 28 U.S.C. § 1391(f)(4).

8.    28 U.S.C. § 1605A(c) provides a federal private right of action against a State Sponsor of Terrorism for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support and resources for such acts. The foreign state is liable for the acts of its officials, employees, and agents.

## THE DEFENDANT

9.    Defendant Iran is a foreign state that was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979

(50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780).  Iran has remained designated continuously since then.

10.     Iran is politically and ideologically hostile to the United States and its allies.  Iran has consistently provided material support and resources for acts of international terrorism targeting the United States and its overseas interests, often acting through agents like the IRGC, the Qods Force, and Hezbollah.  Iran's provision of material support for anti-American terrorism commonly includes material support and resources for torture, extrajudicial killings, aircraft sabotage, hostage taking, and other related acts.

11.     Iran – including through its officials, employees, and agents acting within the scope of those relationships – provided material support and resources for the commission of acts of torture, extrajudicial killing, aircraft sabotage, and hostage taking by the Taliban and al-Qaeda in Afghanistan, including the extrajudicial killings in which Plaintiffs or their family members were killed or injured.  Iran's material support and resources caused Plaintiffs' injuries.

12.     Iran provided material support for these acts of terrorism against Americans for the purpose of supporting, enabling, advancing, and benefitting from them.[2]

---

[2] Unless otherwise indicated, when Plaintiffs refer to the material support provided by "Iran" to the syndicate in this Complaint, Plaintiffs are specifically describing support that Iran routed to the syndicate primarily through the Islamic Revolutionary Guard Corps ("IRGC"), including the IRGC-Qods Force ("Qods Force"), as supported by "regular" IRGC and, sometimes, Iran's other terrorist agents, including Lebanese Hezbollah ("Hezbollah") and/or the Ministry of Intelligence and Security ("MOIS").  Plaintiffs' approach generally tracks that of the U.S. government, which regularly describes IRGC-related conduct as "Iran's" conduct.

## FACTUAL ALLEGATIONS

**I.    IRAN HAS LONG SUPPORTED TERRORISM THROUGHOUT THE MIDDLE EAST AND CENTRAL ASIA AS PART OF ITS FOREIGN POLICY**

13.    The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism.  Eliminating the United States' role in the geographic region surrounding Iran – including through violence – was and remains a central tenet of Iranian foreign policy.[3]  Since the Iranian Revolution, Iran has engaged in and supported acts of terrorism directed at the United States and its allies as an instrument of Iran's foreign policy.

14.    Iran's support of terrorist proxies like Hezbollah, Hamas, the Taliban, and al-Qaeda is well-documented.[4]  Iran's support for such groups is especially prevalent in areas where Iran abstains from open conflict.  As a result of Iran's consistent and longstanding support of anti-American terrorism, the U.S. State Department formally designated Iran as a State Sponsor of Terrorism in 1984.[5]  It has maintained that designation at all times since.[6]  In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[7]

---

[3] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*"), http://jcpa.org/killing-americans-allies-irans-war/.

[4] *See* Alireza Nader, Joya Laha, *Iran's Balancing Act in Afghanistan* at 9 (RAND Corp. 2011) ("*Iran's Balancing Act*").

[5] *See* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Sec'y of State George P. Shultz designating Iran); U.S. State Dep't, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm.

[6] *Id.*

[7] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

15.     Iran carries out its support of terrorism largely through the IRGC.  The IRGC, a governmental entity of Iran, is a quasi-military state institution that operates separately from the regular Iranian military.  The IRGC is organized like a traditional military and includes an army, navy, air force, militia, and special forces.[8]  The IRGC is supervised by the Iranian government, but it also "has a relatively strict command-and-control protocol and answers directly to the Supreme Leader, Ayatollah Ali Khamenei."[9]  The Supreme Leader serves as commander-in-chief of the armed forces, appoints the head of each military service, and declares war and peace. He also routinely employs the IRGC to further Iran's global terrorist agenda.  As the U.S. Treasury Department noted in 2010 when it designated certain IRGC officials pursuant to Executive Order 13224, "Iran also uses the . . . IRGC . . . to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups."[10]

16.     Members of the IRGC are officials, employees, or agents of Iran.  In light of the IRGC's regular support for terrorist organizations and the strict command structure tying them to Iran's central leadership, members of the IRGC act within the scope of employment when they provide material support to terrorist organizations.

17.     Iran's constitution vests in the IRGC responsibility for defending the Islamic Revolution.  The IRGC runs prisons in Iran, and it controls hundreds of companies, particularly

---

[8] *See* Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[9] *Iran's Balancing Act* at 10.

[10] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

in the oil-and-gas, engineering, construction, and defense industries.  Some analysts estimate that the IRGC controls up to one-third of Iran's economy – billions of dollars of business.

18.     On April 15, 2019, the U.S. State Department designated the IRGC as a FTO.[11] Announcing the designation, President Trump explained that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft."[12]  According to the U.S. State Department's public statement explaining the designation, the IRGC "has been directly involved in terrorist plotting; its support for terrorism is foundational and institutional, and it has killed U.S. citizens."[13]  Through the IRGC's support for terrorist organizations throughout the region, "[t]he Iranian regime has made a clear choice not only to fund and equip, but also to fuel terrorism, violence, and unrest across the Middle East."[14]

19.     The IRGC has a special foreign division called the Qods Force.  The U.S. State Department has observed that "Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East.  The Qods Force is Iran's primary mechanism for cultivating and supporting terrorists abroad."[15]  The Qods Force is the driving force behind Iran's activities in Afghanistan, as well as in Iraq and elsewhere in the region.

20.     The Qods Force has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing.  It also regularly trains foreign terrorist proxies whose

---

[11] *See* 84 Fed. Reg. 15278-01 (Apr. 15, 2019).

[12] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization (Apr. 8, 2019).

[13] Press Release, U.S. State Dep't, *Fact Sheet: Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019), https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

[14] *Id.*

[15] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

attacks promote Iran's political goals.  The Qods Force, though operationally independent from the rest of the IRGC, is also responsible to and directed by the Supreme Leader of Iran.  Major General Qassem Soleimani, who was the chief of the Qods Force for more than twenty years, oversaw the Qods Force's support for terrorist groups to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020. Khamenei then appointed General Esmail Ghaani to replace him.

21.     The Qods Force provides weapons, funding, and training for terrorist operations targeting American citizens, including by supporting terrorist organizations such as al-Qaeda, the Taliban, and the Haqqani Network.  Iran's Supreme Leader and central government are aware of and encourage those acts.  As the U.S. government's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") concluded:  "Iran's use of weapons smuggling networks is fairly predictable and meant to shape the manner in which foreign countries deal with Iran."[16]  For that reason, the Qods Force varies the quantity, rate, and types of weapons provided to its proxy terrorist organizations depending on the amount of pressure Iran wants to exert on a particular country.  Applying pressure against the United States by funding and supplying terrorist proxies in the Middle East and Central Asia is thus an official component of Iran's foreign policy.

22.     The Qods Force has four regional commands within Iran, with each focused on implementing Iran's foreign policy in a neighboring region.  The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

---

[16] Eric Parks, *Iranian Weapons Smuggling Activities in Afghanistan* at 9, JIEDDO J2 Open Source Augmentation and Analysis Cell (Sept. 3, 2009) ("*JIEDDO Report*").

23.     In October 2007, the U.S. Treasury Department designated the Qods Force as a SDGT under Executive Order 13224 for providing material support to the Taliban and other terrorist organizations, including Hezbollah and terrorist groups in Iraq.[17]  The U.S. Treasury Department also designated multiple Qods Force members as Specially Designated Nationals pursuant to Executive Order 13224, based on their activities in Afghanistan.[18]

24.     The U.S. State Department designated the Qods Force as a FTO in April 2019, along with the IRGC.[19]

25.     Iran has also used its agent, Hezbollah,[20] to commit terrorist attacks.  Hezbollah is a Lebanon-based terrorist group that has pledged fealty to Iran's Supreme Leader.  Each year Iran provides Hezbollah approximately $100 million to $200 million in funding and weapons.  As Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian ambassador to Syria and Lebanon, and former Iranian Minister of Interior) explained, "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[21]

26.     Iran has long provided support – through the IRGC, Qods Force, and Hezbollah – for terrorist attacks against American military forces and contractors.  For example, Iran used the

---

[17] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[18] *Id.*

[19] *See* 84 Fed. Reg. 15278-01 (Apr. 15, 2019).

[20] Several decisions in this District have held that Hezbollah is a proxy of Iran.  *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 61 (D.D.C. 2018), *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 53-55 (D.D.C. 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

[21] *Killing Americans and Their Allies* at 11.

IRGC and Hezbollah to train, guide, direct, and motivate Shi'a terrorists targeting American service members and civilians in Iraq.[22]  Similarly, Iran (acting predominantly through Hezbollah) provided Iraqi terrorists with explosively formed penetrators, a weapon that inflicted more casualties on Americans than any other in Iraq.  And Iranian officials have often participated directly in attacks on Americans in Iraq.

## II.    THE TALIBAN IS PART OF AN AL-QAEDA-BACKED TERRORIST SYNDICATE THAT WAGED A DEADLY INSURGENCY AGAINST AMERICANS IN AFGHANISTAN

27.    Since the United States-led overthrow of the Taliban-controlled government in Afghanistan in 2001, terrorists have repeatedly attacked American service members and civilians working to rebuild Afghanistan and support its elected government.  Iran provided material support for those attacks, which killed or injured Plaintiffs.

28.    Plaintiffs identify below several terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them.  Each worked in concert and shared resources, personnel, and operational plans.  Indeed, the Taliban and al-Qaeda often participated in mafia-style meetings – attended by the leaders of several allied terrorist groups – in which they planned and authorized various terrorist attacks throughout Afghanistan.[23]  Given such coordination, one former CIA official and senior White House advisor called the resulting terrorist superstructure a "syndicate," composed of al-Qaeda, the Taliban, and several allied

---

[22] *Id.*

[23] *See* Bill Roggio and Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Wash. Exam'r (July 4, 2011) ("*The al Qaeda-Taliban Connection*"), archived at https://www.washingtonexaminer.com/weekly-standard/the-al-qaeda-taliban-connection.

FTOs.[24]  In fact, bin Laden himself conceived of al-Qaeda as the leader of a broader coalition of terrorists drawing from other terrorist organizations in Pakistan and Afghanistan.[25]

29.    Iran's support for multiple components of this "syndicate," *see infra* Part III, ensured that its support had maximum effect.  Due to the mutually reinforcing ties between the Taliban and al-Qaeda in Afghanistan, support for the one benefited the other – and vice versa. Iran recognized those interrelationships and so spread its support across multiple parts of the Afghan terror syndicate.  In doing so, Iran was able to achieve its intended effect:  wide-ranging terrorist attacks against Americans, executed mostly by the Taliban but supported by (and sometimes jointly committed with) al-Qaeda and the other components of the syndicate.

30.    Against that backdrop, Plaintiffs identify below the principal Afghan terrorist groups, subgroups, and cells that committed the attacks that killed and injured them.

**A.    The Taliban**

31.    The Taliban is a Sunni Islamic terrorist organization.  It was formed in 1994 and was composed mostly of former mujahedin fighters who had expelled the Soviet Union from Afghanistan.  From its inception, the Taliban was a predominantly Pashtun movement led by Mullah Mohammed Omar.  It began to overtake Afghanistan in late 1994, seeking to establish a radical Islamic government demanding strict adherence to Sharia law.  The Taliban largely ruled Afghanistan from 1996 until 2001, although only three foreign countries formally recognized the Taliban government during that time.

32.    From 1996 until after September 11, 2001, the Taliban government harbored Osama bin Laden and al-Qaeda operatives in Afghanistan.  In late 2001, in response to al-

---

[24] Bruce Riedel, *Deadly Embrace: Pakistan, America, And The Future Of The Global Jihad* at 1 (Brookings Inst. Press 2d ed. 2011).

[25] *The al Qaeda-Taliban Connection*.

Qaeda's September 11 attacks on the United States and the Taliban's refusal to turn over Osama bin Laden, American-led Coalition forces invaded Afghanistan. They quickly overthrew the Taliban government. By November 2001, the Taliban fled Kabul, and they abandoned Kandahar – their historical stronghold in southern Afghanistan – the following month. While rank-and-file Taliban terrorists dispersed back into the countryside, the Taliban leadership – including Mullah Omar – took refuge in Pakistan.

33.     In December 2001, the United Nations passed Resolution 1386 authorizing the International Security Assistance Force ("ISAF") in Afghanistan, whose mandate was to maintain stability in Afghanistan and assist the Afghan government in rebuilding the country.

34.     In July 2002, President George W. Bush amended Executive Order 13224 to designate the Taliban and its leader Mullah Omar as SDGTs.[26]

35.     In May 2003, after the U.S. military toppled the Taliban-led government, the United States declared an end to major combat operations in Afghanistan. Afghanistan ratified a new Constitution in December 2003, and the Taliban was not invited to participate in the formation of a new government. The Taliban reacted by setting up "shadow" governments – including so-called "governors" – in most areas, seeking to exercise de-facto, extra-legal control over the Afghan people.

36.     The Taliban's principal goal was to expel Coalition forces, particularly Americans, from the country and undermine the elected government of Afghanistan. To that end, the Taliban began to ramp up its terrorist attacks on U.S. forces in Afghanistan during the mid-2000s. The Taliban also started using new attack types, including suicide bombings. For

---

[26] *See* Termination of Emergency With Respect to the Taliban and Amendment of Exec. Order No. 13,224, 67 Fed. Reg. 44,751 (Sept. 23, 2001); Exec. Order No. 13,268, 2002 WL 32817626 (July 2, 2002).

example, the Taliban committed six suicide bombings in Afghanistan in 2004, and 141 in 2006. Remotely detonated bombings more than doubled between 2005 and 2006.

37.    In 2008 and 2009, a growing Taliban insurgency attacked U.S. forces throughout Afghanistan with a particular emphasis on the southern provinces of Afghanistan, especially Helmand and Kandahar Provinces.  By 2010, the Taliban had regained much of the territory it had lost after September 11.  Responding to the Taliban's growing threat, U.S. Marines launched counterinsurgency operations focused on "restoring government services, bolstering local police forces, and protecting civilians from Taliban incursion."[27]  The Taliban, in turn, responded with escalating violence.

38.    As of 2018, the Taliban had an active presence in 70% of the country.  Although the Taliban was the primary terrorist organization operating in all of the areas of Afghanistan where Plaintiffs (or their family members) were attacked, it was particularly active in the southern provinces in Afghanistan, including the provinces of Helmand, Zabul, and Kandahar.  It concentrated many of its most deadly attacks in and around Kandahar City.

39.    The Taliban eventually succeeded in retaking control of Afghanistan.  By the end of August 2021, Coalition troops had withdrawn from the country.  But up until the very end, the Taliban's terrorist syndicate actively attacked and murdered American and Coalition forces.

40.    The Taliban often attacked American and Coalition forces, U.S. government contractors, and Afghan forces.  But it also targeted civilian aid workers, non-governmental organization workers, and Afghan civilians.  In later years, the Taliban increased attacks on civilians by placing explosives in public locations and using suicide bombers.  It also used

---

[27] *Timeline: The U.S War in Afghanistan: 1999 – 2019*, Council on Foreign Rel., https://www.cfr.org/timeline/us-war-afghanistan.

civilians to attract Coalition forces before detonating a bomb, frequently killing more civilians than Coalition forces.

41.     The Taliban routinely violated the laws of war and did not comply with the Geneva Conventions.  Among other violations, Taliban terrorists refused to wear uniforms or otherwise distinguish themselves from civilians; intentionally slaughtered civilians; used indiscriminate weapons; conscripted children into committing attacks; and engaged in widespread kidnapping and torture in an effort to intimidate their enemies.

42.     The Taliban – sometimes operating jointly with other terrorist groups – committed the terrorist attacks that killed or injured the Plaintiffs in this case.  *See infra* Part IV.

43.     To effectuate those attacks, the Taliban employed a number of different attack types in service of its terrorist agenda.  Most prominently, the Taliban relied heavily on Improvised Explosive Devices ("IEDs"), including Explosively Formed Penetrators ("EFPs"), designed to destroy American armored vehicles and inflict heavy casualties.  Many of the Plaintiffs, or their family members, were killed or injured by a Taliban-planted IED or EFP.

44.     The Taliban's ability to effectively conduct IED attacks directly facilitated their small arms fire attacks against the U.S. citizens in Afghanistan, including attacks that killed and injured Plaintiffs.  Among other methods, terrorists in Afghanistan (and elsewhere) commonly used IED threats and placement histories to channel U.S. forces into specific pre-planned ambush sites, sometimes called "kill boxes."  With knowledge of how U.S. personnel would travel in order to avoid the IED threat, the terrorists could and did successfully attack the U.S. servicemembers in the kill boxes through an ambush involving small arms fire.

45.    The Taliban also attacked U.S. forces and U.S. government contractors with suicide bombers with increasing frequency in later years.  Many Plaintiffs, or their family members, were killed or injured in Taliban suicide bomber attacks.

46.    The Taliban (often through the Haqqani Network, *see infra* Part II.B) also employed insider attacks carried out by members of the Afghan Army.  According to an August 2012 statement by Taliban commander Mullah Omar, Taliban terrorists "cleverly infiltrated in the ranks of the enemy according to the plan given to them last year."[28]  Mullah Omar expressly encouraged Afghan officers to defect and join the Taliban.  These attacks took place in all areas of Afghanistan, and the Taliban regularly claimed responsibility for them.  Many Plaintiffs in this case, or their family members, were killed or injured in Taliban insider attacks.

**B.    The Haqqani Network**

47.    The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s.  It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani.  The Haqqani Network is part of the Taliban.

48.    The Haqqani Network also has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory in Afghanistan.  After the September 11, 2001 attacks, the Haqqani Network provided sanctuary and support to bin Laden as he fled U.S. military action; Jalaluddin Haqqani himself announced that the Taliban would "retreat to the mountains and begin a long

---

[28] Bill Roggio, *Mullah Omar Addresses Green-on-Blue Attacks*, Long War J. (Aug. 16, 2012).

14

guerrilla war to reclaim our pure land from infidels" and "that Osama bin Laden is not only safe and sound, he is also in good spirits."[29]

49.    The Haqqani Network's close relationship with other terrorist groups helped spawn the modern terrorist syndicate operating in Afghanistan.  Senior Haqqani Network officials have indicated that the Haqqani Network and al-Qaeda operate as one group.[30]  And in July 2008, Jalaluddin Haqqani's son – 18-year-old Muhammad Omar Haqqani – was killed alongside a top al-Qaeda commander in southeast Afghanistan.  The Haqqani Network also maintains training camps and safehouses that are used by both al-Qaeda and Taliban operatives.

50.    On September 13, 2007, the United Nations sanctioned Sirajuddin Haqqani pursuant to the U.N.'s al-Qaeda-Taliban sanctions regime.  In its designation, the U.N. concluded, among other things, that Sirajuddin "participat[ed] in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of" "the Taliban" and "Al-Qaida"; "recruit[ed] for" or "otherwise support[ed] acts or activities of" "the Taliban" and "Al-Qaida"; was "one of the most prominent, influential, charismatic and experienced leaders within the Haqqani Network . . . and [had] been one of the major operational commanders of the network since 2004"; was "a key conduit for terrorist operations in Afghanistan and supporting activities in the Federally Administered Tribal Areas of Pakistan."

51.    By 2008, Sirajuddin Haqqani was simultaneously: (1) a senior al-Qaeda operative, leader, and attack planner, who served as the most important member of al-Qaeda's military

---

[29] Aslam Khan, *Taliban Leader Warns Of Long Guerilla War,* Gulf News UAE (Oct. 21, 2001); *Interview with Taliban Commander Maulvi Jalaluddin Haqqani*, The News (Oct. 20, 2001).

[30] *See* Bill Roggio, *An Interview With Mullah Sangeen*, Long War J. (Sept. 17, 2009).

council (essentially, its terrorist planning committee);[31] (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir).

52.     Other than Osama bin Laden, Sirajuddin Haqqani was the single most important al-Qaeda leader in Afghanistan and Pakistan after September 11.  By joining al-Qaeda management, Sirajuddin fostered a high degree of interoperability and cohesion between al-Qaeda and the Taliban, including its Haqqani Network, that greatly magnified the lethality of the syndicate's campaign.

53.     As a dual-hatted al-Qaeda/Taliban terrorist himself – and one who serves as a leader in both organizations – Sirajuddin Haqqani has openly welcomed al-Qaeda members to join and fight with the Haqqani Network and the rest of the Taliban.  According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council.  U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.[32]

54.     In spring 2010, Sirajuddin Haqqani publicly embraced his status as a member and leader of both al-Qaeda and the Taliban during an interview that was widely disseminated around the world.  In the interview, the questioner asked Sirajuddin whether the "mujahideen who emigrate[d] to the land of the Khorasan" – meaning al-Qaeda's foreign fighters in Afghanistan – "form[ed] any obstacle or burden on the Afghani people."  In response, Sirajuddin noted that al-Qaeda's foreign fighters "enlighten the road for [fighters from Taliban Afghanistan and Pakistan]

---

[31] Sirajuddin Haqqani's service on al-Qaeda's military council – publicly confirmed by declassified U.S. intelligence – necessarily means that Sirajuddin Haqqani swore an oath of allegiance to al-Qaeda, because al-Qaeda only permitted sworn al-Qaeda members to serve on its councils.

[32] Hindustan Times, *Al Qaeda Very Active In Afghanistan, Preparing For Attacks* (Apr. 13, 2016) ("The Taliban's current deputy commander, Siraj Haqqani, is head of the Haqqani Network and al Qaeda's top facilitator in Afghanistan, according to US officials.").

16

and they resist against the cross worshippers by cooperating with us and us with them in one trench."[33]

55.    In June 2010, an al-Qaeda memorandum, sent to bin Laden himself, documented Sirajuddin's terrorist operations in Afghanistan and Pakistan on behalf of al-Qaeda.

56.    In 2011, Sirajuddin Haqqani published and distributed 10,000 copies of a book he authored that encouraged Islamists to follow al-Qaeda's ways, praised al-Qaeda because it "terrifie[d]" its foes, and endorsed attacks against the United States worldwide.

57.    When Plaintiffs and/or their family members were attacked by al-Qaeda in Afghanistan between 2005 and 2022, Sirajuddin Haqqani, and the al-Qaeda and Taliban organizations he led, promoted deep cooperation amongst al-Qaeda (including its subsidiaries like al-Qaeda-in-Iraq), the Taliban (including its Haqqani Network), and the IRGC (including Hezbollah and the Qods Force).

58.    When Plaintiffs and/or their family members were attacked by al-Qaeda in Afghanistan between 2005 and 2022, Sirajuddin Haqqani served as the top syndicate polyterrorist responsible for coordinating key transnational-facing aspects of al-Qaeda's terrorist campaign in Afghanistan and, for coordinating with other al-Qaeda and affiliated terrorists worldwide.

59.    To this day, Sirajuddin Haqqani remains a senior member of al-Qaeda and a terrorist wanted by the United States for murder.[34]

---

[33] Bill Roggio, *Taliban Cooperation With al Qaeda 'Is At The Highest Limits' – Siraj Haqqani*, Long War J. (Apr. 15, 2010).

[34] For more than a decade, and continuing through to today, Sirajuddin Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans.  Along with his brothers, who were also (and remain) key Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Sirajuddin Haqqani personally spearheaded the syndicate's successful campaign on Kabul in August 2021.  Today, Sirajuddin Haqqani serves as the terrorist

60.     The U.S. Treasury Department has repeatedly recognized the links between Haqqani Network leaders and al-Qaeda.  For example, in July 2010, the U.S. Treasury Department designated Nasiruddin Haqqani, the brother of Sirajuddin Haqqani, pursuant to Executive Order 13224.[35]  The designation noted that Nasiruddin Haqqani had received funding via payments from al-Qaeda.[36]  And when the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a SDGT in 2011, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations."[37]

61.     On September 19, 2012, the U.S. State Department designated the Haqqani Network as a FTO.[38]

62.     The United States has also designated various Haqqani leaders as SDGTs.  On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States."[39]  In March 2009, the U.S. State Department put out a bounty of $5 million for information leading to his capture.[40]  In 2010 and 2011, the United States

---

responsible for the "Islamic Emirate of Afghanistan's" borders and guns, while his uncle Khalil and brothers have responsibilities relevant to intelligence and information.

[35] *See*, *e.g.*, Press Release, U.S. Treasury Dep't, *Treasury Targets Taliban and Haqqani Network Leadership: Treasury Designates Three Financiers Operating in Afghanistan and Pakistan* (Jun. 22, 2010).

[36] *Id.*

[37] Press Release, U.S. Treasury Dep't, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[38] U.S. State Dep't, *Country Reports on Terrorism 2017* at 294 (Sept. 2018) ("*Country Reports on Terrorism 2017*").

[39] Notice, U.S. State Dep't, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Sarj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended* at 12499 (Mar. 7, 2008).

[40] Press Release, U.S. State Dep't, *Rewards For Justice: Sirajuddin Haqqani* (Mar. 25, 2009).

designated three other members of the Haqqani Family – Nasiruddin Haqqani, Badruddin Haqqani, and Khalil Al-Rahman Haqqani – as fundraisers and commanders of the Haqqani Network.  By February 2014, the U.S. State Department and the U.S. Treasury Department had designated 14 leaders in the Haqqani Network under Executive Order 13224.

63.    The Haqqani Network began supplying weapons to the Taliban in the mid-1990s when the Taliban was in its infancy.  It has operated as part of the Taliban since approximately 1995, when its founder Jalaluddin Haqqani swore allegiance to the Taliban after the Taliban captured Kabul.  Jalaluddin Haqqani was the Minister of Tribal and Border Affairs in the Taliban government until the United States invaded Afghanistan.

64.    The Haqqani Network is especially active in the southeastern parts of Afghanistan, particularly the provinces of Paktia, Paktika, and Khost, collectively called Loya Paktia.  It also developed a significant presence in the surrounding provinces of Kabul, Logar, Wardak, Ghazni, and Zabul.  Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in these areas.  The Haqqani Network leads the Taliban's Miramshah Shura – one of the four councils below the Taliban's leadership council – for Loya Paktia and provinces north towards Kabul.  Sirajuddin Haqqani explained in a 2010 interview that the Haqqani Network is "assigned by the Islamic Emirate in the southeastern front of Afghanistan (Paktia, Khost, Paktika) and we have mujahideen members [guerilla fighters] who are carrying out jihad in the north (provinces in northern Afghanistan) and in the south (provinces in southern Afghanistan), and they are operating under the Amirs of the provinces they are under."[41]  The Taliban relies on the Haqqani

---

[41] Bill Roggio, *Taliban Cooperation With al Qaeda 'Is At The Highest Limits' – Siraj Haqqani*, Long War J. (Apr. 15, 2010).

Network to carry out the Taliban's operations within the Haqqani Network's sphere of influence, permitting the Taliban to present a united terrorist front throughout much of the country.

65.    The Taliban's terrorist commanders and shadow governors in the Loya Paktia area are often members of the Haqqani Network.  As the U.S. State Department explained when it announced the designation of Mullah Sangeen Zadran as a SDGT, Sangeen Zadran served as the "Shadow Governor for Paktika province, Afghanistan and a commander of the Haqqani Network, a Taliban-affiliated group."[42]  Similarly, Abdul Aziz Abbasin is a "key commander in the Haqqani Network" and the Taliban's shadow governor for the Orgun District of Paktika Province.[43]

66.    The Haqqani Network's influence is not limited to the southeastern provinces. There is significant overlap between the broader leadership of the Taliban and the Haqqani Network.  Sirajuddin Haqqani (Jalaluddin's son and successor) has been a member of the Taliban's governing council since at least 2010.  Since 2015 he has been the Deputy Emir of the Taliban, the second-in-command in the Taliban's leadership.  He presently serves as the Taliban's First Deputy Leader of Afghanistan, as well as the Acting Minister of Interior Affairs.

67.    In particular, the Haqqani Network oversaw the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan.  Jalaluddin Haqqani planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government.  In October 2001, a purported Jihadist publication (as published online) described Jalaluddin as the "chief of the Taliban army."[44]  Indeed, in an interview published by Gulf News UAE, the interviewer

---

[42] Media Note, *Designation of Haqqani Network Commander Sangeen Zadran*, Office of the Spokesperson, U.S. State Dep't (Aug. 16, 2011).

[43] Bill Roggio, *US adds 5 al Qaeda, Taliban, Haqqani Network, and IMU facilitators to terrorist list*, Long War. J. (Sept. 29, 2011).

[44] Karachi Jasarat, Chief of Taliban Army Contacts Jamaat-i-Islami Chief (Oct. 11, 2001).

identified Jalaluddin as "the commander-in-chief of the Taliban's southern military command" –
akin to the Taliban army chief – "[and] Mullah Omar's top military strategist and commander."[45]
As for his son, Sirajuddin oversees Taliban terrorist operations throughout the country.

68.    According to Brigadier General Charles H. Cleveland, the chief spokesman for
United States and NATO forces in Afghanistan, as of 2016 Sirajuddin Haqqani "increasingly
runs the day-to-day military operations for the Taliban, and, we believe, is likely involved in
appointing shadow governors."[46]

69.    In 2016, the *New York Times* reported that, according to a senior Taliban
commander in southern Afghanistan, Sirajuddin Haqqani was in "constant contact" with Taliban
field commanders throughout Afghanistan, including outside the Haqqani Network's area of
particular influence in the southeast.[47]  According to the commander, all field commanders must
contact Sirajuddin Haqqani for permission before launching a surge or changing fighting plans.

70.    The Haqqani Network also influenced Taliban strategic decisions about which
types of attacks to employ.  The Haqqani Network was the first to use suicide bombings in
Afghanistan, an innovation that al-Qaeda taught it.  The Haqqani Network also was involved in
the rising number of Taliban insider attacks – attacks that strategically undermine relations
between U.S. and Afghan forces.  By 2007, Army Lieutenant Colonel Dave Anders, the director
of operations for Combined Joint Task Force-82, explained that "Siraj[uddin Haqqani] is the one
dictating the new parameters of brutality associated with Taliban senior leadership" employing

---

[45] Aslam Khan, *Taliban Leader Warns Of Long Guerilla War,* Gulf News UAE (Oct. 21,
2001), https://gulfnews.com/uae/taliban-leader-warns-of-long-guerrilla-war-1.427860.

[46] Mujib Mashal, *Haqqanis Steering Deadlier Taliban in Afghanistan, Officials Say*, N.Y.
Times (May 7, 2016).

[47] *Id.*

"[k]idnappings, assassinations, beheading women, indiscriminate killings and suicide bombers."[48]

71.     The Haqqani Network's influence within the broader Taliban is not limited to planning and authorizing attacks.  Even outside of the Haqqani Network's traditional stronghold, its members often commit attacks along with other Taliban terrorists.  For example, in early 2009 the Haqqani Network was operating in the southern provinces of Helmand and Kandahar.  A spokesman for the Taliban confirmed that the Haqqani Network was operating in "Kandahar as well as nearby Helmand province to provide training, support – particularly in bomb-making – and to carry out attacks."

72.     In 2013, "[a] combined force in … Kandahar [] arrested a Haqqani network facilitator who managed supply routes from [Kandahar City] to other provinces" and was "also [] believed to have been instrumental in the acquisition and distribution of lethal aid to Haqqani fighters for attacks against Afghan and coalition forces."[49]  And a successful 2017 Taliban attack in Kandahar against the U.A.E. ambassador to Afghanistan, Juma Mohammad Abdullah al-Kaabi, has been attributed to the Haqqani Network.

73.     Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban.[50]  The Taliban, for its part, has likewise rejected claims that the Haqqani Network is a separate entity from the Taliban.[51]

---

[48] Bill Roggio, *Targeting Taliban Commander Siraj Haqqani*, Long War J. (Oct. 20, 2007).

[49] News, U.S. Dep't of Def., *Afghan, Coalition Forces Kill Insurgents in Logar Province* (Feb. 20, 2013), https://archive.defense.gov/news/newsarticle.aspx?id=119329.

[50] Bill Roggio, *US Military Searches for Kabul Attack Network Members*, Long War J. (Apr. 27, 2016).

[51] Bill Roggio, *Taliban Call Haqqani Network a 'Conjured Entity'*, Long War J. (Sept. 9, 2012).

74.     The Haqqani Network is often considered the most radical part of the Taliban. Like the Taliban, it relies on terrorist attacks – including suicide bombings, IED attacks, insider attacks, and complex attacks – rather than open combat.[52]  Like the rest of the Taliban, the Haqqani Network routinely violates the laws of war and does not comply with the Geneva Conventions.

75.     Many Plaintiffs, or their family members, were killed or injured in attacks by the Haqqani Network, for which Sirajuddin Haqqani played a key role.  For example, the Haqqani Network conducted terrorist attacks in the Loya Paktia area of Afghanistan.

76.     After Sirajuddin Haqqani helped lead the syndicate's conquest of Afghanistan generally (and Kabul, among other targets, in particular) in 2021, Sirajuddin made public statements in which he effectively admitted, in sum and substance, to having played a key role in each successful syndicate suicide attack targeting the United States in Afghanistan from approximately 2006 through 2021.  When Sirajuddin publicly made such admissions, he did so while he was (as he remains) an international terrorist who was on the FBI's Most Wanted List for his direct involvement in suicide attacks targeting the United States in Afghanistan.

C.     Al-Qaeda

77.     Osama bin Laden formed al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan.  For decades, al-Qaeda has been a Sunni Islamic terrorist organization with the purpose of destroying the United States.

78.     Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group capable of launching attacks around the world.

---

[52] Bill Roggio, *Haqqani Network Promotes Suicide, IED Attacks, and Ambushes in 'Caravan of Heroes'*, Long War J. (Apr. 10, 2015).

23

After moving to Sudan in the early 1990s, al-Qaeda's leadership returned to Afghanistan in approximately 1996, where it was sheltered by the Taliban for the next five years. One scholar who surveyed first-hand accounts of the initial meeting between bin Laden and the Taliban reported that the initial meetings "emphasize[d] the Taliban's humble attitude toward the Saudi guest and their immediate readiness to serve him."[53] While under the Taliban's shelter, Osama bin Laden declared war on the United States in a published fatwa (religious decree) in 1996.[54]

79.    In return for the Taliban's safe harbor, al-Qaeda provided substantial resources to the Taliban. By March 1997, Osama bin Laden had met with Mullah Omar personally and offered to lend his fighters to the Taliban in their battles with northern factions that were still resisting Taliban rule. As bin Laden's deputy, Abu Hafs al-Masri, wrote at the time, "The [Taliban] movement is a capable Islamic entity and it is possible that it can be a turning point for the betterment of the Islamic world. The movement needs a vision and it needs support. It needs someone who will give it a military strategy. And it needs to build a military force which is suitable for the situation in Afghanistan."[55] Al-Qaeda supplied the strategy and support that the Taliban needed to morph into a deadly terrorist group capable of inflicting mass casualties on Americans. During this time period, al-Qaeda also shared technical knowledge with the Taliban and reportedly paid the Taliban $10 million to $20 million a year for shelter.

---

[53] Anne Stenersen, *Al-Qaida in Afghanistan* at 58 (Cambridge Univ. Press, 2017) ("Stenersen, *Al-Qaida in Afghanistan*").

[54] *Id.* at 62-63; *Osama bin Laden,* Counter Extremism Project, https://www.counterextremism.com/extremists/osama-bin-laden; *The 9/11 Commission Report* at 48, National Commission on Terrorist Attacks Upon the United States, https://govinfo.library.unt.edu/911/report/911Report.pdf.

[55] Stenersen, *Al-Qaida in Afghanistan* at 67-68.

80.     At the same time that bin Laden was cementing his ties with the Taliban, he was escalating his attacks on the United States.  In 1998, while under the Taliban's protection, he declared a global jihad calling on all Muslims to kill Americans at any opportunity.

81.     On August 7, 1998, al-Qaeda suicide bombers in explosive-laden trucks simultaneously attacked the U.S. embassies in Kenya and Tanzania, killing more than 200 people and wounding more than 5,000 others.  The United States responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan and demanded that Mullah Omar turn over bin Laden.  He refused.

82.     As a result of these and other terrorist attacks, the U.S. State Department designated al-Qaeda as a FTO on October 8, 1999.  A week later the U.N. called for sanctions against the Taliban unless it expelled bin Laden from Afghanistan.  Again, the Taliban refused.

83.     In the spring of 2001, bin Laden, on behalf of al-Qaeda, pledged an oath of allegiance to Mullah Omar and the Taliban.  A few months later, on September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands.  A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93.  The United States demanded once again that the Taliban turn over bin Laden, and once again the Taliban refused.  A U.S.-led coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.

84.     Al-Qaeda's and the Taliban's close relationship continued long after September 11.  In the years since, it has become clear that the al-Qaeda and Taliban organizations have been fused together:  al-Qaeda terrorists have often worked in close conjunction with Taliban terrorists and the affiliated Haqqani Network and Kabul Attack Network.  In May 2007, Taliban

official Mullah Dadullah said, "[W]e and al-Qaeda are as one."[56]  In early 2009, a military-intelligence official was quoted as saying, "The line between the Taliban and al Qaeda is increasingly blurred, especially from a command and control perspective."[57]  By the end of that year, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly. "We are deeply concerned about the growing level of collusion between the Taliban and al Qaeda," he told *The Wall Street Journal*.[58]  And as Lieutenant General Ronald L. Burgess, Jr. reported in a February 2010 Hearing of the Senate Select Committee on Intelligence, "al Qaeda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."[59]

85.     The Taliban and al-Qaeda have remained intimately intertwined.  For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced his acceptance of the pledge the following day.[60]  When Mansour was killed in May 2016, Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada.

86.     Often, individual Taliban leaders are also members of al-Qaeda.  For example, in late 2011 or early 2012 the Taliban appointed Sheikh Mohammed Aminullah, who has close ties to al-Qaeda, as the head of its Peshawar Regional Military Shura, which is responsible for attacks in northern and eastern Afghanistan.

---

[56] Thomas Ruttig, *The Other Side* 23, Afghanistan Analysts Network (July 2009).

[57] Bill Roggio, *Al Qaeda Builds A 'Shadow Army'*, Wash. Times (Feb. 13, 2009).

[58] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).

[59] Transcript, Hr'g Of The Senate Select Committee On Intelligence Subject: "Current And Projected Threats To The United States, Fed. News Serv., 2010 WLNR 27828348 (Feb. 2, 2010).

[60] Thomas Joscelyn & Bill Roggio, *New Taliban Emir Accepts al Qaeda's Oath Of Allegiance*, Long War J. (Aug. 14, 2015).

87.    Al-Qaeda also encouraged the Taliban to embrace new terrorist techniques.  In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq.  Taliban terrorists had previously viewed suicide attacks as taboo, but al-Qaeda convinced them they were religiously permissible.  Indeed, al-Qaeda trumpeted their ideological success online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"[61]  With al-Qaeda's encouragement and training, the number of such suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005 and more than 100 in 2006.  Al-Qaeda further encouraged these attacks by paying the families of suicide bombers in Afghanistan.

88.    Al-Qaeda's role in that suicide-bombing trend was pivotal.  As Islamic history scholar Bryan Glyn Williams explained, "Al Qaeda operatives carried out two to three [suicide] bombings per year on the Afghan government and NATO troops from 2002 to 2004 that were meant to demonstrate the effectiveness of this alien tactic to the local Taliban.  These demonstrative acts and videos of successful [Al Qaeda] suicide bombings in Iraq seem to have convinced the Taliban to condone the previously taboo tactic of suicide bombing."[62]

89.    Al-Qaeda and the Taliban embraced a "joint cell" model of terrorism not unlike that practiced by Lebanese Hezbollah and the IRGC's proxy in Iraq, Jaysh al-Mahdi.  Under the syndicate's "joint cell" approach in Afghanistan, al-Qaeda operatives also served as embedded trainers, intelligence operatives, religious advisers, and attack planners within Taliban cells.  These experienced trainers provided instructions, funding, and resources for conducting local

---

[61] Brian Glyn Williams, *Suicide Bombings In Afghanistan*, Jane's Islamic Affairs Analyst at 5 (Sept. 2007).
[62] Bryan Glyn Williams, *Afghanistan Declassified: A Guide to America's Longest War* at 202 (Univ. Penn. Press 2012).

and international attacks.  By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans.  For example, al-Qaeda members trained Taliban commanders in bomb-making techniques.  Al-Qaeda also invited Taliban commanders to Iraq, where they learned how to make armor-penetrating "shaped" charges,[63] a type of IED later known as an EFP.  Taliban trainees also learned how to use remote controls and timers, and urban warfare tactics.

90.    The syndicate's "joint cell" strategy mirrored that of the U.S. military.  As one writer put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do – as trainers and force multipliers."[64]

91.    The syndicate's "joint cell" approach also benefited from the syndicate's deployment of dual-hatted terrorists who served as sworn members of both al-Qaeda and the Taliban.  While Sirajuddin Haqqani was the most famous such dual-hatted al-Qaeda/Taliban terrorist, he was far from alone – many of the syndicate's other key leaders were similarly dual-hatted.  For example, Sirajuddin's brother, Khalil Haqqani, was – like Sirajuddin – a terrorist who served both al-Qaeda and the Taliban.

92.    Similarly, from the mid-2000s until late 2013, Ahmed Jan Wazir was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and the Taliban's Haqqani Network, in which he provided financial and material support to both organizations.  In 2008, al-Qaeda and the Taliban (including its Haqqani Network) jointly appointed Wazir to lead their combined cell in Ghazni Province, Afghanistan.  Thereafter, Wazir served as an operative for al-Qaeda and the

---

[63] Sami Yousafzai, *Unholy Allies*, Newsweek (Sept. 25, 2005).

[64] Peter Bergen, *The Front*, New Republic (Oct. 19, 2009), https://newrepublic.com/article/70376/the-front.

Taliban, including its Haqqani Network, until his death in an American airstrike on November

21, 2013.  Wazir led a joint al-Qaeda/Taliban cell based in Ghazni, which committed attacks

against Americans in Ghazni and in Kabul (the latter as a part of the Kabul Attack Network).[65]

93.    By the mid-2000s, al-Qaeda's partnership with the Haqqani Network had

facilitated the emergence of a network of al-Qaeda training camps in North Waziristan.

According to a declassified 2008 Defense Intelligence Agency intelligence report:

> [Sirajuddin] Haqqani is also affiliated with the several foreign fighter (ff) training
> facilities that are controlled by or associated with al Qaeda (AQ) in North Waziristan. . . .
> A list and brief description of each facility follows . . .
>
> A.  Mohammad Taher ((Yuldashov)), leader of the Islamic Movement of Uzbekistan
> (IMU), and his 60 bodyguards are staying at an AQ training center in Miram Shah Dand.
>
> B.  There is an al-Qaeda training center located at the Miskeen and Khaisur in Miram
> Shah.  Approximately 45 U/I Arabs and Uzbeks receive training there.
>
> C.  An AQ training facility called "Shaki Massod" is located in Miram Shah and over 200
> AQ members (NFI) reside there; Usama bin Laden has been seen in this center (NFI).
>
> D.  Another AQ training facility is located at Spin-Qamar in Masood District of Northern
> Waziristan.  Over 80 Arabs receive training there (NFI).[66]

---

[65] On June 21, 2011, the U.S. designated Wazir as an SDGT.  On January 6, 2012, the United
Nations followed the U.S. lead and designated Wazir under its al-Qaeda/Taliban sanctions
regime.  In its designation, the U.N. observed that "Taliban and Al-Qaida militants appointed
Ahmed Jan Wazir as a Taliban commander in Ghazni Province" "[i]n 2008" and, among other
things, that Wazir: served as a "[k]ey commander of the Haqqani Network"; "[a]ct[ed] as deputy,
spokesperson and advisor for Haqqani Network senior leader Sirajuddin Jallaloudine Haqqani";
"[l]iaise[d] with the Taliban Supreme Council"; had "travelled abroad" "with senior Haqqani
Network members to the Gulf"; "[l]iaise[d] with and provide[d] Taliban commanders in
Ghazni . . . with money, weapons, communications equipment and supplies"; "conduct[ed]
meetings on behalf of the Haqqani Network"; "represented the Haqqani Network at the Taliban's
shura and has served as a conduit between the Haqqani Network and the Taliban in Ghazni
Province, Afghanistan"; and "provided" other terrorists "in Ghazni Province with money and
supplies, including weapons and communications equipment."

[66] Defense Intelligence Agency, *Location and Activities of the Training Centers Affiliated
with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and
Activities of Sarajuddin ((Haqqani))*, Intelligence Information Report (Apr. 16, 2008),
https://www.dia.mil/FOIA/FOIA-Electronic-Reading-Room/FOIA-Reading-Room-Other-
Available-Records/FileId/155424/.

94.     Al-Qaeda has also established multiple training camps within Afghanistan reportedly "hosted by the Taliban."[67]  One such camp covered nearly 30 square miles and contained heavy weapons, IED-making material, anti-aircraft weapons, rocket-propelled grenade systems, machine guns, pistols, rifles, and ammunition.

95.     On top of the myriad forms of support detailed above, al-Qaeda also jointly planned and authorized terrorist attacks that the Taliban carried out.  Those joint planning sessions often occurred in meetings in which al-Qaeda, the Taliban, and other members of the al-Qaeda-Taliban syndicate (such as Lashkar-e-Taiba) would confer about particular geographies and targets to attack.[68]  The close operational coordination not only manifested itself in the Kabul Attack Network, but also provided a broader terrorist superstructure that organized the insurgency throughout Afghanistan.  In observing that this superstructure formed an Afghan-Pakistani "syndicate" of sorts, a former CIA analyst and White House advisor documented several notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the intricate connections between al Qaeda and its allies in Pakistan and Afghanistan."[69]  Those intimate connections enhanced the lethality of the overall anti-American insurgency.

96.     Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates the planning and authorization activities of the al-Qaeda-Taliban syndicate.  For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was a "high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami

---

[67] Thomas Joscelyn and Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

[68] *The al Qaeda-Taliban Connection*.

[69] Bruce Riedel, *Deadly Embrace: Pakistan, America, And The Future Of The Global Jihad* at 100 (Brookings Inst. Press 2d ed. 2011).

Gulbuddin ("HIG"),] and Taliban forces within Afghanistan," which the leaders of the respective terrorist groups "envisioned [as a] new coalition of HIG, Al Qaeda, and Taliban during a meeting in Pakistan in early spring 2003."[70]  Another purported Gitmo detainee file quoted by Messrs. Roggio and Joscelyn concerning Haroon al Afghani, a dual-hatted al-Qaeda/HIG terrorist, contained the following intelligence report:

> [Afghani] is assessed to have attended a joint operations meeting among extremist elements in mid-2006.  A letter describing an 11 August 2006 meeting between commanders of the Taliban, al Qaeda, [Lashkar e Taiba], . . . and the Islamic Party (probably a reference to the HIG), disclosed that the groups decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations.[71]

97.     Taken together, these reports "demonstrate a high degree of collusion between al Qaeda and other terrorist groups" as part of a "jihadist hydra" that shares the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."[72]  One al-Qaeda operative, whom U.S. officials characterized as "an important al-Qaida planner and explosives expert," Ghazwan al-Yemeni, trained Taliban members in Pakistan.[73]

98.     Al-Qaeda terrorists also regularly attacked U.S. forces alongside Taliban terrorists, including in some of the attacks that killed or injured Plaintiffs.  For example, in the early 2000s, al-Qaeda's third-ranking member participated in attacks on Americans in Afghanistan alongside Taliban terrorists under the command of Sirajuddin Haqqani, who was himself a dual-hatted al-Qaeda/Taliban terrorist.

---

[70] *The al Qaeda – Taliban Connection*.

[71] *Id.*

[72] *Id.*

[73] Evan F. Kohlmann, *Al-Qa'ida's Yemeni Expatriate Faction in Pakistan*, CTC Sentinel at 11-12 (Jan. 2011).

D.     **The Kabul Attack Network**

99.     The Kabul Attack Network is the operational manifestation of the terrorist syndicate led by al-Qaeda and the Taliban, including its Haqqani Network.  Specifically, the Kabul Attack Network is a set of terrorist cells focused on attacks against targets in Kabul, the capital, with supporting efforts extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Ghazni, and Zabul.[74]  It is particularly active around key waypoints and transit routes on the way to Kabul, including Wardak, Ghazni City, and areas of Logar Province. The Kabul Attack Network was responsible for suicide bombings and some other attacks on Americans in these areas.[75]

100.     The Kabul Attack Network's members include the Taliban, including its Haqqani Network, as well as al-Qaeda, Lashkar-e-Taiba, and other terrorists active in the Kabul area.

101.     The Kabul Attack Network is led by Mullah Dawood, the Taliban's shadow governor for Kabul who is also a Taliban and Haqqani Network commander, and Taj Mir Jawad, a top commander in the Haqqani Network with a long history of high-profile attacks.

102.     According to an ISAF public affairs officer, the "Haqqani Network is deeply entrenched in the Kabul Attack Network, specifically in the facilitation of weapons and fighters into the area south of Kabul in Logar and Wardak."[76]  Senior Haqqani Network leaders often planned and executed terrorist attacks by the Kabul Attack Network, including giving tactical advice during attacks.

---

[74] Bill Roggio, *Karzai Assassination Plotters Part of Kabul Attack Network*, Long War J. (Oct. 5, 2011).

[75] *See* Bill Roggio, *Afghan Intel Captures Taliban Commander Involved In Targeting 'Foreigners' In Kabul*, Long War J. (Mar. 31, 2015).

[76] Bill Roggio, *Senior Taliban Commander Killed in Eastern Afghanistan*, Long War J. (Aug. 20, 2010).

103.    Many Plaintiffs, or their family members, were killed or injured in attacks by the Kabul Attack Network.

## III.    IRAN PROVIDED MATERIAL SUPPORT TO THE TALIBAN AND AFFILIATED TERRORIST GROUPS IN AFGHANISTAN

### A.    Iran Provided Material Support For Anti-American Terrorism In Afghanistan To Undermine The U.S. Mission There

104.    Although there are religious differences between the Shiite Iranian regime and the Sunni Taliban organization, those differences have not deterred Iran from supporting the Taliban's terrorist activities.  Iran and the Taliban share a core geopolitical aim:  to inflict mass casualties on Americans in the region.  As two military-intelligence scholars observed, "the Iranian regime is ideologically and religiously opposed to the Taliban, [but] it nevertheless views the group as a useful counterweight to the United States."[77]  Similarly, as a Taliban commander stated in 2010 of Iran, "Our religions and our histories are different, but our target is the same – we both want to kill Americans."[78]  Sectarian distinctions aside, Iran has supported and funded attacks by the Taliban on U.S. and allied forces in Afghanistan to harm the United States.

105.    The Fourth Corps of the Qods Force, one of its four regional commands, implements Iran's foreign policy in Afghanistan.[79]  During the relevant timeframe, the Qods Force did so largely by providing the Taliban (including its Haqqani Network) with material support for terrorist attacks in Afghanistan.  The Fourth Corps' al-Ansar Command Center is

---

[77] *Iran's Balancing Act* at 5.

[78] Bill Roggio, *Taliban Commander Linked To Al Qaeda, Iran, Killed In US Strike In Western Afghanistan*, Long War J. (July 16, 2010).

[79] *JIEDDO Report* at 5.

based in Iran's second-largest city, Mashhad, near the border with Afghanistan.[80]  Mashhad

naturally serves as a stopping point between Afghanistan and Tehran, Iran's capital.[81]

106.    Following the September 11 attacks on the United States, Iran met with senior

Taliban officials to offer military aid to support the Taliban's fight against U.S.-led Coalition

forces.  Iran planned that meeting and hosted it on the Iranian side of the Afghanistan border.  As

part of this initial offer of support, Iran pledged to sell advanced military equipment to the

Taliban for use against U.S. and allied forces, boasted of Iran's ability to track U.S. troop

movements, and promised to allow terrorists entering Afghanistan to travel through Iranian

territory.  Iran also provided safe harbor to Taliban leaders who escaped U.S. forces.

107.    Immediately following the U.S. invasion of Afghanistan, Iran made a pretense of

professing support for the U.S. and NATO mission, but in reality was already seeking to

undermine it.  In February 2002, then-CIA Director George J. Tenet testified before Congress

that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being

eclipsed by Iranian efforts to undermine US influence there.  While Iran's officials express a

shared interest in a stable government in Afghanistan, its security forces appear bent on

countering the US presence."[82]  As one scholar explained, Iran "feared the US might use

Afghanistan as a base from which to launch a kinetic attack on Iran.  The Taliban insurgency

thus became viewed by Tehran as a tool with which to keep American forces preoccupied."[83]

---

[80] Joseph Felter & Brian Fishman, *Iranian Strategy in Iraq, Politics and "Other Means"* at 18, Combating Terrorism Center (Oct. 13, 2008).

[81] *JIEDDO Report* at 5.

[82] *DCI Testimony:  Converging Dangers in a Post 9/11 World*, Central Intelligence Agency (Feb. 6, 2002).

[83] Farhad Rezaei, *Iran and the Taliban:  A Tactical Alliance?*, The Begin-Sadat Center for Strategic Studies (Jan. 15, 2019) ("*Iran and the Taliban:  A Tactical Alliance?*").

108.    The U.S. government documented Iran's escalating support for the Taliban terrorists over the course of the United States' involvement in Afghanistan.  In April 2007, General Peter Pace, Chairman of the U.S. Joint Chiefs of Staff, stated that Iranian explosives had been captured in Kandahar Province en route to the Taliban but acknowledged that it was not yet entirely clear who within Iran was responsible.[84]  The next day, U.S. Assistant Secretary of State Richard Boucher described "a series of indicators that Iran is maybe getting more involved in an unhealthy way in Afghanistan."[85]

109.    Those indicators rapidly grew in intensity, and soon there was little doubt that Iran was actively sponsoring the Taliban terrorists as a core part of its foreign policy.  A purported May 2007 U.S. State Department cable (as published online), for example, reported that Afghan President Hamid Karzai had expressed concerns "over Iranian agents engaging Taliban and supplying them with weapons."  A purported July 2007 U.S. State Department cable (as published online) similarly reported that Taliban terrorists had received "light weapons and grenade launchers [that] bore the stamps of the Iranian factories where they were manufactured, primarily in 2006 and 2007."  The same cable explained that the fighters claimed they had received training in Iran and had been promised access to antiaircraft rockets by Iranian officials. A purported military-intelligence summary the next month (as published online), reported on an "'alarmingly rapid increase' in Iranian presence in Afghanistan."

---

[84] Breffni O'Rourke, *Afghanistan:  U.S. Says Iranian-Made Weapons Found*, RadioFreeEurope (Apr. 18, 2007).
[85] *Id.*

110.    When the U.S. Treasury Department designated the Qods Force as a SDGT later

in 2007, it confirmed that the "Qods Force provides weapons and financial support to the Taliban

to support anti-U.S. and anti-Coalition activity in Afghanistan."[86]  As the designation explained:

> The Qods Force is the Iranian regime's primary instrument for providing lethal support to
> the Taliban.  The Qods Force provides weapons and financial support to the Taliban to
> support anti-U.S. and anti-Coalition activity in Afghanistan.  Since at least 2006, Iran has
> arranged frequent shipments of small arms and associated ammunition, rocket propelled
> grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable
> defense systems to the Taliban. . . .  Through Qods Force material support to the Taliban,
> we believe Iran is seeking to inflict casualties on U.S. and NATO forces.[87]

111.    Similar observations continued in 2008.  According to the U.S. State

Department's 2008 Country Reports on Terrorism:  "The Qods Force, an elite branch of the

Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating

and supporting terrorists abroad.  The Qods Force provided aid in the form of weapons, training,

and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based

militants, and Taliban fighters in Afghanistan."[88]

112.    The U.S. government's JIEDDO Report recognized that "Iran's intentions are the

same in both Iraq and Afghanistan:  to develop, fund and arm proxy networks to leverage against

the perceived U.S. aim of pursuing an active regime change doctrine in Iran."[89]  Similarly, a

purported January 2010 cable (as published online) explained that senior officials from the

United Arab Emirates' State Security Department had accused Iran, through the IRGC, of

supporting the Taliban by providing money and weapons, smuggling drugs, and facilitating the

movement of Taliban leaders and fighters.

---

[86] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[87] *Id.*

[88] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

[89] *JIEDDO Report* at 5.

113.    According to another purported February 2010 cable (as published online), President Karzai's Chief of Staff and former Ambassador to Iran, Omar Daudzai, reported that Iranian officials were no longer denying Iran's support for the Taliban in Afghanistan, instead remaining silent in the face of the assertion by the Government of Afghanistan.

114.    By April 2010, the U.S. Department of Defense reported that Iran was "covertly" supporting the Taliban.  "Arms caches have been recently uncovered with large amounts of Iranian manufactured weapons, to include l07mm rockets, which we assess IRGC-QF delivered to Afghan militants." [90]  It further explained that "Tehran's support to the Taliban is inconsistent with their historic enmity, but fits with Iran's strategy of backing many groups to ensure that it will have a positive relationship with the eventual leaders."[91]

115.    On August 3, 2010, the U.S. Treasury Department – pursuant to Executive Order 13224 – designated General Hossein Musavi and Colonel Hasan Mortezavi, senior officials in the Qods Force, as SDGTs for their roles in supporting the Taliban.[92]  General Musavi was the leader of the Ansar Corps, also known as the Fourth Corps, the branch of the Qods Force responsible for carrying out activities within Afghanistan.[93]  The U.S. Treasury Department found that both General Musavi and Colonel Mortezavi, acting in their capacity as senior Qods Force officers, had provided "financial and material support to the Taliban."[94]  The U.S.

---

[90] Unclassified Report on Military Power of Iran (Apr. 2010), https://fas.org/man/eprint/dod_iran_2010.pdf.

[91] *Id*.

[92] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

[93] *Id*.

[94] *Id*.

Treasury Department further concluded that "the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."[95]

116.    General David Petraeus, then the Commander of the ISAF, testified before the Senate Armed Services Committee in March 2011 that Iran "without question" supplied weapons, training, and funding to the Taliban in order to "make life difficult" for U.S. and NATO forces in Afghanistan.[96]

117.    When the U.S. Department of Defense provided Congress with its Annual Report on Military Power of Iran in April 2012, it explained that, even though Iranian "support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence."[97]  By means of "the IRGC-QF, Iran provides material support to terrorist or militant groups such as . . . the Taliban."[98]  The U.S. Department of Defense characterized the support as part of a "grand strategy" to "challeng[e] U.S. influence."[99]

118.    In its 2012 Report on Progress Toward Security and Stability in Afghanistan, the U.S. Department of Defense reported to Congress that Iran was engaging in "covert activities" in Afghanistan, including the provision of weapons and training to the Taliban.[100]  As the report explained, "Since 2007, Coalition and Afghan forces have interdicted several shipments of

---

[95] *Id.*

[96] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40 (Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

[97] *Annual Report on Military Power of Iran* 2 (Apr. 2012).

[98] *Id.* at 3.

[99] *Id.* at 1.

[100] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 148 (Dec. 2012).

Iranian weapons.  Tehran's relationship with the insurgency, although not ideologically based, is consistent with Iran's short- to mid-term goal of undermining Coalition efforts and opposing the international military presence in Afghanistan."[101]

119.    Less than two years later, the U.S. Treasury Department concluded that the Qods Force "utilized now-detained Afghan associate, Sayyed Kamal Musavi, who was designated today, to plan and execute attacks in Afghanistan."  It further confirmed that "[t]wo IRGC-QF officers also designated today, Alireza Hemmati and Akbar Seyed Alhosseini, provided logistical support to this associate."[102]  Similarly, according to a Taliban commander in central Afghanistan in 2015:  "Iran supplies us with whatever we need."[103]

120.    In 2016, Taliban leader Mullah Mansour was killed by an American drone strike while returning to Afghanistan from Tehran, where he had been meeting with Iranian security officials, and possibly directly with Ayatollah Ali Khameni, to discuss tactical coordination of Taliban terrorist activities in Afghanistan.  He had made at least two visits to Iran since 2013.

121.    Iran's support for terrorist groups in Afghanistan has continued.  The U.S. State Department stated in 2017 that "Iran is responsible for intensifying multiple conflicts and undermining the legitimate governments of, and U.S. interests in, Afghanistan . . . ."[104]  The U.S. Department of Defense similarly confirmed that Iran "provides some support to the Taliban and

---

[101] *Id.*

[102] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[103] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

[104] *Country Reports on Terrorism 2017* at Foreword.

Haqqani Network."[105]  In May 2018, U.S. Secretary of State Michael Pompeo publicly accused

Iran of supporting the Taliban and other terrorist groups in Afghanistan.[106]

122.    In October 2018, the U.S. Treasury Department, pursuant to Executive Order

13224, designated additional Qods Force officials "for acting for or on behalf of IRGC-QF and

for assisting in, sponsoring, or providing financial, material, or technological support for, or

financial or other services to or in support of, the Taliban."[107]  The U.S. Treasury Department

acted along with the six other member nations of the Terrorist Financing Targeting Center – a

multinational, cooperative effort to combat terrorism in the Middle East.[108]

123.    The Secretary of Iran's Supreme National Security Council, Ali Shamkhani,

publicly acknowledged Iran's support for the Taliban in January 2019, claiming that it was

designed to "curb[] the security problems in Afghanistan."[109]

124.    Most recently, the United States has recognized Iran's support of the Taliban in

the aftermath of Qassem Soleimani's death.  In a press conference in the days after the killing of

General Soleimani, Secretary of State Michael Pompeo publicly accused Iran of backing the

Taliban and associated groups, including its Haqqani Network.

125.    Iran, in turn, signaled its continued focus on destabilizing U.S. forces in

Afghanistan by appointing General Esmail Ghaani ("Ghaani" or "Qaani"), the former head of

---

[105] U.S. Dep't of Def., *Enhancing Security and Stability in Afghanistan at 21* (June 2017).

[106] *Mike Pompeo speech:  What are the 12 demands given to Iran?*, Al Jazeera News (May 21, 2018).

[107] Press Release, U.S. Treasury Dep't, *Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters* (Oct. 23, 2018).

[108] *Mike Pompeo speech:  What are the 12 demands given to Iran?*, Al Jazeera News (May 21, 2018); Press Release, U.S. Treasury Dep't, *U.S. and Saudi Arabia to Co-Chair New Terrorist Financing Targeting Center* (May 1, 2017).

[109] *Iran and the Taliban:  A Tactical Alliance?*

Iran's Qods Force branch in Afghanistan, to be the top commander of the Qods Force. General Ghaani traveled to Afghanistan in 2018 as the deputy ambassador of Iran to Kabul and remains focused on cultivating Iran's relationship with the Taliban in Afghanistan.

126.    The Taliban's reaction to Soleimani's death similarly recognized Iran's support for its terrorist activities. A Taliban statement condemned American forces for the attack on Soleimani and expressed regret for his "martyrdom." Additional details were reported in Taliban-aligned publications about Soleimani's support for the Taliban, including his meeting with Taliban delegations in Iran, personally traveling to Afghanistan, and planning attacks.

127.    Consistent with the policy described above, Iran provided material support or resources for the acts of extrajudicial killing that killed or injured Plaintiffs or their family members. As explained below, that support took the form of "currency . . . lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, . . . and transportation."[110]

### B.    Iran Provided The Taliban With Weapons, Explosives, and Lethal Substances

128.    Iran provided material support or resources for the acts of extrajudicial killing that killed or injured Plaintiffs, or their family members, by providing (among other things) weapons, explosives, and lethal substances to the Taliban. Many of the weapons Iran provided were designed to be particularly effective against U.S. and allied forces operating in Afghanistan. For example, Iran provided the Taliban with anti-tank mines, long range rockets, explosively formed

---

[110] 18 U.S.C. § 2339A(b)(1).

penetrators, suicide vehicle-borne improvised explosive devices, rocket-propelled grenades, and explosives, which were uniquely suited for terrorist attacks on U.S. and allied forces.

129.    U.S. and allied forces seized large caches of Iran-made weapons and explosives in Afghanistan, many of which bore markings of Iranian origin.  A purported April 2007 military-intelligence summary (as published online) reported that "Iranian officials" were sending "to Afghanistan explosive devices and vehicles ready to be used as SVBIEDs [suicide vehicle-borne improvised explosive devices]."[111]  A purported U.S. government document from August of that year (as published online) also reported that the Afghanistan National Police had found evidence of a planning meeting for 25 suicide attacks in which it was stated that "[t]he materials for the bombs will be supplied by Iran Government . . . ."

130.    When the U.S. Treasury Department designated the Qods Force as a SDGT under Executive Order 13224 in October 2007, it specifically documented Iran's frequent shipments of weapons to the Taliban over at least the prior year.  A purported December 2007 military-intelligence summary (as published online) further reported that explosive samples in suicide vests seized from four suicide bombers "tasked by Taliban/Al-Qaeda leaders" with carrying out a suicide attack in Helmand Province were found to be a 92% probability of a match against a suspected sample of Iran-sourced C4.

131.    In January 2008, a raid by Afghan Police in Farah Province discovered 130 mines, of which the Afghan Police concluded 60 were Iran-made.[112]  That same month the U.S.

---

[111] *Afghanistan War Logs:  Anti-aircraft Missiles Clandestinely Transported From Iran Into Afghanistan – US Report*, The Guardian (July 25, 2010) ("*Anti-aircraft Missiles Clandestinely Transported*"); *see also Afghanistan War Logs: Afghan Government Seeking to Maintain Friendly Relations With Iran*, The Guardian (July 25, 2010) (referencing Iranian-made weapons recently found in Kandahar Province).

[112] *JIEDDO Report* at 10.

Ambassador to Afghanistan stated that "[t]here is no question that elements of insurgency have received weapons from Iran."[113]

132.    A purported June 2008 U.S. State Department cable (as published online) detailed multiple instances of Iran transferring arms to the Taliban in 2007 and 2008 and concluded that analyses of the weaponry "indicate the Taliban had access to Iranian weaponry produced as recently as 2006 and 2007."  Similarly, Afghan forces discovered a large cache of Iran-made explosives hidden near the Bakhshabad Dam in Farah Province in March 2009.  That same month, a purported military-intelligence summary (as published online) indicated that Taliban commanders had obtained portable surface-to-air missiles that originated in Iran.

133.    In May 2009, 44 bricks of Iran-made explosives and dozens of Iran-made mortars were discovered in a Taliban stronghold in Helmand Province.  Also in May 2009, Afghanistan border police intercepted a shipment crossing the Iranian border with dozens of anti-tank mines bound for Afghan militants.  And in September 2009, a purported military-intelligence summary report (as published online) claimed that the Taliban had received "six very powerful anti-tank mines from Iran" to target ISAF forces or important Afghan Police Officers.  That same year, the U.S. State Department reported that, "[s]ince at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 107mm rockets, and plastic explosives."[114]

134.    By 2011, Taliban terrorists were using Iran-made and -sourced long-range rockets to attack Coalition targets in Afghanistan.  In February 2011, British forces intercepted more than four dozen 122-milimeter rockets in Nimruz Province near the Iranian border, which gave

---

[113] Brian Bennett, *Iran Raises the Heat in Afghanistan*, Time (Feb. 22, 2008).
[114] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

the terrorists roughly double the range to attack Coalition targets.  British Foreign Secretary William Hague stated that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."[115]  The *Wall Street Journal* similarly reported that U.S. officials "said the rockets' markings, and the location of their discovery, give them a 'high degree' of confidence that they came from the Revolutionary Guard's overseas unit, the Qods Force."[116]  General Petraeus later confirmed that the Qods Force had supplied these rockets to a "known Taliban facilitator."[117]  The U.S. Department of Defense's 2011 Report on Progress Toward Security and Stability in Afghanistan similarly stated that "[f]orensics teams examined the rockets and confirmed an Iranian point of origin."[118]

135.    In June 2015, Iran hired smugglers to ferry supplies across the Iranian border and deliver them to Taliban units in Afghanistan.  These Iran-supplied weapons included 82mm mortars, light machine guns, AK-47 rifles, rocket-propelled grenades, and materials for making roadside bombs.

136.    Iran also provided EFPs to the Taliban.  EFPs are specially shaped charges, first used by Hezbollah in Lebanon, which typically employ a manufactured concave copper disk and an explosive-packed liner.  Thus, when Iran "smuggled [EFPs] to Afghan insurgents for use against U.S. Forces,"[119] Iran supplied the Taliban with a particularly lethal form of support.

---

[115] Julian Borger & Richard Norton-Taylor, *British Special Forces Seize Iranian Rockets In Afghanistan*, The Guardian (Mar. 9, 2011).

[116] Jay Solomon, *Iran Funnels New Weapons to Iraq and Afghanistan*, Wall St. J. (July 2, 2011).

[117] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40 (Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

[118] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 107 (Apr. 2011).

[119] *JIEDDO Report* at 1.

Indeed, Iran and Hezbollah designed EFPs to defeat armored vehicles like the ones used by Coalition forces in Afghanistan.  Those EFPs gave the Taliban a sophisticated anti-American weapon that it could not have obtained or deployed effectively on its own.

137.    The Taliban began using EFPs against Coalition forces in 2007.  A purported May 2007 U.S. State Department cable (as published online) reported on increased IED attacks and noted that recent attacks had been successful against armored ISAF vehicles, which indicated an Iran-supplied EFP.  Just days later another purported cable (as published online) reported that two EFPs had been discovered in April 2007 in Herat Province.  Through the summer of 2007, at least four EFPs were discovered in Herat Province, near other Iranian arms shipments.

138.    A purported September 2007 cable (as published online) stated that British forces "in Farah Province, Afghanistan intercepted an arms convoy they had been tracking from inside Iran," which included EFPs "of Iranian origin."  One week later, another purported cable (as published online) reported that, according to the U.K. Ambassador to NATO, Stewart Eldon, analysis of the munitions "showed a clear link to Iran and weapons the Iranian Revolutionary Guard Corps Qods Force has sent to insurgents in Iraq."  In 2008, the United Kingdom obtained proof that Iran was supplying the components for these EFPs.

139.    By 2007, the JIEDDO concluded that Iran was attempting to "inflict psychological damage" on the United States by smuggling EFPs "to Afghan insurgents for use against U.S. Forces."[120]

140.    In Afghanistan, Iranian EFPs earned the nickname "Dragons" because their explosive force was concentrated in the direction of the designated target rather than blasting in

---

[120] *JIEDDO Report* at 3.

all directions and dispersing the impact.[121]  Unlike ordinary mines that cause only minor damage to U.S. military vehicles, a Dragon "superbomb" can completely destroy a military Humvee or tank.[122]  According to one Taliban commander, "If you lay an ordinary mine, it will only cause minor damage to Humvees or one of their big tanks.  But if you lay a[n] [Iranian] Dragon, it will destroy it completely."[123]

141.    On information and belief, many Plaintiffs, or their family members, were severely injured or killed in terrorist attacks using Iran-supplied EFPs.

142.    Iran also provided the Taliban with rockets and similar weapons that were particularly effective against U.S. and Coalition forces.  A purported April 2007 military-intelligence summary (as published online), for example, reported that Iran had purchased anti-aircraft missiles from Algeria in late 2006 and then smuggled them from Mashhad, Iran – where the Fourth Corps of the Qods Force is headquartered – into Afghanistan.[124]  A purported Afghanistan Police Report from the next month (as published online) claimed that Iran intelligence sources issued three anti-aircraft launchers and ammunition to a Taliban commander. A purported March 2009 military intelligence summary (as published online) included intelligence reports of portable surface-to-air missiles arriving in Afghanistan from Iran. Similarly, a purported July 2009 military-intelligence summary (as published online) included reports of two dozen "Stinger" style surface-to-air missiles smuggled from Iran into Afghanistan.

---

[121] Kate Clark, *Taliban Claim Weapons Supplied By Iran*, The Telegraph (Sept. 14, 2008).
[122] *Id.*

[123] Steven O'Hern, *Iran's Revolutionary Guard: The Threat That Grows While America Sleeps* at 112 (Potomac Books, 1st ed. 2012) (internal quotations and citation omitted); Kate Clark, *Taliban claim weapons supplied by Iran*, The Telegraph (Sept. 14, 2008).

[124] *Anti-aircraft Missiles Clandestinely Transported*.

143.    According to a purported September 2009 military-intelligence summary (as published online), Taliban terrorists used an Iran-made rocket-propelled grenade launcher to shoot down Coalition helicopters.  The launcher was marked "Made In Iran."  The launcher was particularly effective because, unlike some other launchers, the Iran-made launcher had a scope that could be adjusted for targeting and was more accurate for shooting helicopters.

### C.    Iran Provided The Taliban With Lodging, Training, Expert Advice or Assistance, Safehouses, Personnel, and Transportation

144.    Iran also provided members of the Taliban and affiliated terrorist groups with lodging, training, expert advice or assistance, safe harbor, and transportation.  Iran taught the Taliban attack techniques that were particularly effective against U.S. and Coalition forces. Without the training from Iran and its agents, the Taliban would not have been able to launch as successful a terrorist campaign against American forces.

145.    According to a purported June 2006 military-intelligence summary (as published online), two members of the Iranian Intelligence Secret Service had arrived in Parwan Province to help Taliban members "in carrying out terrorist attacks against the [Afghanistan] governmental authorities and the [Coalition] members, especially against the Americans forces."[125]  A purported military-intelligence summary later that year (as published online), reported that injured Taliban terrorists were evacuating to Tehran for shelter.[126]

146.    Iran also trained Taliban fighters at camps within Iran.  For example, a purported April 2007 military intelligence summary (as published online) reported that "Iranian officials

---

[125] *Afghanistan War Logs: US Claims Iran Spies Helping Insurgents to Attack Coalition Forces,* The Guardian (July 25, 2010).

[126] *Afghanistan War Logs: Iranians Alleged to Be Sheltering Wounded Taliban Fighters in Tehran*, The Guardian (July 25, 2010).

train" members of the Taliban at an Iranian base in Birjand, Iran, near the Afghanistan border.[127] A similar purported June 2007 military intelligence summary (as published online) claimed that the IRGC was training roughly 300 foreign fighters in Iran, presumably to fight in Afghanistan.

147.    A purported military-intelligence summary (as published online) from May 2008 claimed that a Taliban commander had traveled to Iran for training and returned with 40 trained terrorists.  Similarly, a military-intelligence summary (as published online) from July 2008 referenced "trained fighters moving in from Iran."  And a purported military-intelligence summary (as published online) from October 2009 likewise reported on the return of a Taliban commander from training "in an Iran army barracks."

148.    Iran provided Taliban terrorists with specialized training on how best to deploy Iran-supplied weapons against U.S. and Coalition forces.  A purported December 2008 military-intelligence summary (as published online) reported on a group of 40 insurgents "who allegedly were trained in an Iranian Military base" who had plans to attack the capital of Farah Province using weapons that "Iran Intelligence could have provided."  According to a purported April 2009 military-intelligence summary (as published online), Iran was recruiting Taliban terrorists for training in Iran on shooting down Coalition helicopters.  And another purported April 2009 military-intelligence summary (as published online), reported on the return of a Taliban commander after receiving IED-manufacturing training in Iran.

149.    A March 21, 2010 article in London's *The Sunday Times* reported extensively on Iranian security officials training Taliban recruits to "ambush" Coalition forces, attack checkpoints, and use guns and IEDs.  The *Times* interviewed two Taliban commanders – from Wardak and Ghanzi province – who had traveled to Iran with groups of Taliban terrorists for

---

[127] *Anti-aircraft Missiles Clandestinely Transported.*

training, which improved their ability to launch lethal attacks on Coalition forces.  According to the commanders, Iran paid for this travel and training.  One commander who received training in Iran observed that the Taliban's and Iran's "religions and . . . histories are different, but our target is the same — we both want to kill Americans."[128]

150.    U.S government officials openly accused the IRGC of training the Taliban.  In an August 2009 report, ISAF Commander General Stanley McChrystal publicly explained that "the Iranian Qods Force is reportedly training fighters for certain Taliban groups and providing other forms of military assistance to insurgents."[129]  In August 2010, the U.S. State Department publicly reported to Congress:  "Iran's Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons . . . ."[130]

151.    From at least 2005 through 2022, the IRGC provided the Taliban, including its Haqqani Network, lodging, training, expert advice or assistance, safe harbor, and transportation. *E.g.*, *Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *11 (D.D.C. July 19, 2022). The IRGC taught the Taliban attack techniques that were particularly effective against U.S. forces.  Without the IRGC's training, the Taliban would not have been able to launch as successful a terrorist campaign against U.S. forces.  The IRGC's training of Taliban terrorists in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Taliban

---

[128] Miles Amoore, *Iranian military teaches Taliban fighters the art of ambush*, The Times (Mar. 21, 2010).

[129] General Stanley A. McChrystal, Commander's Initial Assessment at 2-11 (Aug. 30, 2009), https://nsarchive.gwu.edu/document/24560-headquarters-international-security-assistance-force-kabul-afghanistan-gen-stanley.  General McChrystal confirmed again in May 2010 that the IRGC was training Afghan fighters in Iran.  *Killing Americans and Their Allies* at 19.

[130] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).  In May 2013, the U.S. State Department publicly reported: "the IRGC-QF trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets."  U.S. State Dep't, *Country Reports on Terrorism 2012* at 196 (May 2013).

to better attack U.S. forces.  The Taliban and its syndicate allies in Afghanistan used the IRGC's training to kill or injure Plaintiffs or their family members.

152.    Iran also facilitated the Taliban's attacks by allowing the Taliban to establish offices in Iran to serve as bases for planning terrorist attacks.  For example, Iran permitted a senior leader of the Taliban to set up an office in Zahedan, Iran, near the borders with Afghanistan and Pakistan.  In or about 2014, the Taliban also opened an office in Mashhad, Iran, where the Fourth Corps of the Qods Force is headquartered.[131]  As of January 2019, the Taliban maintained an office in Tehran, Iran.[132]

153.    Iranian fighters also conducted attacks alongside Taliban terrorists.  In an October 2016 Taliban attack in Farah Province, four senior Iranian commandos were killed, and many of the other Taliban dead were taken across the border to Iran for burial.

154.    Mohammad Arif Shahjahan, the governor of Farah Province in western Afghanistan, told Radio Free Afghanistan in 2017 that Taliban leaders had been traveling frequently to Iran, where they received protection and support.[133]  He reported that Qods Force operatives had recently met with and advised the Taliban in Farah Province.[134]

155.    Iran's training of Taliban terrorists in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Taliban to more effectively attack U.S. forces and Coalition forces.  The Taliban and affiliated terrorist groups in Afghanistan used Iran's training to kill or injure Plaintiffs or their family members.

---

[131] Oved Lobel, *Afghanistan:  The Forgotten Front Against Iran*, Australia/Israel & Jewish Affairs Council (Nov. 16, 2018).

[132] *Iran and the Taliban:  A Tactical Alliance?*

[133] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

[134] *Id.*

156.     Acting through the IRGC, Iran also provided vital intelligence support that directly enabled many of the syndicate attacks that killed and injured Plaintiffs.  In addition to general intelligence that the IRGC provided, e.g., how particular weapons are useful against particular American military vehicles or strategies, the IRGC also provided direct, attack-related intelligence that helped al-Qaeda and the Taliban, including its Haqqani Network, more effectively attack at least three types of targets:  (1) U.S. facilities, e.g., a U.S. Army base in Faryab Province, Afghanistan from which U.S. forces targeted the syndicate terrorists in the area; (2) U.S. allies' facilities, e.g., an Afghan government prison outside of Kabul that detained al-Qaeda, Taliban (including Haqqani Network), and ISIS terrorists; and (3) known transit routes and potential ambush sites relating to the movement of Americans and their allies to and from such American and allied facilities.  Unlike the generalized intelligence that the IRGC provided (e.g., how to effectively attack an American armored vehicle), the IRGC's attack-related intelligence as described above was part-and-parcel of the syndicate's attacks.  That was because part of the commission of any terrorist attack involved the specific intelligence as to that exact target location.  Thus, for example, when the IRGC provided satellite imagery, human source intelligence, and signals intelligence to the syndicate that helped the latter better determine the "pattern of life" of U.S. forces – the vital condition precedent to most successful attacks – the IRGC was participating in the attack itself.

157.     The IRGC's unique status as the world's only FTO that openly operated as a terrorist group with a safe haven and the support and technical resources of a nation-state meant that the IRGC's intelligence support was extraordinarily potent – and offered unique, irreplaceable benefits to the syndicate because *only* the IRGC had both (a) robust intelligence assets throughout the Middle East, including Afghanistan, which usually entailed a mix of

51

human assets, signals intelligence, and imagery; and (b) the willingness to share such data with the syndicate.  Even the ISI, Pakistan's notorious anti-American agency that also helped the Taliban, usually drew the line at sharing such direct intelligence with the syndicate even though the ISI also financially supported the Taliban.  Simply put, if the IRGC did not provide intelligence aid to the syndicate, the syndicate's IRGC-supported attacks targeting the United States – and injuring Plaintiffs – would have been substantially less effective.

158.    Iran's IRGC-led intelligence aid to syndicate terrorists enabled the syndicate to attack U.S. forces and Afghan government installations alike more effectively, including, but not limited to, U.S. bases and diplomatic facilities, and U.S. and Afghan detention centers and prisons that housed al-Qaeda, Taliban, and ISIS terrorists.  The syndicate benefited from and used Iran's IRGC-provided intelligence to kill or injure Plaintiffs.

### D.    Iran Provided The Taliban With Financial Support

159.    Iran has also supported the Taliban financially.  On an annual basis, Iran provided large cash payments to the Taliban.  For example, a purported February 2005 military intelligence summary (as published online) reported that the IRGC delivered 10 million Afghanis (worth roughly $212,000) to a location on Iran's border where the money was transferred to four members of a Taliban-associated terrorist group.[135]

160.    Iran also directly paid Taliban insurgents to kill U.S. forces.  Another purported February 2005 military-intelligence summary (as published online) reported on a Taliban group that was being paid by the Iranian government $1,740 for each Afghanistan soldier killed and $3,481 for each Government of Afghanistan official killed.  The report further explained that the

---

[135] *Afghanistan War Logs:  Iran Smuggles Money into Afghanistan to Fund Insurgents, says US Report*, The Guardian (July 25, 2010).

group would begin attacking U.S. forces if the attacks on Afghans were successful.[136]  Iran paid

Taliban terrorists an estimated $1,000 for each U.S. soldier murdered in Afghanistan and $6,000

for each destroyed American military vehicle.  In one specific example, Taliban fighters received

$18,000 from Iran as a reward for an attack in 2010 than killed several Afghan forces and

destroyed an American armored vehicle.[137]

161.    Iran also provided funding to individual Taliban commanders, often as they were

returning to Afghanistan from training in Iran.  A purported May 2008 military-intelligence

summary (as published online) reported on a Taliban leader returning from training in Iran

"along with a considerable amount of money."  A purported May 2009 U.S. State Department

Cable (as published online) stated that the IRGC may provide Taliban Commander Mullah

Sangin with financial support to engage Coalition forces, including U.S. contractors.

162.    Iran has also supported the Taliban's finances by supporting its ability to traffic

narcotics, which Taliban terrorists use "to finance their acts of terror and violence."[138]  As the

U.S. Treasury Department explained when it designated Iranian Qods Force General Gholamreza

Baghbani as a Specially Designated Narcotics Trafficker in March 2012, General Baghbani

allowed Afghan narcotics traffickers to smuggle opiates through Iran, facilitated the smuggling

of chemicals necessary to produce heroin from Iran into Afghanistan, and helped "facilitate

---

[136] *Afghanistan War Logs:  Iran Offers Reward for Each Afghan Official and Solider Killed, According to Coalition Report*, The Guardian (July 25, 2010).

[137] Miles Amoore, *Iran pays the Taliban to Kill US Soldiers*, The Times (Sept. 5, 2010).

[138] Press Release, U.S. Treasury Dep't, *Treasury Targets Taliban Shadow Governor of Helmand Afghanistan as Narcotics Trafficker* (Nov. 15, 2012).

shipments of opium into Iran."[139]  General Baghbani also had narcotics traffickers deliver weapons on his behalf to the Taliban.[140]

163.    As reported in a 2015 *Wall Street Journal* article, a Taliban commander described Iran's financial support of the Taliban in the form of recruiting and paying individual terrorists. The commander explained that he had been detained for working illegally in Iran when he was approached by the IRGC and offered double his previous salary – to be paid by Iran – if he fought with the Taliban in Afghanistan.[141]  And in 2017, officials in Ghor Province accused Iran of financing a Taliban offensive that briefly enabled the Taliban to overtake a key district.[142]

### E.    Iran Provided Material Support To Al-Qaeda

164.    Iran has also long provided material support to al-Qaeda.  As with the Taliban, the sectarian differences between the Shiite regime in Tehran and the Sunni al-Qaeda leadership have not hindered cooperation between the groups.  Whatever their religious differences, both groups share a hatred of America and support anti-American violence.

165.    Iran has supported al-Qaeda's terrorist activities since the early 1990s, when Osama bin Laden lived in Sudan.  Iran, through the IRGC and Hezbollah, served as the original trainer for al-Qaeda with respect to suicide bombings, attacks against large buildings, IEDs, explosives, intelligence, and general attack tactics directed at American interests.  For example, senior al-Qaeda operatives traveled to Iran and Lebanon during this period to camps run by

---

[139] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Qods Force General Overseeing Afghan Heroin Trafficking Through Iran* (Mar. 7, 2012).

[140] *Id.*

[141] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

[142] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

Hezbollah and sponsored by the Qods Force.[143]  The operatives received advanced explosives training that enabled al-Qaeda to launch large-scale terrorist attacks on American embassies in Africa.[144]  According to one senior al-Qaeda official, trainers at this time were already researching how to develop shaped charges to pierce armor plating – the technology later perfected in EFPs.

166.    When the U.S. Department of Justice indicted Osama bin Laden for the 1998 bombings of the U.S. embassies in Kenya and Tanzania, the indictment alleged that al-Qaeda had "forged alliances" with "the government of Iran and its associated terrorist group Hezballah [sic] for the purpose of working together against their perceived common enemies in the West, particularly the United States."[145]  This Court subsequently found that Iran had caused the East Africa Embassy bombings by materially supporting al-Qaeda's operations.[146]

167.    Following the September 11, 2001 attacks on the United States, Iran provided safe harbor to many senior leaders of al-Qaeda and their families, including Osama bin Laden's sons. Iran permitted these senior leaders to move freely within Iran in the early 2000s, while they continued to direct, organize, and support al-Qaeda's terrorist operations throughout the world.[147] In essence, Iran provided al-Qaeda with a safe location to orchestrate its terrorist activities.[148]

---

[143] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011) ("Prior to al Qaeda members' training in Iran and Lebanon, al Qaeda had not carried out any successful large scale bombings.").

[144] *Id*.

[145] Indictment at 3, *United States v. Bin Laden*, No. 1:98-cr-00539-LAK (S.D.N.Y. filed Nov. 5, 1998), Dkt. 1, *available at* https://fas.org/irp/news/1998/11/indict1.pdf.

[146] *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011).

[147] *Id.*

[148] *Id.* at 150-51 ("When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of 'safehouse.'").

168.    In 2007, Osama bin Laden discouraged terrorist attacks against Iran because of its historical support for al-Qaeda's terrorist operations, and he referred to Iran as al-Qaeda's "main artery for funds, personnel, and communication."[149]  Similarly, a letter reportedly written by al-Qaeda's second-in-command, Ayman al-Zawahiri, thanked the IRGC for its support in setting up al-Qaeda's terrorist network in Yemen in 2008.

169.    In 2012, the Council on Foreign Relations reported that "al-Qaeda has stepped up its cooperation on logistics and training with Hezbollah, a radical, Iran-backed Lebanese militia drawn from the minority Shiite strain of Islam."[150]

170.    The U.S. government has also recognized these connections.  In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under a secret agreement between Iran and al-Qaeda.[151]  The agreement provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities in Afghanistan and Pakistan."  The Treasury Department found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network

---

[149] October 18, 2007 translated letter from Osama bin Laden to Karim at 1, *Bin Laden's Bookshelf*, Office of the Director of National Intelligence, https://www.dni.gov/files/documents/ubl2016/english/Letter%20to%20Karim.pdf.  In March 2016, the Office of the Director of National Intelligence declassified items that had been obtained by U.S. special operators in the May 2011 raid on bin Laden's compound, including this letter.  See Bin Laden's Bookshelf, Office of the Director of National Intelligence, https://www.dni.gov/index.php/features/bin-laden-s-bookshelf?start=2.

[150] *al-Qaeda (a.k.a. al-Qaida, al-Qa'ida)*, Council on Foreign Relations (June 6, 2012), https://www.cfr.org/backgrounder/al-qaeda-aka-al-qaida-al-qaida.

[151] Press Release, U.S. Treasury Dep't, *Treasury Targets Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011).

that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia."[152]  Indeed, al-Qaeda has honored its commitment to Iran despite its attacks on Shi'a Muslims elsewhere in the Middle East.

171.    The U.S. Treasury Department has repeatedly recognized the link between al-Qaeda and Iran in making SDGT designations under Executive Order 13224.  In February 2012, the agency designated the Iranian Ministry of Intelligence and Security as a terrorist-sponsoring entity for, among other things, supporting al-Qaeda.[153]  In 2014, the agency likewise designated a "key Iran-based" al-Qaeda facilitator who has "assisted extremists and operatives transiting Iran on their way into and out of Pakistan and Afghanistan."[154]

172.    The close relationship between al-Qaeda and Iran has continued in recent years. In 2017, the U.S. State Department explained, "Since at least 2009, Iran has allowed [al-Qaeda] facilitators to operate a core facilitation pipeline through the country, enabling [al-Qaeda] to move funds and fighters to South Asia and Syria."[155]  It further accused Iran of remaining unwilling to bring to justice or identify al-Qaeda members in its custody.[156]  The next year, the agency reaffirmed those conclusions and reiterated Iran's close relationship with al-Qaeda.[157]

173.    As alleged above, the mafia-style "syndicate" of which both the Taliban and al-Qaeda formed a part made attacks by each group more lethal.  Iran's mutually reinforcing support for both the Taliban and al-Qaeda made both organizations more effective.

---

[152] *Id.*

[153] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012).

[154] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[155] U.S. State Dep't, *Country Reports on Terrorism 2016* at Iran Section (July 2017).

[156] *Id.*

[157] *Country Reports on Terrorism 2017* at Foreword.

174.    By supporting al-Qaeda, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families. Al-Qaeda directly participated in many of the attacks that killed or injured Plaintiffs or their family members. Moreover, al-Qaeda was closely intertwined with the Taliban and associated terrorist groups acting in Afghanistan, and al-Qaeda planned and authorized the Taliban attacks in which it did not directly participate. Material support and resources provided to al-Qaeda thus flowed to the Taliban, causing the injury and deaths of Plaintiffs or their family members.

## IV.    THE TALIBAN KILLED AND INJURED PLAINTIFFS THROUGH TERRORIST ATTACKS FOR WHICH IRAN PROVIDED MATERIAL SUPPORT OR RESOURCES

175.    Plaintiffs are members of the U.S. military, U.S. government employees, or U.S. government contractors serving in Afghanistan, and their family members, who were killed or injured in terrorist attacks conducted by the Taliban in conjunction with al-Qaeda and affiliated terrorist groups. Iran's provision of material support or resources for these acts of extrajudicial killing caused Plaintiffs' personal injuries or deaths.

### A.    The June 2, 2007 Complex Attack in Kunar (Lowell Family)

176.    On June 2, 2007, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a complex attack involving small arms fire and rocket propelled grenades in Kunar Province, Afghanistan (the "June 2, 2007 Attack"). The June 2, 2007 Attack constituted an extrajudicial killing.

177.    **Specialist Jacob Lowell** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Lowell was injured in the June 2, 2007 Attack. SPC Lowell died on June 2, 2007, as a result of injuries sustained during the attack.

178.    SPC Lowell was a U.S. national at the time of the attack and his death.

179.    Plaintiff Bernadine Lowell is the mother of SPC Lowell and a U.S. national.

180.    Plaintiff Raymond Lowell is the father of SPC Lowell and a U.S. national.

181.    As a result of the June 2, 2007 Attack and SPC Lowell's injuries and death, each member of the Lowell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Lowell's society, companionship, and counsel.

182.    As a result of the June 2, 2007 Attack, SPC Lowell was injured in his person and/or property. The Plaintiff members of the Lowell Family are the survivors and/or heirs of SPC Lowell and are entitled to recover for the damages SPC Lowell sustained.

**B.    The August 11, 2007 IED Attack in Paktia (Goode Family)**

183.    On August 11, 2007, the Haqqani Network (a part of the Taliban) committed an IED attack in Paktia Province, Afghanistan (the "August 11, 2007 Attack"). The August 11, 2007 Attack constituted an extrajudicial killing.

184.    **Corporal Jordan Goode** served in Afghanistan as a member of the U.S. Army at the time of the attack. CPL Goode was injured in the August 11, 2007 Attack. CPL Goode died on August 11, 2007, as a result of injuries sustained during the attack.

185.    CPL Goode was a U.S. national at the time of the attack and his death.

186.    Plaintiff Amirah Goode is the daughter of CPL Goode and a U.S. national.

187.    Plaintiff Tony Goode is the father of CPL Goode and a U.S. national.

188.    Plaintiff Domonique Goode is the brother of CPL Goode and a U.S. national.

189.    As a result of the August 11, 2007 Attack and CPL Goode's injuries and death, each member of the Goode Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Goode's society, companionship, and counsel.

190.    As a result of the August 11, 2007 Attack, CPL Goode was injured in his person and/or property. The Plaintiff members of the Goode Family are the survivors and/or heirs of CPL Goode and are entitled to recover for the damages CPL Goode sustained.

**C.    The August 28, 2007 Suicide Bombing Attack in Paktia (Howard Family)**

191.    On August 28, 2007, the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack), acting together in a joint al-Qaeda-Taliban cell, committed a suicide bombing attack in Paktia Province, Afghanistan (the "August 28, 2007 Attack"). The August 28, 2007 Attack constituted an extrajudicial killing.

192.    **Sergeant Bryce Howard** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Howard was injured in the August 28, 2007 Attack. SGT Howard died on August 28, 2007, as a result of injuries sustained during the attack.

193.    SGT Howard was a U.S. national at the time of the attack and his death.

194.    Plaintiff Amberlynn Howard is the widow of SGT Howard and a U.S. national.

195.    As a result of the August 28, 2007 Attack and SGT Howard's injuries and death, each member of the Howard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Howard's society, companionship, and counsel.

196.    As a result of the August 28, 2007 Attack, SGT Howard was injured in his person and/or property. The Plaintiff members of the Howard Family are the survivors and/or heirs of SGT Howard and are entitled to recover for the damages SGT Howard sustained.

**D.    The November 10, 2007 Direct Fire Attack in Nuristan (Mersman Family)**

197.    On November 10, 2007, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a direct fire attack in Nuristan Province, Afghanistan (the "November 10, 2007 Attack"). The November 10, 2007 Attack constituted an extrajudicial killing.

198.    **Sergeant Jeffery Mersman** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Mersman was injured in the November 10, 2007 Attack. SGT Mersman died on November 10, 2007, as a result of injuries sustained during the attack.

199.    SGT Mersman was a U.S. national at the time of the attack and his death.

200.    Plaintiff Mary Ritch is the mother of SGT Mersman and a U.S. national.

201.    Plaintiff Bobbie Miller is the sister of SGT Mersman and a U.S. national.

202.    As a result of the November 10, 2007 Attack and SGT Mersman's injuries and death, each member of the Mersman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Mersman's society, companionship, and counsel.

203.    As a result of the November 10, 2007 Attack, SGT Mersman was injured in his person and/or property. The Plaintiff members of the Mersman Family are the survivors and/or heirs of SGT Mersman and are entitled to recover for the damages SGT Mersman sustained.

**E.    The December 12, 2007 IED Attack in Paktika (Blaney Family)**

204.    On December 12, 2007, the Haqqani Network (a part of the Taliban) committed an IED attack in Paktika Province, Afghanistan (the "December 12, 2007 Attack"). The December 12, 2007 Attack constituted an extrajudicial killing.

205.    **Sergeant Joshua Blaney** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Blaney was injured in the December 12, 2007 Attack. SGT Blaney died on December 12, 2007, as a result of injuries sustained during the attack.

206.    SGT Blaney was a U.S. national at the time of the attack and his death.

207.    Plaintiff Norman Allen is the brother of SGT Blaney and a U.S. national.

208.    As a result of the December 12, 2007 Attack and SGT Blaney's injuries and death, each member of the Blaney Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Blaney's society, companionship, and counsel.

209.    As a result of the December 12, 2007 Attack, SGT Blaney was injured in his person and/or property. The Plaintiff members of the Blaney Family are the survivors and/or heirs of SGT Blaney and are entitled to recover for the damages SGT Blaney sustained.

### F.    The June 26, 2008 Complex Attack in Wardak (Hilton Family)

210.    On June 26, 2008, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a complex attack involving an IED, small arms fire, and rocket propelled grenades in Wardak Province, Afghanistan (the "June 26, 2008 Attack"). The June 26, 2008 Attack constituted an extrajudicial killing.

211.    **Sergeant First Class Matthew Hilton** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SFC Hilton was injured in the June 26, 2008 Attack. SFC Hilton died on June 26, 2008, as a result of injuries sustained during the attack.

212.    SFC Hilton was a U.S. national at the time of the attack and his death.

213.    Plaintiff Hailie Robinson is the stepdaughter of SFC Hilton and a U.S. national. Ms. Robinson lived in the same household as SFC Hilton for a substantial period of time and considered SFC Hilton the functional equivalent of a biological father.

214.    As a result of the June 26, 2008 Attack and SFC Hilton's injuries and death, each member of the Hilton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Hilton's society, companionship, and counsel.

215.    As a result of the June 26, 2008 Attack, SFC Hilton was injured in his person and/or property. The Plaintiff members of the Hilton Family are the survivors and/or heirs of SFC Hilton and are entitled to recover for the damages SFC Hilton sustained.

### G.    The August 15, 2008 Complex Attack in Wardak (Conlon Family)

216.    On August 15, 2008, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a complex attack involving an IED, small arms fire, and rocket propelled grenades in

Wardak Province, Afghanistan (the "August 15, 2008 Attack"). The August 15, 2008 Attack constituted an extrajudicial killing.

217.    **Private First Class Paul Conlon Jr.** served in Afghanistan as a member of the U.S. Army at the time of the attack. PFC Conlon was injured in the August 15, 2008 Attack. PFC Conlon died on August 15, 2008, as a result of injuries sustained during the attack.

218.    PFC Conlon was a U.S. national at the time of the attack and his death.

219.    Plaintiff Maria Conlon is the mother of PFC Conlon and a U.S. national.

220.    As a result of the August 15, 2008 Attack and PFC Conlon's injuries and death, each member of the Conlon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Conlon's society, companionship, and counsel.

221.    As a result of the August 15, 2008 Attack, PFC Conlon was injured in his person and/or property. The Plaintiff members of the Conlon Family are the survivors and/or heirs of PFC Conlon and are entitled to recover for the damages PFC Conlon sustained.

### H.    The September 6, 2008 Small Arms Attack in Kunar (Dinterman Family)

222.    On September 6, 2008, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a small arms attack in Kunar Province, Afghanistan (the "September 6, 2008 Attack"). The September 6, 2008 Attack constituted an extrajudicial killing.

223.    **Private First Class Michael Dinterman** served in Afghanistan as a member of the U.S. Army at the time of the attack. PFC Dinterman was injured in the September 6, 2008 Attack. PFC Dinterman died on September 6, 2008, as a result of injuries sustained during the attack.

224.    PFC Dinterman was a U.S. national at the time of the attack and his death.

225.    Plaintiff Lora Martin is the mother of PFC Dinterman and a U.S. national.

226.    Plaintiff Michael Martin is the stepfather of PFC Dinterman and a U.S. national. Mr. Martin lived in the same household as PFC Dinterman for a substantial period of time and considered PFC Dinterman the functional equivalent of a biological son.

227.    As a result of the September 6, 2008 Attack and PFC Dinterman's injuries and death, each member of the Dinterman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Dinterman's society, companionship, and counsel.

228.    As a result of the September 6, 2008 Attack, PFC Dinterman was injured in his person and/or property. The Plaintiff members of the Dinterman Family are the survivors and/or heirs of PFC Dinterman and are entitled to recover for the damages PFC Dinterman sustained.

**I.    The September 11, 2008 Small Arms Attack in Nuristan (Murdock Family)**

229.    On September 11, 2008, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a small arms attack in Nuristan Province, Afghanistan (the "September 11, 2008 Attack"). The September 11, 2008 Attack constituted an extrajudicial killing.

230.    **Private Second Class Michael Murdock** served in Afghanistan as a member of the U.S. Army at the time of the attack. PV2 Murdock was injured in the September 11, 2008 Attack. PV2 Murdock died on September 11, 2008, as a result of injuries sustained during the attack.

231.    PV2 Murdock was a U.S. national at the time of the attack and his death.

232.    Plaintiff Jennifer Tripp is the mother of PV2 Murdock and a U.S. national.

233.    As a result of the September 11, 2008 Attack and PV2 Murdock's injuries and death, each member of the Murdock Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV2 Murdock's society, companionship, and counsel.

234.    As a result of the September 11, 2008 Attack, PV2 Murdock was injured in his person and/or property. The Plaintiff members of the Murdock Family are the survivors and/or heirs of PV2 Murdock and are entitled to recover for the damages PV2 Murdock sustained.

**J.    The September 11, 2008 Helicopter Attack in Zabul (Slebodnik Family)**

235.    On September 11, 2008, the Taliban committed an attack on a helicopter in Zabul Province, Afghanistan (the "September 11, 2008 Helicopter Attack"). The September 11, 2008 Helicopter Attack constituted an extrajudicial killing.

236.    **Chief Warrant Officer 4 Michael Slebodnik** served in Afghanistan as a member of the U.S. Army at the time of the attack. CW4 Slebodnik was injured in the September 11, 2008 Helicopter Attack. CW4 Slebodnik died on September 11, 2008, as a result of injuries sustained during the attack.

237.    CW4 Slebodnik was a U.S. national at the time of the attack and his death.

238.    Plaintiff Patricia Slebodnik is the mother of CW4 Slebodnik and a U.S. national.

239.    Plaintiff William Slebodnik is the father of CW4 Slebodnik and a U.S. national.

240.    Plaintiff Jody Barnes is the sister of CW4 Slebodnik and a U.S. national.

241.    Plaintiff Daniel Slebodnik is the brother of CW4 Slebodnik and a U.S. national.

242.    As a result of the September 11, 2008 Attack and CW4 Slebodnik's injuries and death, each member of the Slebodnik Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW4 Slebodnik's society, companionship, and counsel.

243.    As a result of the September 11, 2008 Attack, CW4 Slebodnik was injured in his person and/or property. The Plaintiff members of the Slebodnik Family are the survivors and/or heirs of CW4 Slebodnik and are entitled to recover for the damages CW4 Slebodnik sustained.

### K.    The September 29, 2008 IED Attack in Helmand (Nicholas Family)

244.    On September 29, 2008, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "September 29, 2008 Attack"). The September 29, 2008 Attack constituted an extrajudicial killing.

245.    **Sergeant First Class Jamie Nicholas** served in Afghanistan as a member of the U.S. Army at the time of the attack. SFC Nicholas was injured in the September 29, 2008 Attack. SFC Nicholas died on September 29, 2008, as a result of injuries sustained during the attack.

246.    SFC Nicholas was a U.S. national at the time of the attack and his death.

247.    Plaintiff Sharise Coleman is the stepdaughter of SFC Nicholas and a U.S. national. Ms. Coleman lived in the same household as SFC Nicholas for a substantial period of time and considered SFC Nicholas the functional equivalent of a biological father.

248.    As a result of the September 29, 2008 Attack and SFC Nicholas's injuries and death, each member of the Nicholas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Nicholas's society, companionship, and counsel.

249.    As a result of the September 29, 2008 Attack, SFC Nicholas was injured in his person and/or property. The Plaintiff members of the Nicholas Family are the survivors and/or heirs of SFC Nicholas and are entitled to recover for the damages SFC Nicholas sustained.

### L.    The October 13, 2008 Complex Attack in Kandahar (Dimond Family)

250.    On October 13, 2008, the Taliban committed a complex attack involving an IED and small arms fire in Kandahar Province, Afghanistan (the "October 13, 2008 Attack"). The October 13, 2008 Attack constituted an extrajudicial killing.

251.    **Corporal Scott Dimond** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. CPL Dimond was injured in the October 13, 2008 Attack. CPL Dimond died on October 13, 2008, as a result of injuries sustained during the attack.

252.    CPL Dimond was a U.S. national at the time of the attack and his death.

253.    Plaintiff Leland Dimond is the father of CPL Dimond and a U.S. national.

254.    Plaintiff Peggy Dimond is the stepmother of CPL Dimond and a U.S. national. Ms. Dimond lived in the same household as CPL Dimond for a substantial period of time and considered CPL Dimond the functional equivalent of a biological son.

255.    As a result of the October 13, 2008 Attack and CPL Dimond's injuries and death, each member of the Dimond Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Dimond's society, companionship, and counsel.

256.    As a result of the October 13, 2008 Attack, CPL Dimond was injured in his person and/or property. The Plaintiff members of the Dimond Family are the survivors and/or heirs of CPL Dimond and are entitled to recover for the damages CPL Dimond sustained.

**M.    The October 28, 2008 IED Attack in Nuristan (Yllescas Family)**

257.    On October 28, 2008, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed an IED attack in Nuristan Province, Afghanistan (the "October 28, 2008 Attack"). The October 28, 2008 Attack constituted an extrajudicial killing.

258.    **Captain Robert Yllescas** served in Afghanistan as a member of the U.S. Army at the time of the attack. CPT Yllescas was injured in the October 28, 2008 Attack. CPT Yllescas died on December 1, 2008, as a result of injuries sustained during the attack.

259.    CPT Yllescas was a U.S. national at the time of the attack and his death.

260.    Plaintiff Christopher Yllescas is the brother of CPT Yllescas and a U.S. national.

261.    As a result of the October 28, 2008 Attack and CPT Yllescas's injuries and death, each member of the Yllescas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Yllescas's society, companionship, and counsel.

262.     As a result of the October 28, 2008 Attack, CPT Yllescas was injured in his person and/or property. The Plaintiff members of the Yllescas Family are the survivors and/or heirs of CPT Yllescas and are entitled to recover for the damages CPT Yllescas sustained.

**N.     The November 13, 2008 Suicide Bombing Attack in Nangarhar (Stiles Family)**

263.     On November 13, 2008, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a suicide bombing attack in Nangarhar Province, Afghanistan (the "November 13, 2008 Attack"). The November 13, 2008 Attack constituted an extrajudicial killing.

264.     **Sergeant Jonnie Stiles** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SGT Stiles was injured in the November 13, 2008 Attack. SGT Stiles died on November 13, 2008, as a result of injuries sustained during the attack.

265.     SGT Stiles was a U.S. national at the time of the attack and his death.

266.     Plaintiff Linda Barnett is the mother of SGT Stiles and a U.S. national.

267.     Plaintiff Larry Barnett is the stepfather of SGT Stiles and a U.S. national. Mr. Barnett lived in the same household as SGT Stiles for a substantial period of time and considered SGT Stiles the functional equivalent of a biological son.

268.     As a result of the November 13, 2008 Attack and SGT Stiles's injuries and death, each member of the Stiles Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Stiles's society, companionship, and counsel.

269.     As a result of the November 13, 2008 Attack, SGT Stiles was injured in his person and/or property. The Plaintiff members of the Stiles Family are the survivors and/or heirs of SGT Stiles and are entitled to recover for the damages SGT Stiles sustained.

**O.    The January 17, 2009 Complex Attack in Kunar (Dawson Family)**

270.    On January 17, 2009, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a complex attack involving a rocket propelled grenade and small arms fire in Kunar Province, Afghanistan (the "January 17, 2009 Attack"). The January 17, 2009 Attack constituted an extrajudicial killing.

271.    **Sergeant Ezra Dawson** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Dawson was injured in the January 17, 2009 Attack. SGT Dawson died on January 17, 2009, as a result of injuries sustained during the attack.

272.    SGT Dawson was a U.S. national at the time of the attack and his death.

273.    Plaintiff E'vala Dawson is the sister of SGT Dawson and a U.S. national.

274.    Plaintiff Ivory Ihegboro is the sister of SGT Dawson and a U.S. national.

275.    As a result of the January 17, 2009 Attack and SGT Dawson's injuries and death, each member of the Dawson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dawson's society, companionship, and counsel.

276.    As a result of the January 17, 2009 Attack, SGT Dawson was injured in his person and/or property. The Plaintiff members of the Dawson Family are the survivors and/or heirs of SGT Dawson and are entitled to recover for the damages SGT Dawson sustained.

**P.    The March 8, 2009 IED Attack in Paktia (Dupont Family)**

277.    On March 8, 2009, the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack), acting together in a joint al-Qaeda-Taliban cell committed an IED attack in Paktia Province, Afghanistan (the "March 8, 2009 Attack"). The March 8, 2009 Attack constituted an extrajudicial killing.

278.    **First Sergeant Kevin Dupont** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. 1SG Dupont was injured in the March 8, 2009 Attack. 1SG Dupont died on June 17, 2009, as a result of injuries sustained during the attack.

279.    1SG Dupont was a U.S. national at the time of the attack and his death.

280.    Plaintiff Christopher Dupont is the brother of 1SG Dupont and a U.S. national.

281.    As a result of the March 8, 2009 Attack and 1SG Dupont's injuries and death, each member of the Dupont Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1SG Dupont's society, companionship, and counsel.

282.    As a result of the March 8, 2009 Attack, 1SG Dupont was injured in his person and/or property. The Plaintiff members of the Dupont Family are the survivors and/or heirs of 1SG Dupont and are entitled to recover for the damages 1SG Dupont sustained.

**Q.    The March 27, 2009 Insider Attack in Balkh (Toner Family)**

283.    On March 27, 2009, the Taliban committed an insider attack in Balkh Province, Afghanistan (the "March 27, 2009 Attack"). The March 27, 2009 Attack constituted an extrajudicial killing.

284.    **Lieutenant Junior Grade Francis Toner IV** served in Afghanistan as a member of the U.S. Navy at the time of the attack. LTJG Toner was injured in the March 27, 2009 Attack. LTJG Toner died on March 27, 2009, as a result of injuries sustained during the attack.

285.    LTJG Toner was a U.S. national at the time of the attack and his death.

286.    Plaintiff Michael Toner is the brother of LTJG Toner and a U.S. national.

287.    As a result of the March 27, 2009 Attack and LTJG Toner's injuries and death, each member of the Toner Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTJG Toner's society, companionship, and counsel.

288.    As a result of the March 27, 2009 Attack, LTJG Toner was injured in his person and/or property. The Plaintiff members of the Toner Family are the survivors and/or heirs of LTJG Toner and are entitled to recover for the damages LTJG Toner sustained.

**R.    The June 21, 2009 Indirect Fire Attack in Parwan (Jones Family)**

289.    On June 21, 2009, the Taliban committed an indirect fire attack in Parwan Province, Afghanistan (the "June 21, 2009 Attack"). The June 21, 2009 Attack constituted an extrajudicial killing.

290.    **Sergeant Ricky Jones** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Jones was injured in the June 21, 2009 Attack. SGT Jones died on June 21, 2009, as a result of injuries sustained during the attack.

291.    SGT Jones was a U.S. national at the time of the attack and his death.

292.    Plaintiff Willie Tyus is the father of SGT Jones and a U.S. national.

293.    Plaintiff Latisha Tyus is the sister of SGT Jones and a U.S. national.

294.    Plaintiff Tanza Tyus is the sister of SGT Jones and a U.S. national.

295.    As a result of the June 21, 2009 Attack and SGT Jones's injuries and death, each member of the Jones Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Jones's society, companionship, and counsel.

296.    As a result of the June 21, 2009 Attack, SGT Jones was injured in his person and/or property. The Plaintiff members of the Jones Family are the survivors and/or heirs of SGT Jones and are entitled to recover for the damages SGT Jones sustained.

**S.    The July 2, 2009 Small Arms Attack in Helmand (Sharp Family)**

297.    On July 2, 2009, the Taliban committed a small arms attack in Helmand Province, Afghanistan (the "July 2, 2009 Attack"). The July 2, 2009 Attack constituted an extrajudicial killing.

298.    **Lance Corporal Charles Sharp** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. LCpl Sharp was injured in the July 2, 2009 Attack. LCpl Sharp died on July 2, 2009, as a result of injuries sustained during the attack.

299.    LCpl Sharp was a U.S. national at the time of the attack and his death.

300.    Plaintiff Tiffany Sharp is the stepmother of LCpl Sharp and a U.S. national. Ms. Sharp lived in the same household as LCpl Sharp for a substantial period of time and considered LCpl Sharp the functional equivalent of a biological son.

301.    Plaintiff Jocelyn Greene is the stepsister of LCpl Sharp and a U.S. national. Ms. Greene lived in the same household as LCpl Sharp for a substantial period of time and considered LCpl Sharp the functional equivalent of a biological brother.

302.    Plaintiff Kaitlyn Greene is the stepsister of LCpl Sharp and a U.S. national. Ms. Greene lived in the same household as LCpl Sharp for a substantial period of time and considered LCpl Sharp the functional equivalent of a biological brother.

303.    As a result of the July 2, 2009 Attack and LCpl Sharp's injuries and death, each member of the Sharp Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Sharp's society, companionship, and counsel.

304.    As a result of the July 2, 2009 Attack, LCpl Sharp was injured in his person and/or property. The Plaintiff members of the Sharp Family are the survivors and/or heirs of LCpl Sharp and are entitled to recover for the damages LCpl Sharp sustained.

**T.    The July 7, 2009 IED Attack in Herat (Talbert Family)**

305.    On July 7, 2009, the Taliban committed an IED attack in Herat Province, Afghanistan (the "July 7, 2009 Attack"). The July 7, 2009 Attack constituted an extrajudicial killing.

306.    **Specialist Christopher Talbert** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SPC Talbert was injured in the July 7, 2009 Attack. SPC Talbert died on July 7, 2009, as a result of injuries sustained during the attack.

307.    SPC Talbert was a U.S. national at the time of the attack and his death.

308.    Plaintiff Amanda Talbert is the mother of SPC Talbert and a U.S. national.

309.    As a result of the July 7, 2009 Attack and SPC Talbert's injuries and death, each member of the Talbert Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Talbert's society, companionship, and counsel.

310.    As a result of the July 7, 2009 Attack, SPC Talbert was injured in his person and/or property. The Plaintiff members of the Talbert Family are the survivors and/or heirs of SPC Talbert and are entitled to recover for the damages SPC Talbert sustained.

**U.    The August 1, 2009 IED Attack in Kandahar (Walls Family)**

311.    On August 1, 2009, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 1, 2009 Attack"). The August 1, 2009 Attack constituted an extrajudicial killing.

312.    **Sergeant Jonathan Walls** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Walls was injured in the August 1, 2009 Attack. SGT Walls died on August 1, 2009, as a result of injuries sustained during the attack.

313.    SGT Walls was a U.S. national at the time of the attack and his death.

314.    Plaintiff Nevin Walls is the brother of SGT Walls and a U.S. national.

315.    As a result of the August 1, 2009 Attack and SGT Walls's injuries and death, each member of the Walls Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Walls's society, companionship, and counsel.

73

316.     As a result of the August 1, 2009 Attack, SGT Walls was injured in his person and/or property. The Plaintiff members of the Walls Family are the survivors and/or heirs of SGT Walls and are entitled to recover for the damages SGT Walls sustained.

**V.     The August 7, 2009 IED Attack in Wardak (Evans Family)**

317.     On August 7, 2009, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed an IED attack in Wardak Province, Afghanistan (the "August 7, 2009 Attack"). The August 7, 2009 Attack constituted an extrajudicial killing.

318.     **Sergeant Jerry Evans Jr.** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Evans was injured in the August 7, 2009 Attack. SGT Evans died on August 7, 2009, as a result of injuries sustained during the attack.

319.     SGT Evans was a U.S. national at the time of the attack and his death.

320.     Plaintiff C.E., by and through his next friend Tiffany Olds, is the minor son of SGT Evans. He is a U.S. national.

321.     As a result of the August 7, 2009 Attack and SGT Evans's injuries and death, each member of the Evans Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Evans's society, companionship, and counsel.

322.     As a result of the August 7, 2009 Attack, SGT Evans was injured in his person and/or property. The Plaintiff members of the Evans Family are the survivors and/or heirs of SGT Evans and are entitled to recover for the damages SGT Evans sustained.

**W.     The August 7, 2009 Complex Attack in Kapisa (Freeman Family)**

323.     On August 7, 2009, the Taliban committed a complex attack in Kapisa Province, Afghanistan (the "August 7, 2009 Attack"). The August 7, 2009 Attack constituted an extrajudicial killing.

324.    Captain Matthew Freeman served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. Capt Freeman was injured in the August 7, 2009 Attack. Capt Freeman died on August 7, 2009, as a result of injuries sustained during the attack.

325.    Capt Freeman was a U.S. national at the time of the attack and his death.

326.    Plaintiff Mary Rich is the sister of Capt Freeman and a U.S. national.

327.    As a result of the August 7, 2009 Attack and Capt Freeman's injuries and death, each member of the Freeman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Freeman's society, companionship, and counsel.

328.    As a result of the August 7, 2009 Attack, Capt Freeman was injured in his person and/or property. The Plaintiff members of the Freeman Family are the survivors and/or heirs of Capt Freeman and are entitled to recover for the damages Capt Freeman sustained.

## X.    The August 16, 2009 Complex Attack in Herat (Roush Family)

329.    On August 16, 2009, the Taliban committed a complex attack involving an IED, small arms fire, machine guns, and rocket propelled grenades in Herat Province, Afghanistan (the "August 16, 2009 Attack"). The August 16, 2009 Attack constituted an extrajudicial killing.

330.    **Corporal Nicholas Roush** served in Afghanistan as a member of the U.S. Army at the time of the attack. CPL Roush was injured in the August 16, 2009 Attack. CPL Roush died on August 16, 2009, as a result of injuries sustained during the attack.

331.    CPL Roush was a U.S. national at the time of the attack and his death.

332.    Plaintiff Kyle Roush is the brother of CPL Roush and a U.S. national.

333.    As a result of the August 16, 2009 Attack and CPL Roush's injuries and death, each member of the Roush Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Roush's society, companionship, and counsel.

334.    As a result of the August 16, 2009 Attack, CPL Roush was injured in his person and/or property. The Plaintiff members of the Roush Family are the survivors and/or heirs of CPL Roush and are entitled to recover for the damages CPL Roush sustained.

**Y.    The August 31, 2009 IED Attack in Kandahar (Walshe Family)**

335.    On August 31, 2009, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 31, 2009 Attack"). The August 31, 2009 Attack constituted an extrajudicial killing.

336.    **Specialist Tyler Walshe** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Walshe was injured in the August 31, 2009 Attack. SPC Walshe died on August 31, 2009, as a result of injuries sustained during the attack.

337.    SPC Walshe was a U.S. national at the time of the attack and his death.

338.    Plaintiff Kirsten Walshe is the widow of SPC Walshe and a U.S. national.

339.    Plaintiff K.W., by and through her next friend Kirsten Walshe, is the minor daughter of SPC Walshe. She is a U.S. national.

340.    As a result of the August 31, 2009 Attack and SPC Walshe's injuries and death, each member of the Walshe Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Walshe's society, companionship, and counsel.

341.    As a result of the August 31, 2009 Attack, SPC Walshe was injured in his person and/or property. The Plaintiff members of the Walshe Family are the survivors and/or heirs of SPC Walshe and are entitled to recover for the damages SPC Walshe sustained.

**Z.    The September 4, 2009 Complex Attack in Paktika (Andrews Family)**

342.    On September 4, 2009, the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) committed a complex attack involving an IED and

rocket propelled grenades in Paktika Province, Afghanistan (the "September 4, 2009 Attack"). The September 4, 2009 Attack constituted an extrajudicial killing.

343.    **Second Lieutenant Darryn Andrews** served in Afghanistan as a member of the U.S. Army at the time of the attack. 2LT Andrews was injured in the September 4, 2009 Attack. 2LT Andrews died on September 4, 2009, as a result of injuries sustained during the attack.

344.    2LT Andrews was a U.S. national at the time of the attack and his death.

345.    Plaintiff Jarrett Andrews is the brother of 2LT Andrews and a U.S. national.

346.    As a result of the September 4, 2009 Attack and 2LT Andrews's injuries and death, each member of the Andrews Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 2LT Andrews's society, companionship, and counsel.

347.    As a result of the September 4, 2009 Attack, 2LT Andrews was injured in his person and/or property. The Plaintiff members of the Andrews Family are the survivors and/or heirs of 2LT Andrews and are entitled to recover for the damages 2LT Andrews sustained.

**AA.    The September 9, 2009 Suicide Bombing Attack in Helmand (David Bryant)**

348.    On September 9, 2009, the Taliban and al-Qaeda (a designated FTO at the time of the attack) committed a suicide bombing attack in Helmand Province, Afghanistan (the "September 9, 2009 Attack"). The September 9, 2009 Attack constituted an extrajudicial killing.

349.    **Lance Corporal David Bryant** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. LCpl Bryant was injured in the September 9, 2009 Attack. The September 9, 2009 Attack severely wounded LCpl Bryant, who suffered from shrapnel wounds, PTSD, TBI, concussions, and injuries to his eardrums.

350.    Plaintiff LCpl Bryant was a U.S. national at the time of the attack and remains one today.

351.     As a result of the September 9, 2009 Attack and his injuries, LCpl Bryant has experienced severe mental anguish, emotional pain, and suffering.

**BB.    The September 12, 2009 IED Attack in Wardak (Allen Family)**

352.     On September 12, 2009, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell  committed an IED attack in Wardak Province, Afghanistan (the "September 12, 2009 Attack"). The September 12, 2009 Attack constituted an extrajudicial killing.

353.     **Staff Sergeant Nekl Allen** served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Allen was injured in the September 12, 2009 Attack. SSG Allen died on September 12, 2009, as a result of injuries sustained during the attack.

354.     SSG Allen was a U.S. national at the time of the attack and his death.

355.     Plaintiff Grace Allen is the daughter of SSG Allen and a U.S. national.

356.     Plaintiff Michael Allen is the son of SSG Allen and a U.S. national.

357.     Plaintiff Christopher Berry is the son of SSG Allen and a U.S. national.

358.     As a result of the September 12, 2009 Attack and SSG Allen's injuries and death, each member of the Allen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Allen's society, companionship, and counsel.

359.     As a result of the September 12, 2009 Attack, SSG Allen was injured in his person and/or property. The Plaintiff members of the Allen Family are the survivors and/or heirs of SSG Allen and are entitled to recover for the damages SSG Allen sustained.

**CC.    The September 24, 2009 IED Attack in Zabul (Smith Family)**

360.     On September 24, 2009, the Taliban committed an IED attack in Zabul Province, Afghanistan (the "September 24, 2009 Attack"). The September 24, 2009 Attack constituted an extrajudicial killing.

361.    **Staff Sergeant Edward Smith** served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Smith was injured in the September 24, 2009 Attack. SSG Smith died on September 24, 2009, as a result of injuries sustained during the attack.

362.    SSG Smith was a U.S. national at the time of the attack and his death.

363.    Plaintiff Richard Carter is the brother of SSG Smith and a U.S. national.

364.    Plaintiff June Render is the sister of SSG Smith and a U.S. national.

365.    As a result of the September 24, 2009 Attack and SSG Smith's injuries and death, each member of the Smith Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Smith's society, companionship, and counsel.

366.    As a result of the September 24, 2009 Attack, SSG Smith was injured in his person and/or property. The Plaintiff members of the Smith Family are the survivors and/or heirs of SSG Smith and are entitled to recover for the damages SSG Smith sustained.

**DD.    The October 20, 2009 IED Attack in Helmand (Baker Family)**

367.    On October 20, 2009, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "October 20, 2009 Attack"). The October 20, 2009 Attack constituted an extrajudicial killing.

368.    **Lance Corporal David Baker** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. LCpl Baker was injured in the October 20, 2009 Attack. LCpl Baker died on October 20, 2009, as a result of injuries sustained during the attack.

369.    LCpl Baker was a U.S. national at the time of the attack and his death.

370.    Plaintiff Lauren Genovese is the sister of LCpl Baker and a U.S. national.

371.    As a result of the October 20, 2009 Attack and LCpl Baker's injuries and death, each member of the Baker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Baker's society, companionship, and counsel.

372.    As a result of the October 20, 2009 Attack, LCpl Baker was injured in his person and/or property. The Plaintiff members of the Baker Family are the survivors and/or heirs of LCpl Baker and are entitled to recover for the damages LCpl Baker sustained.

**EE.    The October 27, 2009 Complex Attack in Kandahar (Williamson Family)**

373.    On October 27, 2009, the Taliban committed a complex attack involving an IED and small arms fire in Kandahar Province, Afghanistan (the "October 27, 2009 Attack"). The October 27, 2009 Attack constituted an extrajudicial killing.

374.    **Sergeant Patrick Williamson** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Williamson was injured in the October 27, 2009 Attack. SGT Williamson died on October 27, 2009, as a result of injuries sustained during the attack.

375.    SGT Williamson was a U.S. national at the time of the attack and his death.

376.    Plaintiff Elizabeth Williamson is the sister of SGT Williamson and a U.S. national.

377.    Plaintiff Steven Williamson is the brother of SGT Williamson and a U.S. national.

378.    As a result of the October 27, 2009 Attack and SGT Williamson's injuries and death, each member of the Williamson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Williamson's society, companionship, and counsel.

379.    As a result of the October 27, 2009 Attack, SGT Williamson was injured in his person and/or property. The Plaintiff members of the Williamson Family are the survivors and/or heirs of SGT Williamson and are entitled to recover for the damages SGT Williamson sustained.

**FF.    The December 26, 2009 IED Attack in Nangarhar (Johnston and Towery Families)**

380.    On December 26, 2009, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed an IED attack in

Nangarhar Province, Afghanistan (the "December 26, 2009 Attack"). The December 26, 2009 Attack constituted an extrajudicial killing.

381.    **Specialist Jason Johnston** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Johnston was injured in the December 26, 2009 Attack. SPC Johnston died on December 26, 2009, as a result of injuries sustained during the attack.

382.    SPC Johnston was a U.S. national at the time of the attack and his death.

383.    Plaintiff Jeanine Johnston is the mother of SPC Johnston and a U.S. national.

384.    As a result of the December 26, 2009 Attack and SPC Johnston's injuries and death, each member of the Johnston Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Johnston's society, companionship, and counsel.

385.    As a result of the December 26, 2009 Attack, SPC Johnston was injured in his person and/or property. The Plaintiff members of the Johnston Family are the survivors and/or heirs of SPC Johnston and are entitled to recover for the damages SPC Johnston sustained.

386.    **Specialist Stephen Towery** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Towery was injured in the December 26, 2009 Attack. The December 26, 2009 Attack severely wounded SPC Towery, who suffered from a below knee amputation to his right leg.

387.    Plaintiff SPC Towery was a U.S. national at the time of the attack and remains one today.

388.    As a result of the December 26, 2009 Attack and his injuries, SPC Towery has experienced severe mental anguish, emotional pain, and suffering.

**GG. The February 3, 2010 IED Attack in Khyber Pakhtunkhwa (Hartman Family)**

389.     On February 3, 2010, the Taliban committed an IED attack in Khyber Pakhtunkhwa Province, Pakistan (the "February 3, 2010 Attack"). The February 3, 2010 Attack constituted an extrajudicial killing.

390.     **Sergeant 1st Class David Hartman** served in Pakistan as a member of the U.S. Army at the time of the attack. SFC Hartman was injured in the February 3, 2010 Attack. SFC Hartman died on February 3, 2010, as a result of injuries sustained during the attack.

391.     SFC Hartman was a U.S. national at the time of the attack and his death.

392.     Plaintiff Mikail Bacon is the mother of SFC Hartman and a U.S. national.

393.     As a result of the February 3, 2010 Attack and SFC Hartman's injuries and death, each member of the Hartman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Hartman's society, companionship, and counsel.

394.     As a result of the February 3, 2010 Attack, SFC Hartman was injured in his person and/or property. The Plaintiff members of the Hartman Family are the survivors and/or heirs of SFC Hartman and are entitled to recover for the damages SFC Hartman sustained.

**HH. The February 13, 2010 Small Arms Attack in Helmand (Turbett Family)**

395.     On February 13, 2010, the Taliban committed a small arms attack in Helmand Province, Afghanistan (the "February 13, 2010 Attack"). The February 13, 2010 Attack constituted an extrajudicial killing.

396.     **Corporal Jacob Turbett** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. Cpl Turbett was injured in the February 13, 2010 Attack. Cpl Turbett died on February 13, 2010, as a result of injuries sustained during the attack.

397.     Cpl Turbett was a U.S. national at the time of the attack and his death.

398.    Plaintiff Sheila Turbett is the mother of Cpl Turbett and a U.S. national.

399.    Plaintiff Richard Turbett is the father of Cpl Turbett and a U.S. national.

400.    Plaintiff Jaime Turbett is the sister of Cpl Turbett and a U.S. national.

401.    As a result of the February 13, 2010 Attack and Cpl Turbett's injuries and death, each member of the Turbett Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Turbett's society, companionship, and counsel.

402.    As a result of the February 13, 2010 Attack, Cpl Turbett was injured in his person and/or property. The Plaintiff members of the Turbett Family are the survivors and/or heirs of Cpl Turbett and are entitled to recover for the damages Cpl Turbett sustained.

## II.    The March 4, 2010 IED Attack in Helmand (Olsen Family)

403.    On March 4, 2010, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "March 4, 2010 Attack"). The March 4, 2010 Attack constituted an extrajudicial killing.

404.    **Lance Corporal Nigel Olsen** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. LCpl Olsen was injured in the March 4, 2010 Attack. LCpl Olsen died on March 4, 2010, as a result of injuries sustained during the attack.

405.    LCpl Olsen was a U.S. national at the time of the attack and his death.

406.    Plaintiff Kim Olsen is the mother of LCpl Olsen and a U.S. national.

407.    Plaintiff Layne Olsen is the father of LCpl Olsen and a U.S. national.

408.    Plaintiff Quintin Hess III is the brother of LCpl Olsen and a U.S. national.

409.    As a result of the March 4, 2010 Attack and LCpl Olsen's injuries and death, each member of the Olsen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Olsen's society, companionship, and counsel.

410.    As a result of the March 4, 2010 Attack, LCpl Olsen was injured in his person and/or property. The Plaintiff members of the Olsen Family are the survivors and/or heirs of LCpl Olsen and are entitled to recover for the damages LCpl Olsen sustained.

**JJ.    The May 6, 2010 Indirect Fire Attack in Wardak (Slack Family)**

411.    On May 6, 2010, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed an indirect fire attack in Wardak Province, Afghanistan (the "May 6, 2010 Attack"). The May 6, 2010 Attack constituted an extrajudicial killing.

412.    **Specialist Wade Slack** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Slack was injured in the May 6, 2010 Attack. SPC Slack died on May 6, 2010, as a result of injuries sustained during the attack.

413.    SPC Slack was a U.S. national at the time of the attack and his death.

414.    Plaintiff Ethan Roderick is the stepbrother of SPC Slack and a U.S. national. Mr. Roderick lived in the same household as SPC Slack for a substantial period of time and considered SPC Slack the functional equivalent of a biological brother.

415.    As a result of the May 6, 2010 Attack and SPC Slack's injuries and death, each member of the Slack Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Slack's society, companionship, and counsel.

416.    As a result of the May 6, 2010 Attack, SPC Slack was injured in his person and/or property. The Plaintiff members of the Slack Family are the survivors and/or heirs of SPC Slack and are entitled to recover for the damages SPC Slack sustained.

**KK.    The May 8, 2010 IED Attack in Helmand (Comfort Family)**

417.    On May 8, 2010, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "May 8, 2010 Attack"). The May 8, 2010 Attack constituted an extrajudicial killing.

418.    **Captain Kyle Comfort** served in Afghanistan as a member of the U.S. Army at the time of the attack. CPT Comfort was injured in the May 8, 2010 Attack. CPT Comfort died on May 8, 2010, as a result of injuries sustained during the attack.

419.    CPT Comfort was a U.S. national at the time of the attack and his death.

420.    Plaintiff Kenneth Comfort II is the brother of CPT Comfort and a U.S. national.

421.    As a result of the May 8, 2010 Attack and CPT Comfort's injuries and death, each member of the Comfort Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Comfort's society, companionship, and counsel.

422.    As a result of the May 8, 2010 Attack, CPT Comfort was injured in his person and/or property. The Plaintiff members of the Comfort Family are the survivors and/or heirs of CPT Comfort and are entitled to recover for the damages CPT Comfort sustained.

**LL.    The May 18, 2010 Suicide Bombing Attack in Kabul (Tomlinson Family)**

423.    On May 18, 2010, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network committed a suicide bombing attack in Kabul Province, Afghanistan (the "May 18, 2010 Attack"). The May 18, 2010 Attack constituted an extrajudicial killing.

424.    **Sergeant Joshua Tomlinson** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Tomlinson was injured in the May 18, 2010 Attack. SGT Tomlinson died on May 18, 2010, as a result of injuries sustained during the attack.

425.    SGT Tomlinson was a U.S. national at the time of the attack and his death.

426.    Plaintiff Rebecca Jobe is the mother of SGT Tomlinson and a U.S. national.

427.    Plaintiff Carl Tomlinson Sr. is the father of SGT Tomlinson and a U.S. national.

428.    Plaintiff Jordan Tomlinson is the brother of SGT Tomlinson and a U.S. national.

429.    Plaintiff Latha Tomlinson is the sister of SGT Tomlinson and a U.S. national.

430.    As a result of the May 18, 2010 Attack and SGT Tomlinson's injuries and death, each member of the Tomlinson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Tomlinson's society, companionship, and counsel.

431.    As a result of the May 18, 2010 Attack, SGT Tomlinson was injured in his person and/or property. The Plaintiff members of the Tomlinson Family are the survivors and/or heirs of SGT Tomlinson and are entitled to recover for the damages SGT Tomlinson sustained.

**MM.    The May 19, 2010 IED Attack in Kandahar (Barnard Family)**

432.    On May 19, 2010, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 19, 2010 Attack"). The May 19, 2010 Attack constituted an extrajudicial killing.

433.    **Staff Sergeant Shane Barnard** served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Barnard was injured in the May 19, 2010 Attack. SSG Barnard died on May 19, 2010, as a result of injuries sustained during the attack.

434.    SSG Barnard was a U.S. national at the time of the attack and his death.

435.    Plaintiff Carl Barnard is the brother of SSG Barnard and a U.S. national.

436.    As a result of the May 19, 2010 Attack and SSG Barnard's injuries and death, each member of the Barnard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Barnard's society, companionship, and counsel.

437.    As a result of the May 19, 2010 Attack, SSG Barnard was injured in his person and/or property. The Plaintiff members of the Barnard Family are the survivors and/or heirs of SSG Barnard and are entitled to recover for the damages SSG Barnard sustained.

**NN.    The June 9, 2010 RPG Attack in Helmand (Gentz Family)**

438.    On June 9, 2010, the Taliban committed an RPG attack on a helicopter in Helmand Province, Afghanistan (the "June 9, 2010 Attack"). The June 9, 2010 Attack constituted an extrajudicial killing.

439.    **Captain Joel Gentz** served in Afghanistan as a member of the U.S. Air Force at the time of the attack. Capt Gentz was injured in the June 9, 2010 Attack. Capt Gentz died on June 9, 2010, as a result of injuries sustained during the attack.

440.    Capt Gentz was a U.S. national at the time of the attack and his death.

441.    Plaintiff Steven Gentz is the father of Capt Gentz and a U.S. national.

442.    Plaintiff Jared Gentz is the brother of Capt Gentz and a U.S. national.

443.    Plaintiff Rachel Gentz is the sister of Capt Gentz and a U.S. national.

444.    As a result of the June 9, 2010 Attack and Capt Gentz's injuries and death, each member of the Gentz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Gentz's society, companionship, and counsel.

445.    As a result of the June 9, 2010 Attack, Capt Gentz was injured in his person and/or property. The Plaintiff members of the Gentz Family are the survivors and/or heirs of Capt Gentz and are entitled to recover for the damages Capt Gentz sustained.

**OO.    The June 22, 2010 IED Attack in Nimruz (Dumaw Family)**

446.    On June 22, 2010, the Taliban committed an IED attack in Nimruz Province, Afghanistan (the "June 22, 2010 Attack"). The June 22, 2010 Attack constituted an extrajudicial killing.

447.    **Corporal Joshua Dumaw** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. Cpl Dumaw was injured in the June 22, 2010 Attack. Cpl Dumaw died on June 22, 2010, as a result of injuries sustained during the attack.

448.    Cpl Dumaw was a U.S. national at the time of the attack and his death.

449.    Plaintiff Jenifer Gorman is the mother of Cpl Dumaw and a U.S. national.

450.    Plaintiff Andrew Dahlman is the father of Cpl Dumaw and a U.S. national.

451.    As a result of the June 22, 2010 Attack and Cpl Dumaw's injuries and death, each member of the Dumaw Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Dumaw's society, companionship, and counsel.

452.    As a result of the June 22, 2010 Attack, Cpl Dumaw was injured in his person and/or property. The Plaintiff members of the Dumaw Family are the survivors and/or heirs of Cpl Dumaw and are entitled to recover for the damages Cpl Dumaw sustained.

**PP.    The June 25, 2010 Complex Attack in Parwan (Thompson Family)**

453.    On June 25, 2010, the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Parwan Province, Afghanistan (the "June 25, 2010 Attack"). The June 25, 2010 Attack constituted an extrajudicial killing.

454.    **Specialist Blair Thompson** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Thompson was injured in the June 25, 2010 Attack. SPC Thompson died on June 25, 2010, as a result of injuries sustained during the attack.

455.    SPC Thompson was a U.S. national at the time of the attack and his death.

456.    Plaintiff Vincent Thompson is the father of SPC Thompson and a U.S. national.

457.    As a result of the June 25, 2010 Attack and SPC Thompson's injuries and death, each member of the Thompson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Thompson's society, companionship, and counsel.

88

458.    As a result of the June 25, 2010 Attack, SPC Thompson was injured in his person and/or property. The Plaintiff members of the Thompson Family are the survivors and/or heirs of SPC Thompson and are entitled to recover for the damages SPC Thompson sustained.

**QQ.    The June 26, 2010 IED Attack in Wardak (Holmes Family)**

459.    On June 26, 2010, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed an IED attack in Wardak Province, Afghanistan (the "June 26, 2010 Attack"). The June 26, 2010 Attack constituted an extrajudicial killing.

460.    **Specialist David Holmes** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SPC Holmes was injured in the June 26, 2010 Attack. SPC Holmes died on June 26, 2010, as a result of injuries sustained during the attack.

461.    SPC Holmes was a U.S. national at the time of the attack and his death.

462.    Plaintiff LaTonya Holmes is the widow of SPC Holmes and a U.S. national.

463.    As a result of the June 26, 2010 Attack and SPC Holmes's injuries and death, each member of the Holmes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Holmes's society, companionship, and counsel.

464.    As a result of the June 26, 2010 Attack, SPC Holmes was injured in his person and/or property. The Plaintiff members of the Holmes Family are the survivors and/or heirs of SPC Holmes and are entitled to recover for the damages SPC Holmes sustained.

**RR.    The July 2, 2010 IED Attack in Parwan (Grady Family)**

465.    On July 2, 2010, the Taliban committed an IED attack in Parwan Province, Afghanistan (the "July 2, 2010 Parwan Attack"). The July 2, 2010 Parwan Attack constituted an extrajudicial killing.

466.    **Specialist Ryan Grady** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SPC Grady was injured in the July 2, 2010 Parwan Attack. SPC Grady died on July 2, 2010, as a result of injuries sustained during the attack.

467.    SPC Grady was a U.S. national at the time of the attack and his death.

468.    Plaintiff Heaven Grady-Gangwer is the widow of SPC Grady and a U.S. national.

469.    As a result of the July 2, 2010 Parwan Attack and SPC Grady's injuries and death, each member of the Grady Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Grady's society, companionship, and counsel.

470.    As a result of the July 2, 2010 Parwan Attack, SPC Grady was injured in his person and/or property. The Plaintiff members of the Grady Family are the survivors and/or heirs of SPC Grady and are entitled to recover for the damages SPC Grady sustained.

**SS.    The July 2, 2010 IED Attack in Kandahar (Jefferson Family)**

471.    On July 2, 2010, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "July 2, 2010 Attack"). The July 2, 2010 Attack constituted an extrajudicial killing.

472.    **Private First Class David Jefferson** served in Afghanistan as a member of the U.S. Army at the time of the attack. PFC Jefferson was injured in the July 2, 2010 Attack. PFC Jefferson died on July 2, 2010, as a result of injuries sustained during the attack.

473.    PFC Jefferson was a U.S. national at the time of the attack and his death.

474.    Plaintiff Darniece Melton-Jefferson is the widow of PFC Jefferson and a U.S. national.

475.    Plaintiff I.J., by and through his next friend Darniece Melton-Jefferson, is the minor son of PFC Jefferson. He is a U.S. national.

476.    As a result of the July 2, 2010 Attack and PFC Jefferson's injuries and death, each member of the Jefferson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Jefferson's society, companionship, and counsel.

477.    As a result of the July 2, 2010 Attack, PFC Jefferson was injured in his person and/or property. The Plaintiff members of the Jefferson Family are the survivors and/or heirs of PFC Jefferson and are entitled to recover for the damages PFC Jefferson sustained.

**TT.    The July 4, 2010 Complex Attack in Kandahar (McGarrah Family)**

478.    On July 4, 2010, the Taliban committed a complex attack involving an IED and rocket propelled grenades in Kandahar Province, Afghanistan (the "July 4, 2010 Attack"). The July 4, 2010 Attack constituted an extrajudicial killing.

479.    **Specialist Clayton McGarrah** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC McGarrah was injured in the July 4, 2010 Attack. SPC McGarrah died on July 4, 2010, as a result of injuries sustained during the attack.

480.    SPC McGarrah was a U.S. national at the time of the attack and his death.

481.    Plaintiff Michele McGarrah is the mother of SPC McGarrah and a U.S. national.

482.    Plaintiff Orville McGarrah is the father of SPC McGarrah and a U.S. national.

483.    Plaintiff Emilie McGarrah is the sister of SPC McGarrah and a U.S. national.

484.    Plaintiff James McGarrah is the brother of SPC McGarrah and a U.S. national.

485.    As a result of the July 4, 2010 Attack and SPC McGarrah's injuries and death, each member of the McGarrah Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC McGarrah's society, companionship, and counsel.

486.    As a result of the July 4, 2010 Attack, SPC McGarrah was injured in his person and/or property. The Plaintiff members of the McGarrah Family are the survivors and/or heirs of SPC McGarrah and are entitled to recover for the damages SPC McGarrah sustained.

**UU.    The July 10, 2010 Complex Attack in Kunar (Negron Family)**

487.    On July 10, 2010, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a complex attack involving small arms fire and rocket propelled grenades in Kunar Province, Afghanistan (the "July 10, 2010 Attack"). The July 10, 2010 Attack constituted an extrajudicial killing.

488.    **Specialist Carlos Negron Sr.** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Negron was injured in the July 10, 2010 Attack. SPC Negron died on July 10, 2010, as a result of injuries sustained during the attack.

489.    SPC Negron was a U.S. national at the time of the attack and his death.

490.    Plaintiff Carlos Negron Maldonado is the son of SPC Negron and a U.S. national.

491.    As a result of the July 10, 2010 Attack and SPC Negron's injuries and death, each member of the Negron Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Negron's society, companionship, and counsel.

492.    As a result of the July 10, 2010 Attack, SPC Negron was injured in his person and/or property. The Plaintiff members of the Negron Family are the survivors and/or heirs of SPC Negron and are entitled to recover for the damages SPC Negron sustained.

**VV.    The July 23, 2010 Small Arms Attack in Logar (Newlove Family)**

493.    On July 23, 2010, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a small arms attack in Logar Province, Afghanistan (the "July 23, 2010 Attack"). The July 23, 2010 Attack constituted an extrajudicial killing.

494.    **Petty Officer 3rd Class Jarod Newlove** served in Afghanistan as a member of the U.S. Navy at the time of the attack. PO3 Newlove was injured in the July 23, 2010 Attack. PO3 Newlove died on July 28, 2010, as a result of injuries sustained during the attack.

495.    PO3 Newlove was a U.S. national at the time of the attack and his death.

496.    Plaintiff William Newlove is the brother of PO3 Newlove and a U.S. national.

497.    As a result of the July 23, 2010 Attack and PO3 Newlove's injuries and death, each member of the Newlove Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO3 Newlove's society, companionship, and counsel.

498.    As a result of the July 23, 2010 Attack, PO3 Newlove was injured in his person and/or property. The Plaintiff members of the Newlove Family are the survivors and/or heirs of PO3 Newlove and are entitled to recover for the damages PO3 Newlove sustained.

**WW.  The July 24, 2010 IED Attack in Zabul (Hand Family)**

499.    On July 24, 2010, the Taliban committed an IED attack in Zabul Province, Afghanistan (the "July 24, 2010 Attack"). The July 24, 2010 Attack constituted an extrajudicial killing.

500.    **Specialist Andrew Hand** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Hand was injured in the July 24, 2010 Attack. SPC Hand died on July 24, 2010, as a result of injuries sustained during the attack.

501.    SPC Hand was a U.S. national at the time of the attack and his death.

502.    Plaintiff Kenneth Hand is the father of SPC Hand and a U.S. national.

503.    Plaintiff Renee Hand is the stepmother of SPC Hand and a U.S. national. Ms. Hand lived in the same household as SPC Hand for a substantial period of time and considered SPC Hand the functional equivalent of a biological son.

504.    Plaintiff Robert Bagwell III is the stepbrother of SPC Hand and a U.S. national. Mr. Bagwell lived in the same household as SPC Hand for a substantial period of time and considered SPC Hand the functional equivalent of a biological brother.

505.    As a result of the July 24, 2010 Attack and SPC Hand's injuries and death, each member of the Hand Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Hand's society, companionship, and counsel.

506.    As a result of the July 24, 2010 Attack, SPC Hand was injured in his person and/or property. The Plaintiff members of the Hand Family are the survivors and/or heirs of SPC Hand and are entitled to recover for the damages SPC Hand sustained.

### XX.    The August 7, 2010 IED Attack in Kandahar (Andrade Family)

507.    On August 7, 2010, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 7, 2010 Attack"). The August 7, 2010 Attack constituted an extrajudicial killing.

508.    **Private First Class John Andrade Sr.** served in Afghanistan as a member of the U.S. Army at the time of the attack. PFC Andrade was injured in the August 7, 2010 Attack. PFC Andrade died on August 7, 2010, as a result of injuries sustained during the attack.

509.    PFC Andrade was a U.S. national at the time of the attack and his death.

510.    Plaintiff Elizabeth Andrade is the widow of PFC Andrade and a U.S. national.

511.    Plaintiff Betty Martinez is the mother of PFC Andrade and a U.S. national.

512.    Plaintiff Madeline Andrade is the sister of PFC Andrade and a U.S. national.

513.    Plaintiff Pablo Martinez III is the brother of PFC Andrade and a U.S. national.

514.    Plaintiff Jennifer Medina is the sister of PFC Andrade and a U.S. national.

515.    Plaintiff Christopher Valadez is the brother of PFC Andrade and a U.S. national.

516.    Plaintiff Juanita Perez is the stepmother of PFC Andrade and a U.S. national. Mr. Perez lived in the same household as PFC Andrade for a substantial period of time and considered PFC Andrade the functional equivalent of a biological son.

517.    Plaintiff Pablo Martinez Jr. is the stepfather of PFC Andrade and a U.S. national. Mr. Martinez lived in the same household as PFC Andrade for a substantial period of time and considered PFC Andrade the functional equivalent of a biological son.

518.    As a result of the August 7, 2010 Attack and PFC Andrade's injuries and death, each member of the Andrade Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Andrade's society, companionship, and counsel.

519.    As a result of the August 7, 2010 Attack, PFC Andrade was injured in his person and/or property. The Plaintiff members of the Andrade Family are the survivors and/or heirs of PFC Andrade and are entitled to recover for the damages PFC Andrade sustained.

**YY.    The August 22, 2010 IED Attack in Kandahar (Millet-Meletiche Family)**

520.    On August 22, 2010, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 22, 2010 Attack"). The August 22, 2010 Attack constituted an extrajudicial killing.

521.    **Specialist Pedro Millet-Meletiche IV** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Millet-Meletiche was injured in the August 22, 2010 Attack. SPC Millet-Meletiche died on August 22, 2010, as a result of injuries sustained during the attack.

522.    SPC Millet-Meletiche was a U.S. national at the time of the attack and his death.

523.    Plaintiff Denise Meletiche is the mother of SPC Millet-Meletiche and a U.S. national.

524.    As a result of the August 22, 2010 Attack and SPC Millet-Meletiche's injuries and death, each member of the Millet-Meletiche Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Millet-Meletiche's society, companionship, and counsel.

525.     As a result of the August 22, 2010 Attack, SPC Millet-Meletiche was injured in his person and/or property. The Plaintiff members of the Millet-Meletiche Family are the survivors and/or heirs of SPC Millet-Meletiche and are entitled to recover for the damages SPC Millet-Meletiche sustained.

**ZZ.     The August 28, 2010 Rocket Propelled Grenade Attack in Nangarhar (Raver Family)**

526.     On August 28, 2010, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a rocket propelled grenade attack in Nangarhar Province, Afghanistan (the "August 28, 2010 Attack"). The August 28, 2010 Attack constituted an extrajudicial killing.

527.     **Specialist Bryn Raver** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Raver was injured in the August 28, 2010 Attack. SPC Raver died on August 28, 2010, as a result of injuries sustained during the attack.

528.     SPC Raver was a U.S. national at the time of the attack and his death.

529.     Plaintiff Charles Raver is the father of SPC Raver and a U.S. national.

530.     As a result of the August 28, 2010 Attack and SPC Raver's injuries and death, each member of the Raver Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Raver's society, companionship, and counsel.

531.     As a result of the August 28, 2010 Attack, SPC Raver was injured in his person and/or property. The Plaintiff members of the Raver Family are the survivors and/or heirs of SPC Raver and are entitled to recover for the damages SPC Raver sustained.

**AAA.   The August 31, 2010 IED Attack in Logar (Alcaraz Family)**

532.     On August 31, 2010, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell

committed an IED attack in Logar, Afghanistan (the "August 31, 2010 Attack"). The August 31, 2010 Attack constituted an extrajudicial killing.

533. **Sergeant Raymond Alcaraz Jr.** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Alcaraz was injured in the August 31, 2010 Attack. SGT Alcaraz died on September 1, 2010, as a result of injuries sustained during the attack.

534. SGT Alcaraz was a U.S. national at the time of the attack and his death.

535. Plaintiff Lucas Gonzales III is the brother of SGT Alcaraz Jr. and a U.S. national.

536. As a result of the August 31, 2010 Attack and SGT Alcaraz's injuries and death, each member of the Alcaraz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Alcaraz's society, companionship, and counsel.

537. As a result of the August 31, 2010 Attack, SGT Alcaraz was injured in his person and/or property. The Plaintiff members of the Alcaraz Family are the survivors and/or heirs of SGT Alcaraz and are entitled to recover for the damages SGT Alcaraz sustained.

**BBB. The September 2, 2010 Small Arms Attack in Helmand (Twigg Family)**

538. On September 2, 2010, the Taliban committed a small arms attack in Helmand Province, Afghanistan (the "September 2, 2010 Attack"). The September 2, 2010 Attack constituted an extrajudicial killing.

539. **Lance Corporal Joshua Twigg** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. LCpl Twigg was injured in the September 2, 2010 Attack. LCpl Twigg died on September 2, 2010, as a result of injuries sustained during the attack.

540. LCpl Twigg was a U.S. national at the time of the attack and his death.

541. Plaintiff Terri Twigg is the mother of LCpl Twigg and a U.S. national.

542. Plaintiff Carolyn Ressler is the sister of LCpl Twigg and a U.S. national.

543. Plaintiff Aaron Twigg is the brother of LCpl Twigg and a U.S. national.

544.     As a result of the September 2, 2010 Attack and LCpl Twigg's injuries and death, each member of the Twigg Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Twigg's society, companionship, and counsel.

545.     As a result of the September 2, 2010 Attack, LCpl Twigg was injured in his person and/or property. The Plaintiff members of the Twigg Family are the survivors and/or heirs of LCpl Twigg and are entitled to recover for the damages LCpl Twigg sustained.

**CCC.  The September 16, 2010 IED Attack in Kandahar (Johnson Family)**

546.     On September 16, 2010, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "September 16, 2010 Attack"). The September 16, 2010 Attack constituted an extrajudicial killing.

547.     **Specialist Timothy Johnson** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Johnson was injured in the September 16, 2010 Attack. SPC Johnson died on September 16, 2010, as a result of injuries sustained during the attack.

548.     SPC Johnson was a U.S. national at the time of the attack and his death.

549.     Plaintiff Thomas Jenkins is the brother of SPC Johnson and a U.S. national.

550.     Plaintiff Tanisha Pierce is the sister of SPC Johnson and a U.S. national.

551.     Plaintiff Damond Smith Jr. is the nephew of SPC Johnson and a U.S. national. Smith lived in the same household as SPC Johnson for a substantial period of time and considered SPC Johnson the functional equivalent of a biological brother.

552.     As a result of the September 16, 2010 Attack and SPC Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Johnson's society, companionship, and counsel.

553.    As a result of the September 16, 2010 Attack, SPC Johnson was injured in his person and/or property. The Plaintiff members of the Johnson Family are the survivors and/or heirs of SPC Johnson and are entitled to recover for the damages SPC Johnson sustained.

**DDD.  The September 18, 2010 Machine Gun Attack in Kunduz (Grider Family)**

554.    On September 18, 2010, the Taliban committed a machine gun fire attack in Kunduz Province, Afghanistan (the "September 18, 2010 Attack"). The September 18, 2010 Attack constituted an extrajudicial killing.

555.    **Sergeant 1st Class Ronald Grider** served in Afghanistan as a member of the U.S. Army at the time of the attack. SFC Grider was injured in the September 18, 2010 Attack. SFC Grider died on September 18, 2010, as a result of injuries sustained during the attack.

556.    SFC Grider was a U.S. national at the time of the attack and his death.

557.    Plaintiff Ronald Grider is the father of SFC Grider and a U.S. national.

558.    Plaintiff Sherry Grider is the sister of SFC Grider and a U.S. national.

559.    Plaintiff Virginia Grider is the stepmother of SFC Grider and a U.S. national. Ms. Grider lived in the same household as SFC Grider for a substantial period of time and considered SFC Grider the functional equivalent of a biological son.

560.    As a result of the September 18, 2010 Attack and SFC Grider's injuries and death, each member of the Grider Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Grider's society, companionship, and counsel.

561.    As a result of the September 18, 2010 Attack, SFC Grider was injured in his person and/or property. The Plaintiff members of the Grider Family are the survivors and/or heirs of SFC Grider and are entitled to recover for the damages SFC Grider sustained.

**EEE.  The September 18, 2010 Direct Fire Attack in Faryab (Harton Family)**

562.    On September 18, 2010, the Taliban committed a direct fire attack in Faryab Province, Afghanistan (the "September 18, 2010 Attack"). The September 18, 2010 Attack constituted an extrajudicial killing.

563.    **Corporal Joshua Harton** served in Afghanistan as a member of the U.S. Army at the time of the attack. CPL Harton was injured in the September 18, 2010 Attack. CPL Harton died on September 18, 2010, as a result of injuries sustained during the attack.

564.    CPL Harton was a U.S. national at the time of the attack and his death.

565.    Plaintiff Jessica Charles is the sister of CPL Harton and a U.S. national.

566.    As a result of the September 18, 2010 Attack and CPL Harton's injuries and death, each member of the Harton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Harton's society, companionship, and counsel.

567.    As a result of the September 18, 2010 Attack, CPL Harton was injured in his person and/or property. The Plaintiff members of the Harton Family are the survivors and/or heirs of CPL Harton and are entitled to recover for the damages CPL Harton sustained.

**FFF.  The October 4, 2010 IED Attack in Kandahar (Campbell Family)**

568.    On October 4, 2010, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 4, 2010 Attack"). The October 4, 2010 Attack constituted an extrajudicial killing.

569.    **Sergeant Karl Campbell** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Campbell was injured in the October 4, 2010 Attack. SGT Campbell died on October 4, 2010, as a result of injuries sustained during the attack.

570.    SGT Campbell was a U.S. national at the time of the attack and his death.

571.    Plaintiff Audrey Bowers is the sister of SGT Campbell and a U.S. national.

572.    As a result of the October 4, 2010 Attack and SGT Campbell's injuries and death, each member of the Campbell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Campbell's society, companionship, and counsel.

573.    As a result of the October 4, 2010 Attack, SGT Campbell was injured in his person and/or property. The Plaintiff members of the Campbell Family are the survivors and/or heirs of SGT Campbell and are entitled to recover for the damages SGT Campbell sustained.

**GGG.  The October 5, 2010 IED Attack in Kandahar (Johnson Family)**

574.    On October 5, 2010, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 5, 2010 Attack"). The October 5, 2010 Attack constituted an extrajudicial killing.

575.    **Senior Airman Daniel Johnson** served in Afghanistan as a member of the U.S. Air Force at the time of the attack. SrA Johnson was injured in the October 5, 2010 Attack. SrA Johnson died on October 5, 2010, as a result of injuries sustained during the attack.

576.    SrA Johnson was a U.S. national at the time of the attack and his death.

577.    Plaintiff Kristen Johnson is the widow of SrA Johnson and a U.S. national.

578.    Plaintiff Holly Higgins is the mother of SrA Johnson and a U.S. national.

579.    Plaintiff James Johnson is the father of SrA Johnson and a U.S. national.

580.    Plaintiff Erik Johnson is the brother of SrA Johnson and a U.S. national.

581.    Plaintiff Peter Johnson is the brother of SrA Johnson and a U.S. national.

582.    Plaintiff William Johnson is the brother of SrA Johnson and a U.S. national.

583.    As a result of the October 5, 2010 Attack and SrA Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SrA Johnson's society, companionship, and counsel.

584.    As a result of the October 5, 2010 Attack, SrA Johnson was injured in his person and/or property. The Plaintiff members of the Johnson Family are the survivors and/or heirs of SrA Johnson and are entitled to recover for the damages SrA Johnson sustained.

**HHH.  The October 6, 2010 IED Attack in Helmand (Sockalosky Family)**

585.    On October 6, 2010, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "October 6, 2010 Attack"). The October 6, 2010 Attack constituted an extrajudicial killing.

586.    **Corporal Stephen Sockalosky** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. Cpl Sockalosky was injured in the October 6, 2010 Attack. Cpl Sockalosky died on October 6, 2010, as a result of injuries sustained during the attack.

587.    Cpl Sockalosky was a U.S. national at the time of the attack and his death.

588.    Plaintiff Brittany Ball is the widow of Cpl Sockalosky and a U.S. national.

589.    As a result of the October 6, 2010 Attack and Cpl Sockalosky's injuries and death, each member of the Sockalosky Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Sockalosky's society, companionship, and counsel.

590.    As a result of the October 6, 2010 Attack, Cpl Sockalosky was injured in his person and/or property. The Plaintiff members of the Sockalosky Family are the survivors and/or heirs of Cpl Sockalosky and are entitled to recover for the damages Cpl Sockalosky sustained.

**III.    The October 14, 2010 IED Attack in Badghis (Billingsley Family)**

591.    On October 14, 2010, the Taliban committed an IED attack in Badghis Province, Afghanistan (the "October 14, 2010 Attack"). The October 14, 2010 Attack constituted an extrajudicial killing.

592.    **Private First Class Tramaine Billingsley** served in Afghanistan as a member of the U.S. Army at the time of the attack. PFC Billingsley was injured in the October 14, 2010 Attack. PFC Billingsley died on October 14, 2010, as a result of injuries sustained during the attack.

593.    PFC Billingsley was a U.S. national at the time of the attack and his death.

594.    Plaintiff Trevon Chambers is the brother of PFC Billingsley and a U.S. national.

595.    As a result of the October 14, 2010 Attack and PFC Billingsley's injuries and death, each member of the Billingsley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Billingsley's society, companionship, and counsel.

596.    As a result of the October 14, 2010 Attack, PFC Billingsley was injured in his person and/or property. The Plaintiff members of the Billingsley Family are the survivors and/or heirs of PFC Billingsley and are entitled to recover for the damages PFC Billingsley sustained.

**JJJ.    The November 29, 2010 Insider Attack in Nangarhar (McLain Family)**

597.    On November 29, 2010, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed an insider attack in Nangarhar Province, Afghanistan (the "November 29, 2010 Attack"). The November 29, 2010 Attack constituted an extrajudicial killing.

598.    **Private First Class Buddy McLain** served in Afghanistan as a member of the U.S. Army at the time of the attack. PFC McLain was injured in the November 29, 2010 Attack. PFC McLain died on November 29, 2010, as a result of injuries sustained during the attack.

599.    PFC McLain was a U.S. national at the time of the attack and his death.

600.    Plaintiff O.M., by and through his next friend Chelsea McLain, is the minor son of PFC McLain. He is a U.S. national.

601.    As a result of the November 29, 2010 Attack and PFC McLain's injuries and death, each member of the McLain Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McLain's society, companionship, and counsel.

602.    As a result of the November 29, 2010 Attack, PFC McLain was injured in his person and/or property. The Plaintiff members of the McLain Family are the survivors and/or heirs of PFC McLain and are entitled to recover for the damages PFC McLain sustained.

**KKK.  The March 19, 2011 Small Arms Attack in Kandahar (Mickler Family)**

603.    On March 19, 2011, the Taliban committed a small arms attack in Kandahar Province, Afghanistan (the "March 19, 2011 Attack"). The March 19, 2011 Attack constituted an extrajudicial killing.

604.    **Sergeant Donald Mickler Jr.** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Mickler was injured in the March 19, 2011 Attack. SGT Mickler died on March 19, 2011, as a result of injuries sustained during the attack.

605.    SGT Mickler was a U.S. national at the time of the attack and his death.

606.    Plaintiff Robert Mickler is the brother of SGT Mickler and a U.S. national.

607.    As a result of the March 19, 2011 Attack and SGT Mickler's injuries and death, each member of the Mickler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Mickler's society, companionship, and counsel.

608.    As a result of the March 19, 2011 Attack, SGT Mickler was injured in his person and/or property. The Plaintiff members of the Mickler Family are the survivors and/or heirs of SGT Mickler and are entitled to recover for the damages SGT Mickler sustained.

**LLL.  The March 29, 2011 Small Arms Attack in Kunar (Adamski Family)**

609.    On March 29, 2011, Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a small arms attack in Kunar

Province, Afghanistan (the "March 29, 2011 Attack"). The March 29, 2011 Attack constituted an extrajudicial killing.

610. **Staff Sergeant Frank Adamski III** served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Adamski was injured in the March 29, 2011 Attack. SSG Adamski died on March 29, 2011, as a result of injuries sustained during the attack.

611. SSG Adamski was a U.S. national at the time of the attack and his death.

612. Plaintiff Veronica Adamski is the sister of SSG Adamski III and a U.S. national.

613. Plaintiff Christopher Fink is the stepbrother of SSG Adamski III and a U.S. national. Mr. Fink lived in the same household as SSG Adamski III for a substantial period of time and considered SSG Adamski III the functional equivalent of a biological brother.

614. As a result of the March 29, 2011 Attack and SSG Adamski's injuries and death, each member of the Adamski Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Adamski's society, companionship, and counsel.

615. As a result of the March 29, 2011 Attack, SSG Adamski was injured in his person and/or property. The Plaintiff members of the Adamski Family are the survivors and/or heirs of SSG Adamski and are entitled to recover for the damages SSG Adamski sustained.

### MMM.        The April 16, 2011 Insider Attack in Laghman (Adkins Family)

616. On April 16, 2011, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a suicide bombing insider attack in Laghman Province, Afghanistan (the "April 16, 2011 Attack"). The April 16, 2011 Attack constituted an extrajudicial killing.

617. **Sergeant First Class Charles Adkins** served in Afghanistan as a member of the U.S. Army at the time of the attack. SFC Adkins was injured in the April 16, 2011 Attack. SFC Adkins died on April 16, 2011, as a result of injuries sustained during the attack.

618.    SFC Adkins was a U.S. national at the time of the attack and his death.

619.    Plaintiff Richard Good is the stepfather of SFC Adkins and a U.S. national. Mr. Good lived in the same household as SFC Adkins for a substantial period of time and considered SFC Adkins the functional equivalent of a biological son.

620.    As a result of the April 16, 2011 Attack and SFC Adkins's injuries and death, each member of the Adkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Adkins's society, companionship, and counsel.

621.    As a result of the April 16, 2011 Attack, SFC Adkins was injured in his person and/or property. The Plaintiff members of the Adkins Family are the survivors and/or heirs of SFC Adkins and are entitled to recover for the damages SFC Adkins sustained.

**NNN.  The April 27, 2011 Insider Attack in Kabul (Brown Family)**

622.    On April 27, 2011, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network committed an insider attack in Kabul Province, Afghanistan (the "April 27, 2011 Attack"). The April 27, 2011 Attack constituted an extrajudicial killing.

623.    **Master Sergeant Tara Brown** served in Afghanistan as a member of the U.S. Air Force at the time of the attack. MSgt Brown was injured in the April 27, 2011 Attack. MSgt Brown died on April 27, 2011, as a result of injuries sustained during the attack.

624.    MSgt Brown was a U.S. national at the time of the attack and her death.

625.    Plaintiff Jim Augustino Jacobs is the brother of MSgt Brown and a U.S. national.

626.    As a result of the April 27, 2011 Attack and MSgt Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSgt Brown's society, companionship, and counsel.

627.    As a result of the April 27, 2011 Attack, MSgt Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of MSgt Brown and are entitled to recover for the damages MSgt Brown sustained.

**OOO.  The April 28, 2011 IED Attack in Helmand (Freeman Family)**

628.    On April 28, 2011, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "April 28, 2011 Attack"). The April 28, 2011 Attack constituted an extrajudicial killing.

629.    **Lance Corporal Ronald Freeman** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. LCpl Freeman was injured in the April 28, 2011 Attack. LCpl Freeman died on April 28, 2011, as a result of injuries sustained during the attack.

630.    LCpl Freeman was a U.S. national at the time of the attack and his death.

631.    Plaintiff Icalynn Engelmann is the sister of LCpl Freeman and a U.S. national.

632.    As a result of the April 28, 2011 Attack and LCpl Freeman's injuries and death, each member of the Freeman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Freeman's society, companionship, and counsel.

633.    As a result of the April 28, 2011 Attack, LCpl Freeman was injured in his person and/or property. The Plaintiff members of the Freeman Family are the survivors and/or heirs of LCpl Freeman and are entitled to recover for the damages LCpl Freeman sustained.

**PPP.  The June 3, 2011 Sniper Attack in Helmand (Zanowick Family)**

634.    On June 3, 2011, the Taliban committed a sniper attack in Helmand Province, Afghanistan (the "June 3, 2011 Attack"). The June 3, 2011 Attack constituted an extrajudicial killing.

635.     **Corporal Paul Zanowick II** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. Cpl Zanowick was injured in the June 3, 2011 Attack. Cpl Zanowick died on June 3, 2011, as a result of injuries sustained during the attack.

636.     Cpl Zanowick was a U.S. national at the time of the attack and his death.

637.     Plaintiff Nanette Zanowick is the mother of Cpl Zanowick and a U.S. national.

638.     Plaintiff Paul Zanowick is the father of Cpl Zanowick and a U.S. national.

639.     Plaintiff Nicole Zanowick-Smith is the sister of Cpl Zanowick and a U.S. national.

640.     As a result of the June 3, 2011 Attack and Cpl Zanowick's injuries and death, each member of the Zanowick Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Zanowick's society, companionship, and counsel.

641.     As a result of the June 3, 2011 Attack, Cpl Zanowick was injured in his person and/or property. The Plaintiff members of the Zanowick Family are the survivors and/or heirs of Cpl Zanowick and are entitled to recover for the damages Cpl Zanowick sustained.

**QQQ.  The August 6, 2011 Helicopter Attack in Wardak (Campbell, Douangdara, Hamburger, Null, Pittman, Robinson, and Vickers Families)**

642.     On August 6, 2011, the Taliban committed an attack on a helicopter in Wardak Province, Afghanistan (the "August 6, 2011 Attack"). The August 6, 2011 Attack constituted an extrajudicial killing.

643.     **Chief Petty Officer Christopher Campbell** served in Afghanistan as a member of the U.S. Navy at the time of the attack. CPO Campbell was injured in the August 6, 2011 Attack. CPO Campbell died on August 6, 2011, as a result of injuries sustained during the attack.

644.     CPO Campbell was a U.S. national at the time of the attack and his death.

645.     Plaintiff Lilly Campbell is the mother of CPO Campbell and a U.S. national.

646.    As a result of the August 6, 2011 Attack and CPO Campbell's injuries and death, each member of the Campbell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Campbell's society, companionship, and counsel.

647.    As a result of the August 6, 2011 Attack, CPO Campbell was injured in his person and/or property. The Plaintiff members of the Campbell Family are the survivors and/or heirs of CPO Campbell and are entitled to recover for the damages CPO Campbell sustained.

648.    **Petty Officer First Class John Douangdara** served in Afghanistan as a member of the U.S. Navy at the time of the attack. PO1 Douangdara was injured in the August 6, 2011 Attack. PO1 Douangdara died on August 6, 2011, as a result of injuries sustained during the attack.

649.    PO1 Douangdara was a U.S. national at the time of the attack and his death.

650.    Plaintiff Phouthasith Douangdara is the father of PO1 Douangdara and a U.S. national.

651.    Plaintiff Ariyavanh Douangdara is the sister of PO1 Douangdara and a U.S. national.

652.    As a result of the August 6, 2011 Attack and PO1 Douangdara's injuries and death, each member of the Douangdara Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Douangdara's society, companionship, and counsel.

653.    As a result of the August 6, 2011 Attack, PO1 Douangdara was injured in his person and/or property. The Plaintiff members of the Douangdara Family are the survivors and/or heirs of PO1 Douangdara and are entitled to recover for the damages PO1 Douangdara sustained.

654.    **Staff Sergeant Patrick Hamburger** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SSG Hamburger was injured in the August 6, 2011 Attack. SSG Hamburger died on August 6, 2011, as a result of injuries sustained during the attack.

655.    SSG Hamburger was a U.S. national at the time of the attack and his death.

656.    Plaintiff P.H., by and through her next friend Candie Reagan, is the minor daughter of SSG Hamburger. She is a U.S. national.

657.    Plaintiff Douglas Hamburger is the father of SSG Hamburger and a U.S. national.

658.    Plaintiff Christopher Hamburger is the brother of SSG Hamburger and a U.S. national.

659.    As a result of the August 6, 2011 Attack and SSG Hamburger's injuries and death, each member of the Hamburger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Hamburger's society, companionship, and counsel.

660.    As a result of the August 6, 2011 Attack, SSG Hamburger was injured in his person and/or property. The Plaintiff members of the Hamburger Family are the survivors and/or heirs of SSG Hamburger and are entitled to recover for the damages SSG Hamburger sustained.

661.    **Chief Petty Officer Nicholas Null** served in Afghanistan as a member of the U.S. Navy at the time of the attack. CPO Null was injured in the August 6, 2011 Attack. CPO Null died on August 6, 2011, as a result of injuries sustained during the attack.

662.    CPO Null was a U.S. national at the time of the attack and his death.

663.    Plaintiff Tracy Kendall Litman is the mother of CPO Null and a U.S. national.

664.    Plaintiff Ashley Sanders is the sister of CPO Null and a U.S. national.

665.    As a result of the August 6, 2011 Attack and CPO Null's injuries and death, each member of the Null Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Null's society, companionship, and counsel.

666.    As a result of the August 6, 2011 Attack, CPO Null was injured in his person and/or property. The Plaintiff members of the Null Family are the survivors and/or heirs of CPO Null and are entitled to recover for the damages CPO Null sustained.

667.    **Petty Officer First Class Jesse Pittman** served in Afghanistan as a member of the U.S. Navy at the time of the attack. PO1 Pittman was injured in the August 6, 2011 Attack. PO1 Pittman died on August 6, 2011, as a result of injuries sustained during the attack.

668.    PO1 Pittman was a U.S. national at the time of the attack and his death.

669.    Plaintiff Corey Pittman is the brother of PO1 Pittman and a U.S. national.

670.    Plaintiff John Pittman Jr. is the brother of PO1 Pittman and a U.S. national.

671.    As a result of the August 6, 2011 Attack and PO1 Pittman's injuries and death, each member of the Pittman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Pittman's society, companionship, and counsel.

672.    As a result of the August 6, 2011 Attack, PO1 Pittman was injured in his person and/or property. The Plaintiff members of the Pittman Family are the survivors and/or heirs of PO1 Pittman and are entitled to recover for the damages PO1 Pittman sustained.

673.    **Senior Chief Petty Officer Heath Robinson** served in Afghanistan as a member of the U.S. Navy at the time of the attack. SCPO Robinson was injured in the August 6, 2011 Attack. SCPO Robinson died on August 6, 2011, as a result of injuries sustained during the attack.

674.    SCPO Robinson was a U.S. national at the time of the attack and his death.

675.    Plaintiff Gear Robinson is the brother of SCPO Robinson and a U.S. national.

676.    As a result of the August 6, 2011 Attack and SCPO Robinson's injuries and death, each member of the Robinson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SCPO Robinson's society, companionship, and counsel.

677.    As a result of the August 6, 2011 Attack, SCPO Robinson was injured in his person and/or property. The Plaintiff members of the Robinson Family are the survivors and/or heirs of SCPO Robinson and are entitled to recover for the damages SCPO Robinson sustained.

678.    **Senior Chief Petty Officer Kraig Vickers** served in Afghanistan as a member of the U.S. Navy at the time of the attack. SCPO Vickers was injured in the August 6, 2011 Attack. SCPO Vickers died on August 6, 2011, as a result of injuries sustained during the attack.

679.    SCPO Vickers was a U.S. national at the time of the attack and his death.

680.    Plaintiff Vance Vickers is the brother of SCPO Vickers and a U.S. national.

681.    As a result of the August 6, 2011 Attack and SCPO Vickers's injuries and death, each member of the Vickers Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SCPO Vickers's society, companionship, and counsel.

682.    As a result of the August 6, 2011 Attack, SCPO Vickers was injured in his person and/or property. The Plaintiff members of the Vickers Family are the survivors and/or heirs of SCPO Vickers and are entitled to recover for the damages SCPO Vickers sustained.

**RRR.  The August 28, 2011 Complex Attack in Kandahar (Green Family)**

683.    On August 28, 2011, the Taliban committed a complex attack involving an IED and small arms fire in Kandahar Province, Afghanistan (the "August 28, 2011 Attack"). The August 28, 2011 Attack constituted an extrajudicial killing.

684.    **Specialist Douglas Green** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Green was injured in the August 28, 2011 Attack. SPC Green died on August 28, 2011, as a result of injuries sustained during the attack.

685.    SPC Green was a U.S. national at the time of the attack and his death.

686.    Plaintiff Douglas Green is the father of SPC Green and a U.S. national.

687.    As a result of the August 28, 2011 Attack and SPC Green's injuries and death, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Green's society, companionship, and counsel.

688.    As a result of the August 28, 2011 Attack, SPC Green was injured in his person and/or property. The Plaintiff members of the Green Family are the survivors and/or heirs of SPC Green and are entitled to recover for the damages SPC Green sustained.

**SSS.    The September 18, 2011 IED Attack in Kandahar (Clark Family)**

689.    On September 18, 2011, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "September 18, 2011 Attack"). The September 18, 2011 Attack constituted an extrajudicial killing.

690.    **Specialist Chazray Clark** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Clark was injured in the September 18, 2011 Attack. SPC Clark died on September 18, 2011, as a result of injuries sustained during the attack.

691.    SPC Clark was a U.S. national at the time of the attack and his death.

692.    Plaintiff Cleveland Davis is the brother of SPC Clark and a U.S. national.

693.    As a result of the September 18, 2011 Attack and SPC Clark's injuries and death, each member of the Clark Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Clark's society, companionship, and counsel.

694.    As a result of the September 18, 2011 Attack, SPC Clark was injured in his person and/or property. The Plaintiff members of the Clark Family are the survivors and/or heirs of SPC Clark and are entitled to recover for the damages SPC Clark sustained.

**TTT.   The September 25, 2011 IED Attack in Laghman (Briseño-Alvarez Family)**

695.    On September 25, 2011, the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together as a joint al-Qaeda-Taliban cell committed an IED attack in Laghman Province, Afghanistan (the "September 25, 2011 Attack"). The September 25, 2011 Attack constituted an extrajudicial killing.

696.    **Specialist Francisco Briseño-Alvarez Jr.** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SPC Briseño-Alvarez was injured in the September 25, 2011 Attack. SPC Briseño-Alvarez died on September 25, 2011, as a result of injuries sustained during the attack.

697.    SPC Briseño-Alvarez was a member of the U.S. armed forces at the time of the attack and his death.

698.    Plaintiff Maria Briseno is the mother of SPC Briseño-Alvarez and a U.S. national.

699.    As a result of the September 25, 2011 Attack and SPC Briseño-Alvarez's injuries and death, each member of the Briseño-Alvarez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Briseño-Alvarez's society, companionship, and counsel.

700.    As a result of the September 25, 2011 Attack, SPC Briseño-Alvarez was injured in his person and/or property. The Plaintiff members of the Briseño-Alvarez Family are the survivors and/or heirs of SPC Briseño-Alvarez and are entitled to recover for the damages SPC Briseño-Alvarez sustained.

**UUU.  The October 29, 2011 Suicide Bombing Attack in Kabul (Darrough Family)**

701.    On October 29, 2011, the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network committed a suicide bombing attack in Kabul Province, Afghanistan (the "October 29, 2011 Attack"). The October 29, 2011 Attack constituted an extrajudicial killing.

702.    **Sergeant James Darrough** served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Darrough was injured in the October 29, 2011 Attack. SGT Darrough died on October 29, 2011, as a result of injuries sustained during the attack.

703.    SGT Darrough was a U.S. national at the time of the attack and his death.

704.    Plaintiff Ashley Dyer is the stepsister of SGT Darrough and a U.S. national. Ms. Dyer lived in the same household as SGT Darrough for a substantial period of time and considered SGT Darrough the functional equivalent of a biological brother.

705.    As a result of the October 29, 2011 Attack and SGT Darrough's injuries and death, each member of the Darrough Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Darrough's society, companionship, and counsel.

706.    As a result of the October 29, 2011 Attack, SGT Darrough was injured in his person and/or property. The Plaintiff members of the Darrough Family are the survivors and/or heirs of SGT Darrough and are entitled to recover for the damages SGT Darrough sustained.

**VVV.  The December 7, 2011 Small Arms Attack in Helmand (Levy Family)**

707.    On December 7, 2011, the Taliban committed a small arms attack in Helmand Province, Afghanistan (the "December 7, 2011 Attack"). The December 7, 2011 Attack constituted an extrajudicial killing.

708.    **Lance Corporal Christopher Levy** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. LCpl Levy was injured in the December 7, 2011 Attack. LCpl Levy died on December 10, 2011, as a result of injuries sustained during the attack.

709.    LCpl Levy was a U.S. national at the time of the attack and his death.

710.    Plaintiff Amanda Ballard is the mother of LCpl Levy and a U.S. national.

711.    Plaintiff Kaleb Levy is the brother of LCpl Levy and a U.S. national.

712.    Plaintiff Elijah Sheek is the brother of LCpl Levy and a U.S. national.

713.    Plaintiff Joshua Yates is the stepbrother of LCpl Levy and a U.S. national. Mr. Yates lived in the same household as LCpl Levy for a substantial period of time and considered LCpl Levy the functional equivalent of a biological brother.

714.    As a result of the December 7, 2011 Attack and LCpl Levy's injuries and death, each member of the Levy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Levy's society, companionship, and counsel.

715.    As a result of the December 7, 2011 Attack, LCpl Levy was injured in his person and/or property. The Plaintiff members of the Levy Family are the survivors and/or heirs of LCpl Levy and are entitled to recover for the damages LCpl Levy sustained.

### WWW.    The March 27, 2012 IED Attack in Helmand (D'Augustine Family)

716.    On March 27, 2012, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "March 27, 2012 Attack"). The March 27, 2012 Attack constituted an extrajudicial killing.

717.    **Staff Sergeant Joseph D'Augustine** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. SSgt D'Augustine was injured in the March 27, 2012 Attack. SSgt D'Augustine died on March 27, 2012, as a result of injuries sustained during the attack.

718.    SSgt D'Augustine was a U.S. national at the time of the attack and his death.

719.    Plaintiff Jennifer D'Augustine is the sister of SSgt D'Augustine and a U.S. national.

720.    As a result of the March 27, 2012 Attack and SSgt D'Augustine's injuries and death, each member of the D'Augustine Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt D'Augustine's society, companionship, and counsel.

721.    As a result of the March 27, 2012 Attack, SSgt D'Augustine was injured in his person and/or property. The Plaintiff members of the D'Augustine Family are the survivors and/or heirs of SSgt D'Augustine and are entitled to recover for the damages SSgt D'Augustine sustained.

**XXX.   The April 4, 2012 Suicide Bombing Attack in Faryab (Rosebrock Family)**

722.    On April 4, 2012, the Taliban and al-Qaeda (a designated FTO at the time of the attack) committed a suicide bombing attack in Faryab Province, Afghanistan (the "April 4, 2012 Attack"). The April 4, 2012 Attack constituted an extrajudicial killing.

723.    Captain Christopher Rosebrock served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. CPT Rosebrock was injured in the April 4, 2012 Attack. The April 4, 2012 Attack severely wounded CPT Rosebrock, who suffered from disfiguring shrapnel wounds, muscular atrophy and reduced mobility in his left arm, a concussion, a traumatic brain injury, and blown eardrums.

724.    CPT Rosebrock was a U.S. national at the time of the attack and remains one today.

725.    Plaintiff Penny Battershell is the mother of CPT Rosebrock and a U.S. national.

726.    As a result of the April 4, 2012 Attack and CPT Rosebrock injuries, each member of the Rosebrock Family has experienced severe mental anguish, emotional pain, and suffering.

**YYY.  The May 6, 2012 IED Attack in Paktia (Fogarty Family)**

727.    On May 6, 2012, the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed an IED attack in Paktia Province, Afghanistan (the "May 6, 2012 Attack"). The May 6, 2012 Attack constituted an extrajudicial killing.

728.    **Staff Sergeant Thomas Fogarty** served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Fogarty was injured in the May 6, 2012 Attack. SSG Fogarty died on May 6, 2012, as a result of injuries sustained during the attack.

729.    SSG Fogarty was a U.S. national at the time of the attack and his death.

730.    Plaintiff Rory Fogarty is the brother of SSG Fogarty and a U.S. national.

731.    As a result of the May 6, 2012 Attack and SSG Fogarty's injuries and death, each member of the Fogarty Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Fogarty's society, companionship, and counsel.

732.    As a result of the May 6, 2012 Attack, SSG Fogarty was injured in his person and/or property. The Plaintiff members of the Fogarty Family are the survivors and/or heirs of SSG Fogarty and are entitled to recover for the damages SSG Fogarty sustained.

**ZZZ.  The May 23, 2012 IED Attack in Kandahar (Morgado Family)**

733.    On May 23, 2012, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 23, 2012 Attack"). The May 23, 2012 Attack constituted an extrajudicial killing.

734. **Second Lieutenant Travis Morgado** served in Afghanistan as a member of the U.S. Army at the time of the attack. 2LT Morgado was injured in the May 23, 2012 Attack. 2LT Morgado died on May 23, 2012, as a result of injuries sustained during the attack.

735. 2LT Morgado was a U.S. national at the time of the attack and his death.

736. Plaintiff Carlos Morgado is the brother of 2LT Morgado and a U.S. national.

737. As a result of the May 23, 2012 Attack and 2LT Morgado's injuries and death, each member of the Morgado Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 2LT Morgado's society, companionship, and counsel.

738. As a result of the May 23, 2012 Attack, 2LT Morgado was injured in his person and/or property. The Plaintiff members of the Morgado Family are the survivors and/or heirs of 2LT Morgado and are entitled to recover for the damages 2LT Morgado sustained.

**AAAA.        The September 14, 2012 Complex Attack in Helmand (Atwell Family)**

739. On September 14, 2012, the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Helmand Province, Afghanistan (the "September 14, 2012 Attack"). The September 14, 2012 Attack constituted an extrajudicial killing.

740. **Sergeant Bradley Atwell** served in Afghanistan as a member of the U.S. Marine Corps at the time of the attack. Sgt Atwell was injured in the September 14, 2012 Attack. Sgt Atwell died on September 15, 2012, as a result of injuries sustained during the attack.

741. Sgt Atwell was a U.S. national at the time of the attack and his death.

742. Plaintiff Victor Atwell is the father of Sgt Atwell and a U.S. national.

743. Plaintiff Kimberlee Atwell is the stepmother of Sgt Atwell and a U.S. national. Ms. Atwell lived in the same household as Sgt Atwell for a substantial period of time and considered Sgt Atwell the functional equivalent of a biological son.

744.    As a result of the September 14, 2012 Attack and Sgt Atwell's injuries and death, each member of the Atwell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Atwell's society, companionship, and counsel.

745.    As a result of the September 14, 2012 Attack, Sgt Atwell was injured in his person and/or property. The Plaintiff members of the Atwell Family are the survivors and/or heirs of Sgt Atwell and are entitled to recover for the damages Sgt Atwell sustained.

**BBBB. The December 10, 2012 IED Attack in Kandahar (Williams Family)**

746.    On December 10, 2012, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "December 10, 2012 Attack"). The December 10, 2012 Attack constituted an extrajudicial killing.

747.    **Staff Sergeant Wesley Williams** served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Williams was injured in the December 10, 2012 Attack. SSG Williams died on December 10, 2012, as a result of injuries sustained during the attack.

748.    SSG Williams was a U.S. national at the time of the attack and his death.

749.    Plaintiff Krista Williams is the widow of SSG Williams and a U.S. national.

750.    Plaintiff F.W., by and through her next friend Krista Williams, is the minor daughter of SSG Williams. She is a U.S. national.

751.    Plaintiff V.W., by and through her next friend Krista Williams, is the minor daughter of SSG Williams. She is a U.S. national.

752.    As a result of the December 10, 2012 Attack and SSG Williams's injuries and death, each member of the Williams Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Williams's society, companionship, and counsel.

753.    As a result of the December 10, 2012 Attack, SSG Williams was injured in his person and/or property. The Plaintiff members of the Williams Family are the survivors and/or heirs of SSG Williams and are entitled to recover for the damages SSG Williams sustained.

**CCCC. The May 4, 2013 IED Attack in Kandahar (Prescott Family)**

754.    On May 4, 2013, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 4, 2013 Attack"). The May 4, 2013 Attack constituted an extrajudicial killing.

755.    **Specialist Brandon Prescott** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Prescott was injured in the May 4, 2013 Attack. SPC Prescott died on May 4, 2013, as a result of injuries sustained during the attack.

756.    SPC Prescott was a U.S. national at the time of the attack and his death.

757.    Plaintiff Tracey Prescott is the mother of SPC Prescott and a U.S. national.

758.    As a result of the May 4, 2013 Attack and SPC Prescott's injuries and death, each member of the Prescott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Prescott's society, companionship, and counsel.

759.    As a result of the May 4, 2013 Attack, SPC Prescott was injured in his person and/or property. The Plaintiff members of the Prescott Family are the survivors and/or heirs of SPC Prescott and are entitled to recover for the damages SPC Prescott sustained.

**DDDD.    The May 14, 2013 IED Attack in Kandahar (Gilbert Family)**

760.    On May 14, 2013, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 14, 2013 Attack"). The May 14, 2013 Attack constituted an extrajudicial killing.

761.    **Specialist William Gilbert** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Gilbert was injured in the May 14, 2013 Attack. SPC Gilbert died on May 14, 2013, as a result of injuries sustained during the attack.

762.    SPC Gilbert was a U.S. national at the time of the attack and his death.

763.    Plaintiff Monica Gilbert is the widow of SPC Gilbert and a U.S. national.

764.    Plaintiff M.G., by and through her next friend Monica Gilbert, is the minor daughter of SPC Gilbert. She is a U.S. national.

765.    As a result of the May 14, 2013 Attack and SPC Gilbert's injuries and death, each member of the Gilbert Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gilbert's society, companionship, and counsel.

766.    As a result of the May 14, 2013 Attack, SPC Gilbert was injured in his person and/or property. The Plaintiff members of the Gilbert Family are the survivors and/or heirs of SPC Gilbert and are entitled to recover for the damages SPC Gilbert sustained.

### EEEE. The June 2, 2013 IED Attack in Nimruz (Mullen Family)

767.    On June 2, 2013, the Taliban committed an IED attack in Nimruz Province, Afghanistan (the "June 2, 2013 Attack"). The June 2, 2013 Attack constituted an extrajudicial killing.

768.    **Warrant Officer Sean Mullen** served in Afghanistan as a member of the U.S. Army at the time of the attack. WO1 Mullen was injured in the June 2, 2013 Attack. WO1 Mullen died on June 2, 2013, as a result of injuries sustained during the attack.

769.    WO1 Mullen was a U.S. national at the time of the attack and his death.

770.    Plaintiff Christina Eilers is the sister of WO1 Mullen and a U.S. national.

771.    As a result of the June 2, 2013 Attack and WO1 Mullen's injuries and death, each member of the Mullen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of WO1 Mullen's society, companionship, and counsel.

772.    As a result of the June 2, 2013 Attack, WO1 Mullen was injured in his person and/or property. The Plaintiff members of the Mullen Family are the survivors and/or heirs of WO1 Mullen and are entitled to recover for the damages WO1 Mullen sustained.

**FFFF. The July 30, 2013 Indirect Fire Attack in Logar (Burley Family)**

773.    On July 30, 2013, the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed an indirect fire attack in Logar Province, Afghanistan (the "July 30, 2013 Attack"). The July 30, 2013 Attack constituted an extrajudicial killing.

774.    **Specialist Nicholas Burley** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Burley was injured in the July 30, 2013 Attack. SPC Burley died on July 30, 2013, as a result of injuries sustained during the attack.

775.    SPC Burley was a U.S. national at the time of the attack and his death.

776.    Plaintiff William Burley is the brother of SPC Burley and a U.S. national.

777.    Plaintiff Jessy Davis is the stepbrother of SPC Burley and a U.S. national. Mr. Davis lived in the same household as SPC Burley for a substantial period of time and considered SPC Burley the functional equivalent of a biological brother.

778.    Plaintiff Zachary Miller is the stepbrother of SPC Burley and a U.S. national. Mr. Miller lived in the same household as SPC Burley for a substantial period of time and considered SPC Burley the functional equivalent of a biological brother.

779.    As a result of the July 30, 2013 Attack and SPC Burley's injuries and death, each member of the Burley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Burley's society, companionship, and counsel.

780.    As a result of the July 30, 2013 Attack, SPC Burley was injured in his person and/or property. The Plaintiff members of the Burley Family are the survivors and/or heirs of SPC Burley and are entitled to recover for the damages SPC Burley sustained.

**GGGG.    October 5, 2013 IED Attack in Kandahar (Patterson Family)**

781.    On October 5, 2013, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 5, 2013 Attack"). The October 5, 2013 Attack constituted an extrajudicial killing.

782.    **Specialist Cody Patterson** served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Patterson was injured in the October 5, 2013 Attack. SPC Patterson died on October 6, 2013, as a result of injuries sustained during the attack.

783.    SPC Patterson was a U.S. national at the time of the attack and his death.

784.    Plaintiff Nicole Patterson is the sister of SPC Patterson and a U.S. national.

785.    Plaintiff Letitia Williams is the sister of SPC Patterson and a U.S. national.

786.    As a result of the October 5, 2013 Attack and SPC Patterson's injuries and death, each member of the Patterson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Patterson's society, companionship, and counsel.

787.    As a result of the October 5, 2013 Attack, SPC Patterson was injured in his person and/or property. The Plaintiff members of the Patterson Family are the survivors and/or heirs of SPC Patterson and are entitled to recover for the damages SPC Patterson sustained.

**HHHH.    The November 3, 2013 Small Arms Attack in Logar (Robertson Family)**

788.    On November 3, 2013, the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell committed a small arms attack in Logar Province, Afghanistan (the "November 3, 2013 Attack"). The November 3, 2013 Attack constituted an extrajudicial killing.

789.    **Sergeant First Class Forrest Robertson** served in Afghanistan as a member of the U.S. Army at the time of the attack. SFC Robertson was injured in the November 3, 2013 Attack. SFC Robertson died on November 3, 2013, as a result of injuries sustained during the attack.

790.    SFC Robertson was a U.S. national at the time of the attack and his death.

791.    Plaintiff Marcie Robertson is the widow of SFC Robertson and a U.S. national.

792.    As a result of the November 3, 2013 Attack and SFC Robertson's injuries and death, each member of the Robertson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Robertson's society, companionship, and counsel.

793.    As a result of the November 3, 2013 Attack, SFC Robertson was injured in his person and/or property. The Plaintiff members of the Robertson Family are the survivors and/or heirs of SFC Robertson and are entitled to recover for the damages SFC Robertson sustained.

**IIII.    The August 22, 2015 Suicide Bombing Attack in Kabul (McEvoy and Sutton Families)**

794.    On August 22, 2015, the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network committed a suicide bombing attack in Kabul, Afghanistan (the "August 22, 2015 Attack"). The August 22, 2015 Attack constituted an extrajudicial killing.

795. **Richard McEvoy** was in Afghanistan as a civilian working for DynCorp, Int'l at the time of the attack. Richard McEvoy was injured in the August 22, 2015 Attack. Richard McEvoy died on August 22, 2015, as a result of injuries sustained during the attack.

796. Richard McEvoy was a U.S. national at the time of the attack and his death.

797. Plaintiff Charles McEvoy is the brother of Richard McEvoy and a U.S. national.

798. Plaintiff Joseph McEvoy is the brother of Richard McEvoy and a U.S. national.

799. As a result of the August 22, 2015 Attack and Richard McEvoy's injuries and death, each member of the McEvoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Richard McEvoy's society, companionship, and counsel.

800. As a result of the August 22, 2015 Attack, Richard McEvoy was injured in his person and/or property. The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Richard McEvoy and are entitled to recover for the damages Richard McEvoy sustained.

801. **Barry Sutton** was in Afghanistan as a civilian working for DynCorp Free Zone at the time of the attack. Barry Sutton was injured in the August 22, 2015 Attack. Barry Sutton died on August 22, 2015, as a result of injuries sustained during the attack.

802. Barry Sutton was a U.S. national at the time of the attack and his death.

803. Plaintiff Katlin Cromer is the daughter of Barry Sutton and a U.S. national.

804. As a result of the August 22, 2015 Attack and Barry Sutton's injuries and death, each member of the Sutton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Barry Sutton's society, companionship, and counsel.

805. As a result of the August 22, 2015 Attack, Barry Sutton was injured in his person and/or property. The Plaintiff members of the Sutton Family are the survivors and/or heirs of Barry Sutton and are entitled to recover for the damages Barry Sutton sustained.

**JJJJ.   The July 29, 2019 Insider Attack in Kandahar (Kreischer Family)**

806.    On July 29, 2019, the Taliban committed an insider attack involving small arms fire in Kandahar Province, Afghanistan (the "July 29, 2019 Attack"). The July 29, 2019 Attack constituted an extrajudicial killing.

807.    **Private First Class Brandon Kreischer** served in Afghanistan as a member of the U.S. Army at the time of the attack. PFC Kreischer was injured in the July 29, 2019 Attack. PFC Kreischer died on July 29, 2019, as a result of injuries sustained during the attack.

808.    PFC Kreischer was a U.S. national at the time of the attack and his death.

809.    Plaintiff Rylan Garza is the stepbrother of PFC Kreischer and a U.S. national. Mr. Garza lived in the same household as PFC Kreischer for a substantial period of time and considered PFC Kreischer the functional equivalent of a biological brother.

810.    As a result of the July 29, 2019 Attack and PFC Kreischer's injuries and death, each member of the Kreischer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Kreischer's society, companionship, and counsel.

811.    As a result of the July 29, 2019 Attack, PFC Kreischer was injured in his person and/or property. The Plaintiff members of the Kreischer Family are the survivors and/or heirs of PFC Kreischer and are entitled to recover for the damages PFC Kreischer sustained.

**KKKK.        The January 31, 2020 Kidnapping Attack in Kabul (Frerichs Family)**

812.    On January 31, 2020, al-Qaeda and the Taliban, acting through its Haqqani Network (a designated FTO at the time of the attack), committed a kidnapping attack in Kabul, Afghanistan (the "January 31, 2020 Attack"). The January 31, 2020 Attack constituted an extrajudicial killing.

813.    **Mark Frerichs** was in Afghanistan as civilian a living in Kabul at the time of the attack. Mark Frerichs was injured in the January 31, 2020 Attack. The January 31, 2020 Attack

severely wounded Mark Frerichs, who suffered from post-traumatic stress disorder, anxiety, trouble sleeping, cold sweats and appetite issues.

814.    Mark Frerichs was a U.S. national at the time of the attack and remains one today.

815.    Plaintiff Charlene Cakora is the sister of Mark Frerichs and a U.S. national.

816.    As a result of the January 31, 2020 Attack and Mark Frerichs's injuries, the Plaintiff members of the Frerichs Family have experienced severe mental anguish and emotional pain and suffering.

## CLAIM FOR RELIEF

## COUNT ONE:  PERSONAL INJURY OR DEATH UNDER 28 U.S.C. § 1605A(c)

817.    Plaintiffs incorporate the allegations above.

818.    Plaintiffs or their family members were killed or injured by acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such acts, and such acts or provision of material support or resources were committed by officials, employees, or agents of Iran while acting within the scope of their office, employment, or agency.

819.    The terrorist attacks that killed or injured Plaintiffs or their family members occurred in Afghanistan.

820.    Iran was designated as a State Sponsor of Terrorism at the time of the terrorist acts that killed or injured Plaintiffs or their family members and remains so today.

821.    At the time of the attacks in which they or their family members were killed or injured, Plaintiffs or their attacked family members were U.S. nationals, members of the U.S. armed forces, and/or employees or contractors of the U.S. government acting within the scope of their employment.

822.    Plaintiffs are currently nationals of the United States, members of the U.S. armed forces, employees or contractors of the United States government acting within the scope of their employment, or the legal representatives of one of the foregoing.

823.    Iran's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public, warranting an award of punitive damages against Iran pursuant to 28 U.S.C. § 1605A(c).

824.    As a result of Defendant's liability under 28 U.S.C. § 1605A(c), Plaintiffs are entitled to recover compensatory damages, including, but not limited to, damages for their severe physical injuries, extreme mental anguish, pain and suffering, economic damages, solatium damages, and punitive damages as determined by the trier of fact.

## PRAYER FOR RELIEF

825.    Plaintiffs request that the Court:

    a.  Enter judgment against Iran finding it liable under 28 U.S.C. § 1605A(c);

    b.  Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, 28 U.S.C. § 1605A(c), including but not limited to pain and suffering, economic damages, solatium damages, and punitive damages;

    c.  Award Plaintiffs prejudgment interest;

    d.  Award Plaintiffs costs, expenses, and attorneys' fees; and

    e.  Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  March 28, 2025

Respectfully submitted,

*/s/* Joshua D. Branson
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Grace W. Knofczynski (D.C. Bar No. 1500407)
James A. Ruck (D.C. Bar No. 1739309)
Chase H. Robinett (D.C. Bar No. 90008072)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com
jruck@kellogghansen.com
crobinett@kellogghansen.com

Ryan R. Sparacino (D.C. Bar No. 493700)
Anthony Asuncion (D.C. Bar No. 420822)
Raj Parekh (D.C. Bar No. 978214)
Jacob R. Loshin (D.C. Bar No. 989320)
Shuman Sohrn (D.C. Bar No. 9001140)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com
anthony.asuncion@sparacinopllc.com
raj.parekh@sparacinopllc.com
jacob.loshin@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

Andrew R. Dunlap, *pro hac vice* forthcoming
Will Rathgeber, *pro hac vice* forthcoming
Selendy Gay PLLC
1290 Avenue of the Americas
New York, N.Y. 10104
Tel:  (212) 390-9363
adunlap@selendygay.com
wrathgeber@selendygay.com

*Counsel for Plaintiffs*