**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERNADINE LOWELL, *et al.*,<br>*Plaintiffs*,<br>v.<br>ISLAMIC REPUBLIC OF IRAN,<br>*Defendant*. | Civil Action No. 25 - 931 (SLS)<br>Judge Sparkle L. Sooknanan |

## MEMORANDUM OPINION

During the two decades that the United States was at war in Afghanistan, thousands of brave American soldiers tragically lost their lives in service of our country. Many were killed by the Taliban, a terrorist organization that was highly active in Afghanistan during the war. In this action, injured U.S. servicemembers and the families of fallen U.S. servicemembers seek to hold the Islamic Republic of Iran responsible under the Foreign Sovereign Immunities Act (FSIA). The Plaintiffs allege that the Iranian government provided material support for the Taliban's campaign of terror in Afghanistan, ultimately enabling the attacks that wounded and killed American troops. Nothing can ever heal the Plaintiffs' pain or bring back the beloved family members who they lost. Nor can any damages award truly compensate the Plaintiffs for their sacrifices and profound losses. But the Court will hold Iran accountable. For the reasons below, the Court grants partial default judgment to ten of the Plaintiffs and defers adjudication of the remaining issues for further proceedings.

## BACKGROUND

The Plaintiffs, 85 injured U.S. servicemembers and relatives of servicemembers killed or injured in Afghanistan, initiated this FSIA action in March 2025. Compl., ECF No. 1. Despite

proper service, Iran has not responded to the Complaint or otherwise appeared in this action. In January 2026, the Clerk of the Court entered default against Iran. Clerk's Entry Default, ECF No. 24. The Plaintiffs now move for default judgment as to liability for all 85 Plaintiffs for 50 terrorist attacks committed between 2007 and 2020, and for default judgment as to damages for 10 of the 85 Plaintiffs arising from five specific "bellwether" attacks. Mot. Default J., ECF No. 29.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 55 provides for "default judgments, which safeguard plaintiffs when the adversary process has been halted because of an essentially unresponsive party." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (cleaned up). But an entry of default judgment is not automatic, and it is not a decision that courts make lightly. *See Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980) (observing that "[d]efault judgments are not favored by modern courts, perhaps because it seems inherently unfair to use the court's power to enter and enforce judgments as a penalty for delays in filing").

Where a plaintiff seeks default judgment in a FSIA case, the plaintiff must "establish[] . . . [its] right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This "imposes a duty on [the] court[ ] to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment[.]" *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 126 (D.D.C. 2013) (cleaned up). "A court retains its 'affirmative obligation'" to ensure that it has subject-matter jurisdiction and personal jurisdiction over the defaulting sovereign nation. *Compagnie Sahélienne d'Entreprise v. Republic of Guinea*, No. 20-cv-1536, 2021 WL 2417105, at *2 (D.D.C. June 14, 2021) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)).

Nevertheless, on default judgment, the court may "accept as true the plaintiff's uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C.

2000). An evidentiary hearing is not required; proof may be established by affidavit. *See Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 16–17 (D.D.C. 2016); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits."); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012). In addition, the court may "take judicial notice of related proceedings and records in cases before the same court." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008) (cleaned up). "Courts in this district regularly take judicial notice of factual evidence developed in other FSIA proceedings involving the same conduct by the same defendants, even when those proceedings have taken place in front of a different judge." *Adamkavicius v. Islamic Republic of Iran*, No. 23-cv-3571, 2025 WL 2159537, at *4 (D.D.C. July 30, 2025) (collecting cases) (cleaned up).

## DISCUSSION

The Plaintiffs seek partial default judgment on liability for all 85 Plaintiffs related to 50 attacks. And they seek default judgment on liability and damages for ten "bellwether" Plaintiffs related to five bellwether attacks. For those latter ten Plaintiffs, the Court is persuaded that the procedural requirements for default judgment are met, that it has personal and subject-matter jurisdiction, and that each Plaintiff has established both a right of action and an entitlement to relief. Therefore, the Court will enter default judgment as to Iran's liability to the ten bellwether Plaintiffs for the five bellwether attacks. But at this stage and on this record, the Court may not grant default judgment to the remaining Plaintiffs. As discussed below, to establish their causes of action under the FSIA, the Plaintiffs must demonstrate that they are U.S. nationals. *See infra* Section D. But only the ten bellwether Plaintiffs have presented evidence of their U.S. citizenship. The Court will thus reserve the claims of the 75 nonbellwether Plaintiffs for later evaluation by Special Masters, who will also recommend damages awards for all Plaintiffs. The Court also defers

adjudication of the attacks for which the Plaintiffs have not yet sought default judgment as to liability, known as the Tranche 2 attacks. *See* Mot. Entry Case Mgmt. Order, ECF No. 25; Min. Order (July 29, 2026).

**A. Rule 55 Requirements**

At the threshold, "[a] plaintiff seeking default judgment must: (1) request that the Clerk of the Court enter default based on the defendant's failure to respond and (2) file a motion for default judgment." *Olive Grp. FZ-LLC v. Afghanistan Civ. Aviation Auth.*, No. 24-cv-2170, 2025 WL 1662961, at *2 (D.D.C. June 12, 2025) (cleaned up); *see also* Fed. R. Civ. P. 55. The Plaintiffs have completed both steps, so Rule 55 is satisfied. *See* Aff. Default, ECF No. 23; Clerk's Entry Default; Mot. Default J.

**B. Subject-Matter Jurisdiction**

"Starting with subject-matter jurisdiction, the FSIA is the sole basis for obtaining jurisdiction over a foreign state in a United States court." *Est. of Majd Kamalmaz v. Syrian Arab Republic*, No. 24-cv-2136, 2026 WL 1159653, at *4 (D.D.C. Feb. 24, 2026) (cleaned up). It gives district courts jurisdiction over "(1) any nonjury civil action (2) against a foreign state (3) for any claim for relief *in personam*, but only if (4) the state is not entitled to immunity." *Id.* (cleaned up); *see* 28 U.S.C. § 1330(a).

Here, the Plaintiffs have established the first three requirements. They have not sought a jury trial, *see* Civil Cover Sheet 2, ECF No. 1-1; they have sued the Islamic Republic of Iran, a foreign state; and they have sued Iran "in its capacity as a legal person, not against property." *Mueller v. Syrian Arab Republic*, 656 F. Supp. 3d 58, 76 (D.D.C. 2023). The fourth jurisdictional requirement warrants further discussion.

### 1. Terrorism Exception

Foreign states are generally "immune from the jurisdiction" of United States courts. 28 U.S.C. § 1604. But the FSIA provides an exception, under which federal courts may exercise subject-matter jurisdiction over lawsuits that seek "money damages" for "personal injury or death" arising from enumerated acts of terrorism. *Id*. § 1605A(a)(1). The exception applies when personal injury or death is "caused by an act of torture, extrajudicial killing, . . . hostage taking, or the provision of material support or resources for such an act," and the act (or provision of support) was "by an official, employee, or agent of [a] foreign state while acting within the scope of his or her office, employment, or agency." *Id*. Invoking the terrorism exception separately requires "satisfy[ing] the requirements of § 1605A(a)(2): the foreign state was a designated state sponsor of terrorism at the time of the attack and at the time the claim was filed, and that the claimant or victim was a United States national, a member of the armed forces, or a U.S. government employee or contractor at the time of the attack."[1] *Cabrera v. Islamic Republic of Iran* (*Cabrera I*), No. 19-cv-3835, 2022 WL 2817730, at *34 (D.D.C. July 19, 2022).

The Section 1605A(a)(2) requirements are straightforwardly met here. "Iran has been designated a state sponsor of terrorism since 1984[.]" *Adamkavicius*, 2025 WL 2159537, at *3 (quoting *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015)); *see also* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984). And the attacks for which the Plaintiffs seek to hold Iran liable

[1] Section 1605A(a)(2) also requires that a claimant "afford[] the foreign state a reasonable opportunity to arbitrate the claim," but only if "the act occurred in the foreign state against which the claim has been brought[.]" 28 U.S.C. § 1605A(a)(2)(A)(iii). Here, the arbitration requirement does not apply because the five bellwether attacks occurred in Afghanistan, not Iran. *See* Mem. Supp. Mot. Default J. 2, ECF No. 29-1; *cf. Cabrera v. Islamic Republic of Iran* (*Cabrera I*), No. 19-cv-3835, 2022 WL 2817730, at *34 n.26 (D.D.C. July 19, 2022).

occurred between 2007 and 2020. *See* Mem. Supp. Mot. Default J. 8 n.6, ECF No. 29-1. Thus, Iran was designated as a state sponsor of terrorism when the relevant attacks took place and at the time the Plaintiffs filed this action. Moreover, all victims of the five bellwether attacks were U.S. servicemembers, so the second Section 1605A(a)(2) requirement is likewise met. *See* Expert Witness Report of Dr. Daveed Gartenstein-Ross, Ph.D. 227–28, 416, 473, Ex. I to Mot. Default J. [ECF No. 29-12] (Gartenstein-Ross Rep.)[2]; Second Expert Witness Report of Dr. Daveed Gartenstein-Ross, Ph.D. 130, Ex. K to Mot. Default J. [ECF No. 29-14] (Gartenstein-Ross T2 Rep.); Report of Casualty, DD Form 3300, Ex. L to Mot. Default J. [ECF No. 33].

Turning to the terrorism exception's requirements, the Plaintiffs must prove that each bellwether attack: (1) caused the associated Plaintiffs to suffer "personal injury or death," (2) was materially supported by Iran in a manner that caused the Plaintiffs' injuries, and (3) constituted a "extrajudicial killing." *See Cabrera I*, 2022 WL 2817730, at *34. The Court first lays out the governing standards and then determines whether the five bellwether attacks meet them.

**a. Personal Injury or Death**

First, an FSIA plaintiff must establish that she seeks "money damages" for "personal injury or death" suffered as a result of the act of terrorism for which she alleges that the defendant is liable. 28 U.S.C. § 1605A(a)(1). Here, the bellwether Plaintiffs seek monetary damages for the pain that they suffered as relatives of servicemembers killed in the bellwether attacks. *See* Mem. Supp. Mot. Default J. 15. Their claims fall within the FSIA, which "is understood to encompass claims by family members of those injured or killed for the distress caused by their relative's injuries, also known as solatium actions[.]" *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d

[2] For consistency, the Court cites the excerpted expert reports using their internal pagination.

323, 359 (D.D.C. 2020). In general, "[s]olatium is awarded to compensate [] the mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 78 (D.D.C. 2010) (cleaned up). Solatium "began as a remedy for the loss of a spouse or a parent" but "has since expanded to include the loss of a child." *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 356 (D.C. Cir. 2018) (cleaned up). Solatium is also available to "children who are in utero at the time a parent is killed in a terrorist attack." *K.E.F.V. ex rel. Vickers v. Islamic Republic of Iran*, 135 F.4th 988, 996 (D.C. Cir. 2025).

**b. Material Support**

The Plaintiffs must next show that Iran provided "material support or resources" for the bellwether attacks and that Iran's material support caused the Plaintiffs' injuries. 28 U.S.C. § 1605A(a)(1). The FSIA's terrorism exception extends to "the provision of material support or resources for" a terrorist act, including extrajudicial killings. *Id.* The FSIA draws its definition of the term "material support or resources" from 18 U.S.C. § 2339A, which explains that "the term 'material support or resources' means any property, tangible or intangible, or service, including . . . lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, . . . and transportation, except medicine or religious materials[.]" 28 U.S.C. § 1605A(h)(3).

The Plaintiffs must also prove that Iran's alleged material support for the bellwether attacks caused their injuries. *See id.* § 1605A(a)(1). The FSIA incorporates a requirement of proximate cause. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). And in the FSIA context, proximate cause encompasses two prongs. "First, the defendant's

actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury. Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). In other words, the Plaintiffs must show "some reasonable connection between the act or omission of the defendant and the damage which [they have] suffered." *Id.* (quoting *Kilburn*, 376 F.3d at 1128).

On the first dimension, "terrorist sponsors' material support can be a substantial factor in a given terrorist attack even without a direct link between the support and the particular attack at issue." *Cabrera I*, 2022 WL 2817730, at *40 (collecting cases); *see also Kilburn*, 376 F.3d at 1130; *Boothe v. Islamic Republic of Iran*, No. 22-cv-1747, 2026 WL 809887, at *10 (D.D.C. Mar. 24, 2026); *Baker v. Islamic Republic of Iran*, No. 22-cv-2765, 2025 WL 2480075, at *18 (D.D.C. Aug. 28, 2025). "Courts in this District have routinely held a state sponsor of terrorism liable when it provides material support that enhances a terrorist group's ability to attack[.]" *Adamkavicius*, 2025 WL 2159537, at *28 (first citing *Owens*, 826 F. Supp. 2d at 151; and then citing *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 139 (D.D.C. 2021)).

For instance, to show that Iran's alleged financial assistance to the Taliban and its affiliates caused the bellwether attacks, the Plaintiffs need not show that the attacks were "directly traceable" to Iran's funding. *Kilburn*, 376 F.3d at 1130 (emphasis omitted). "Money, after all, is fungible, and terrorist organizations can hardly be counted on to keep careful bookkeeping records." *Id.*; *cf. Holder v. Humanitarian L. Proj.*, 561 U.S. 1, 30–31 (2010) (noting that "aiding a foreign terrorist organization's lawful activity" can comprise material support in the absence of "legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those

ultimately used to support violent, terrorist operations" (emphasis omitted)). But the fungibility of money is not absolute. Courts in this District have also recognized that the Taliban and associated terrorist groups operated in a "decentralized" manner during this period. *Sibley v. Islamic Republic of Iran*, No. 23-cv-600, 2025 WL 1928036, at *13 (D.D.C. July 14, 2025). Thus, material support, including financial assistance, to one component of the Taliban is not necessarily a proximate cause of attacks committed by another component. *Id.*; *see also Baker*, 2025 WL 2480075, at *18.

**c. Extrajudicial Killing**

Third, the Plaintiffs must show that each of the bellwether attacks constituted "an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking[.]" 28 U.S.C. § 1605A(a)(1). Here, the Plaintiffs allege that each attack constituted an "extrajudicial killing." Mem. Supp. Mot. Default J. 18–20. The terrorism exception defines "extrajudicial killing" through reference to the Torture Victim Protection Act of 1991 (TVPA). 28 U.S.C. § 1605A(h)(7). Under the TVPA, an "extrajudicial killing" is:

> [A] deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.[3]

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (codified at 28 U.S.C. § 1350 note). This definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse."

[3] The TVPA's exclusion of "killing[s] that, under international law, [are] lawfully carried out under the authority of a foreign nation" is inapposite here because during the period of the bellwether attacks, the Taliban was "was neither a foreign nation nor a military force," *Cabrera I*, 2022 WL 2817730, at *38, and the killings at issue here were not authorized by the law of nations, *see Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom.*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020).

*Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016). And "courts in this District have concluded that injuries resulting from 'deliberated' attempts to kill fall within the scope of the terrorism exception." *Cabrera I*, 2022 WL 2817730, at *37 (cleaned up). In other words, a plaintiff can recover for an extrajudicial killing even if no one was ultimately killed or they were not the one killed. *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019); *see also Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) ("It is not necessary . . . for one of the plaintiffs to have died in the attack[.]").

**2. Evidentiary Standards**

Before determining whether each attack falls within the terrorism exception's grant of jurisdiction, the Court pauses to consider what evidence it may rely on in making the necessary factual findings. The FSIA requires each Plaintiff to establish "[their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The Court may take as true the Plaintiffs' "uncontroverted factual allegations that are supported by admissible evidence[.]" *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 166 (D.D.C. 2020). And in the FSIA context, admissible evidence includes affidavits and expert reports. *See Owens*, 864 F.3d at 785–86; *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048–51 (D.C. Cir. 2014). The Court may also take judicial notice of "factual evidence developed in other FSIA proceedings involving the same conduct by the same defendants"—as "[c]ourts in this district regularly" do in FSIA cases, *Adamkavicius*, 2025 WL 2159537, at *4 (D.D.C. July 30, 2025) (cleaned up) (collecting cases), "to reach their own, independent findings of fact in the cases before them," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (cleaned up). But courts "cannot take judicial notice of prior proceedings for the purpose of accepting the truth of the earlier court's findings and conclusions." *Sibley*, 2025 WL 1928036, at *15 (cleaned up).

Here, the Plaintiffs ask this Court to "take judicial notice of the facts considered and findings made by Judge Bates in *Cabrera* [*v. Islamic Republic of* Iran, No. 19-cv-3835 (D.D.C.)]." Mem. Supp. Mot. Default J. 8. In *Cabrera*, Judge Bates held three days of evidentiary hearings, made extensive factual findings, and ultimately "awarded default judgment and damages to hundreds of plaintiffs" in coordinated FSIA litigation "center[ing] around the atrocities that terrorist groups including . . . the Taliban . . . committed in Afghanistan between 2006 and 2019." *Cabrera v. Islamic Republic of Iran* (*Cabrera VI*), No. 19-cv-3835, 2025 WL 1423739, at *1 (D.D.C. May 16, 2025). As the Plaintiffs point out, numerous courts in this District have taken judicial notice of the evidence adduced in *Cabrera*. *See, e.g.*, *Boothe*, 2026 WL 809887, at *2; *Adamkavicius*, 2025 WL 2159537, at *4; *Sibley*, 2025 WL 1928036, at *15.

*Cabrera* considered attacks committed by the Taliban during the same period as the bellwether attacks. Indeed, Judge Bates found Iran liable for the five bellwether attacks currently before this Court. Accordingly, the Court will take judicial notice of the evidence introduced in *Cabrera*. But the Court will reach its "own, independent findings of fact in the case[] before" it. *Sibley*, 2025 WL 1928036, at *15 (cleaned up).

### 3. Factual Findings

Having catalogued the law that it must apply and the types of evidence that it may rely on, the Court now considers whether each bellwether attack falls into the jurisdictional grant created by the FSIA's terrorism exception. In sum, the Court's factual findings lead it to conclude that it has subject-matter jurisdiction over all five bellwether attacks.

#### a. Personal Injury or Death

Each bellwether Plaintiff has submitted a declaration attesting (1) that they are a child, sibling, widow, or parent of a U.S. servicemember killed in the bellwether attacks, and (2) that

they suffered profound harms as a result of their loved one's killing. *See* Damages Exs. 1-10, ECF Nos. 28-1 to 28-10. Thus, they have established "personal injury or death" under Section 1605A(a)(1).

**b. Material Support**

The Court also finds that Iran provided extensive material support to the Taliban during the period of the bellwether attacks. "Iran is a major state sponsor of global terrorism, and particularly of terrorism against the United States." *Cabrera I*, 2022 WL 2817730, at *9; *see also* Hr'g Tr. 61:7–12, *Cabrera*, Civ. Action No. 19-3835 (D.D.C. Oct. 18, 2021), Ex. A to Mot. Default J. [ECF No. 29-4] (Oct. 18 Tr.) (testimony of William F. Roggio) ("Iran has been one of if not the prime state sponsor of terrorism throughout the world. It has supported various militias, proxies, affiliates throughout the Middle East. It has used its expertise to attack U.S. forces in Afghanistan, in Iraq, and other places, and it's adept at supporting terrorist insurgencies."). Since 2001, Iran has adopted a policy of supporting the Taliban, primarily through the Fourth Corps of Iran's Qods Force, the "special foreign division" of Iran's Islamic Revolutionary Guard Corps. Expert Report of William F. Roggio ¶¶ 76, 137, 152, Ex. D to Mot. Default J. [ECF No. 29-7] (Roggio Rep.). And Iran's support for the Taliban's attacks in Afghanistan was motivated by a desire "to inflict casualties on U.S. and Coalition forces in order to expel the Western countries from Afghanistan." *Id.* ¶ 149.

As relevant here, Iran provided five categories of material support to the Taliban during the period of the bellwether attacks.

First, Iran provided "explosives and weapons" to the Taliban, including improvised explosive devices (IEDs). *Id.* ¶¶ 182–84; *see also* Oct. 18 Tr. 83:17–84:1 (Roggio); Expert Witness Report of Dr. Colin Clarke 36–37, Ex. E to Mot. Default J. [ECF No. 29-8] (Clarke Rep.). At the

time of the bellwether attacks, Iran had been "arrang[ing] arms shipments to select Taliban members" "since at least 2006." Oct. 18 Tr. 84:25–85:1 (Roggio). These shipments "includ[ed] small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 100mm rockets, and plastic explosives." *Id.* at 85:1–3 (Roggio).

Second, Iran conducted extensive training of Taliban fighters before and during the relevant period. Among other things, Iran instructed the Taliban on suicide bombing tactics, infantry techniques, and methods for carrying out more complex attacks. *See id.* at 94:18–95:4 (Roggio). In 2011, the Iranian government also operated training centers for Taliban fighters throughout both Iran and Afghanistan. Roggio Rep. ¶¶ 211–13. And, also in 2011, Iranian intelligence officers entered Afghanistan to "deliver suicide vests and train[] suicide bombers" on the use of IEDs. *Id.* ¶ 213. Iran's training of Taliban fighters—which covered some of the very same tactics used to kill American soldiers in the bellwether attacks—allowed Iran-instructed Taliban fighters to train other Taliban fighters, substantially increasing the Taliban's capabilities. *See* Oct. 18 Tr. 98:11–16 (Roggio).

Third, Iran supported the Taliban financially. For instance, Iran "provide[d] cash . . . directly to the Taliban," which the Taliban could use to buy weapons, ammunition, and other supplies. *Id.* at 98:23–99:2 (Roggio). "Iran also issued bounties on U.S. and Afghan forces inside of Afghanistan," rewarding Taliban fighters that killed or wounded U.S. troops and incentivizing further attacks on American and allied forces. *Id.* at 98:3–9 (Roggio); *see also* Roggio Rep. ¶ 224.

Fourth, after the U.S. invasion of Afghanistan, Iran provided "safe haven on Iranian soil" to the Taliban and its allies, which allowed known Taliban leaders to evade U.S. efforts to target them. Roggio Rep. ¶ 202; Oct. 18 Tr. 104:5–105:13 (Roggio). Iran also permitted the Taliban to

operate two offices in Iran, which became regional command centers through which the Taliban directed its terrorist operations. Oct. 18 Tr. 105:14–106:3 (Roggio).

Fifth (and finally), Iran enabled and facilitated the Taliban's drug-trafficking operations. *See* Oct. 18. Tr. 153:20–25 (testimony of Colin Clarke). Iran "allow[ed] drugs to pass over the Iranian border" into Afghanistan, "sen[t] weapons back with drug traffickers into Afghanistan to give to the Taliban," and "in some cases . . . work[ed] directly with smugglers to plan attack[s] on U.S. soldiers." *Id.*

* * *

In sum, Iran's material support to the Taliban was expansive and multifaceted. Through its decades-long program of aiding the Taliban, Iran substantially and intentionally increased the Taliban's capacity to kill and wound U.S. soldiers. Iran provided the Taliban with the types of weapons—IEDs—used in the bellwether attacks. And through its bounty program, Iran incentivized Taliban-affiliated terrorists to target U.S. troops. On this record, the Plaintiffs have adequately alleged that Iran provided material support to the Taliban that "enhance[d]" the Taliban's "ability to attack" U.S. servicemembers in Afghanistan. *Adamkavicius*, 2025 WL 2159537, at *28.

**c. Attack-Specific Factual Findings**

Having found that Iran provided extensive material support to the Taliban during the relevant period, the Court now considers whether each bellwether attack is (1) attributable to the Taliban (and therefore supported by Iran) and (2) an extrajudicial killing.

<u>August 1, 2009, IED Attack in Kandahar (Walls Family)</u>

The Plaintiff Nevin Walls seeks to hold Iran liable for the attack that killed his brother, U.S. Army Sergeant Jonathan Walls. On the morning of August 1, 2009, Sergeant Walls was killed

by an IED attack in the Zhari District of Kandahar Province. Gartenstein-Ross Rep. 188. While on patrol with his unit, "one of CPL [sic] Walls's unit members triggered a victim-operated improvised explosive device (VOIED) that tragically killed both this individual as well as CPL Walls[.]"[4] *Id.* "Victim operated improvised explosive devices ('VOIEDs') are IEDs that are triggered by a victim action, such as stepping onto a pressure plate, breaking a trip wire or depressing a plunger into a device." October 4, 2021 Expert Report of LTC Steven A. Wood 24, Ex. F to Mot. Default J. [ECF No. 29-9] (Oct. 4 Wood Rep.).

Both the location and method of Sergeant Walls' killing point to the Taliban. Kandahar—located in Southern Afghanistan—was the "birth place of the Taliban." Hr'g Tr. 419:25–420:4, *Cabrera*, Civ. Action No.19-3835 (D.D.C. Oct. 19, 2021), Ex. B to Mot. Default J. [ECF No. 29-5] (Oct. 19 Tr.) (testimony of Captain Ryan Timoney). At the time of the attack, the Taliban was "easily the most dominant insurgent organization" in Kandahar. Oct. 18 Tr. 168:25–169:9 (Clarke). And the Zhari District—where Sergeant Walls was attacked—was "one of the Taliban's strongholds in Kandahar." Gartenstein-Ross Rep. 21 (citing *Cabrera I*, 2022 WL 2817730, at *13); *see also* Oct. 18 Tr. 189:3–9 (testimony of Col. Thomas McGrath). The Taliban's well-documented presence in Kandahar led the expert reports and testimony before this Court to uniformly attest—and Judge Bates to agree—that the Taliban likely committed all the attacks that took place in Kandahar. *Cabrera I*, 2022 WL 2817730, at *13.

But the attack's location is not the only evidence suggesting that the Taliban (and therefore Iran) was responsible for Sergeant Walls' death. The "Tactics Techniques and Procedures" (TTPs) associated with the attack also confirm the Taliban's culpability. Sergeant Walls was killed by a

[4] The Gartenstein-Ross Report describes Mr. Walls as a corporal, while the Report of Casualty describing his passing notes his rank as sergeant. *See* ECF 19-15, Ex. L. The Court refers to Mr. Walls as a sergeant.

VOIED. Gartenstein-Ross Rep. 188. The Taliban frequently deployed VOIEDs during the relevant period, and VOIEDs "were 'used extensively' in Kandahar . . . province[]." *Id.* at 59 (quoting Oct. 4 Wood Rep. 24). In other words, VOIED attacks like the one that killed Sergeant Walls were a "key Taliban TTP[,] demonstrating the Taliban's responsibility for this attack." *Id.* at 189.

For the reasons set out above, the Taliban likely committed the attack that killed Sergeant Walls. Thus, by virtue of Iran's well-documented material support to the Taliban—which included the provision of IEDs, triggers, and detonators, *see supra* Section B.3.b.—the Court finds that Iran likely provided material support for the attack, that Iran's material support was likely a substantial factor in Sergeant Walls' death, and that Sergeant Walls' death was a foreseeable result of Iran's material support for the Taliban. The fact that Iran "shipped 'a large number of weapons to Kandahar,'" Roggio Rep. ¶ 185 (quoting U.S. State Dep't, Country Reports on Terrorism 2012, at 196 (May 2013), https://www.state.gov/j/ct/rls/crt/2012/209985.htm.), only further reinforces the link between Iran's support for the Taliban and Sergeant Walls' death.

The Court also concludes that this attack constituted an extrajudicial killing. That the attack was a killing and was extrajudicial is self-evident—Sergeant Walls was tragically killed in action, and there was no legal process justifying his death. The attack was also "deliberated"—as opposed to being the product of "sudden impulse," *Owens*, 174 F. Supp. 3d at 263—because "the Taliban very likely planned this IED attack in advance" and placed the VOIED and its trigger in place ahead of time, Gartenstein-Ross Rep. 190. Therefore, the August 1, 2009, attack was an extrajudicial killing to which the terrorism exception applies.

In sum, the Court agrees with Judge Bates' conclusion in *Cabrera* that Iran's material support for the August 1, 2009, Taliban attack that killed Sergeant Jonathan Walls falls within the terrorism exception to the FSIA. *See Cabrera v. Islamic Republic of Iran* (*Cabrera IV*), No. 19-

cv-3835, 2024 WL 3225942, at *2 n.1, *4 (D.D.C. June 28, 2024) (awarding damages to Steven Walls Sr.).

September 12, 2009, IED Attack in Wardak (Allen Family)

The Plaintiffs Grace Allen, Michael Allen, and Christopher Berry seek damages from Iran for its role in the attack that killed their father, U.S. Army Staff Sergeant Nekl Allen. On September 12, 2009, Staff Sergeant Allen was the Truck Commander of one vehicle in a four-vehicle routine patrol in the Nerkh District of Afghanistan's Wardak Province. Gartenstein-Ross Rep. 473. As the vehicle commanded by Staff Sergeant Allen returned to the combat outpost, it struck a command wire IED (CWIED)—a type of IED "designed to be triggered at a distance by a terrorist" that "allow[s] for targeting specific personnel or vehicles and limit[s] friendly or civilian casualties" by "includ[ing] an insulator attached to a wire[.]" *Id.* at 58 (quoting Oct. 4 Wood Rep. 24). Staff Sergeant Allen and the vehicle's driver were killed on impact. *Id.* at 473.

Both the location and means of this attack indicate that the Taliban was responsible. First, the Nerkh District was contemporaneously described as a "'Taliban haven' with high levels of Taliban presence." *Id.* at 475 (quoting Soraya Sarhaddi Nelson, *Locals Wary of U.S.-Afghan Patrol Program*, NPR (June 3, 2009), https://www.npr.org/2009/06/03/104849009/locals-wary-of-u-s-afghan-patrol-program [https://perma.cc/9J3L-8Y9T]); *see also id.* at 48 ("The Taliban was the strongest insurgent group in Wardak province [from 2008 to 2013]"); *Cabrera I*, 2022 WL 2817730, at *15 ("In Wardak Province, the Taliban very likely dominated from at least 2009 to 2013, claiming responsibility for numerous attacks on U.S. troops[.]"). Another expert report concurs, concluding that "[w]hen the attacks at issue occurred in Wardak Province from 2009 to 2013, the Taliban very likely had area of operations dominance in the province." Clarke Rep. 55 (emphasis omitted). Second, CWIEDs were a common Taliban TTP. "The Taliban frequently used

anti-personnel and anti-vehicle IEDs that were designed to be triggered at a distance by a terrorist"—of which CWIEDs were one of the "two main types." Gartenstein-Ross Rep. 58. Based on these factors, the Court finds that the Taliban was likely responsible for the September 12, 2009, attack that caused Staff Sergeant Allen's death.

As above, the Court's attribution of the attack to the Taliban, coupled with Iran's extensive material support for the Taliban, suffices to show that Iran materially supported the attack and that Iran's support caused Staff Sergeant Allen's death within the meaning of the terrorism exception. Moreover, because the CWIED that killed Staff Sergeant Allen was laid in advance in an area frequented by American coalition troops, *see* Gartenstein-Ross Rep. 474, the Court has no difficulty in determining that it was a deliberated extrajudicial killing. The Court therefore agrees with Judge Bates that the terrorism exception applies to Iran's material support for the September 12, 2009, attack that killed Staff Sergeant Nekl Allen. *Cabrera v. Islamic Republic of Iran* (*Cabrera III*), No. 19-cv-3835, 2024 WL 864092, at *2–3 (D.D.C. Feb. 29, 2024).

<u>July 24, 2010, IED Attack in Zabul (Hand Family)</u>

The Plaintiffs Kenneth Hand, Renee Hand, and Robert Bagwell III sue to hold Iran liable for the attack that killed U.S. Army Specialist Andrew Hand, who was their son, stepson, and stepbrother, respectively. On July 24, 2010, Specialist Hand was in the lead vehicle of a mission to remove IEDs from a highway in Zabul Province, Afghanistan. Gartenstein-Ross T2 Rep. 130; *see Army Spc. Andrew L. Hand,* Military Times: The Fallen, https://thefallen.militarytimes.com/army-spc-andrew-l-hand/4725542 (last visited Sept. 23, 2026) (documenting that Specialist Hand was present at and killed in the July 24, 2010, attack). Suddenly, an IED struck Specialist Hand's vehicle, causing an explosion that killed Specialist Hand and his three co-occupants. Gartenstein-Ross T2 Rep. 130–31. As surviving members of Specialist Hand's

unit approached the vehicle after the explosion, they received "radio confirmation of a possible triggerman . . . approximately 150 meters away." *Id.* at 130 (cleaned up). The soldiers fired one shot at the potential triggerman, who was later captured. *Id.*

The attack that killed Specialist Hand took place in the Zabul Province, where "the Taliban very likely had operational dominance from 2008 to 2012" and "claimed responsibility for numerous attacks." *Cabrera I*, 2022 WL 2817730, at *15; *see also* Clarke Rep. 57–58; Oct. 4 Wood Rep. 19. And the attack was carried out by means of an IED, which, as discussed above, was a key Taliban TTP at the time of the attack. Gartenstein-Ross T2 Rep. 131. The subsequent military investigation of the attack also supports the Taliban's culpability. For instance, the official government report of the attack refers to a "pre-mission briefing" that covered "recent enemy significant actions . . . and an enemy assessment, including enemy tactics, techniques, and procedures . . ., and the increased risk of IEDs." *Id.* at 132 (cleaned up). And as the expert report explains, government reports during the relevant period generally referred to the Taliban as "the enemy," rather than by name. *Id.* at 5 (citing Oct. 4 Wood Rep. 60). Based on these findings, the Court is persuaded that the Taliban was likely responsible for the attack that killed Specialist Hand.

Because the Taliban committed the July 24, 2010, IED attack, the attack was likely materially supported by Iran in a manner that caused Specialist Hand's death. And his death was a deliberated extrajudicial killing, as confirmed by the fact that the IED was laid in advance and seemingly detonated by an observed triggerman. *See id.* at 130–31. The Court therefore agrees with Judge Bates that the FSIA's terrorism exception permits adjudication of Iran's liability for killing Specialist Andrew Hand in the July 24, 2010, attack. *Cabrera VI*, 2025 WL 1423739, at *3.

September 25, 2011, IED Attack in Laghman (Briseño-Alvarez Family)

The Plaintiff Maria Briseño seeks to hold Iran liable for the IED attack that killed her son, U.S. Army Specialist Francisco Briseño-Alvarez Jr. On September 25, 2011, Specialist Briseño-Alvarez was serving as a gunner on the rear vehicle of a convoy on patrol in Mether Lam District, Laghman Province, Afghanistan. Gartenstein-Ross Rep. 419-20. During the patrol, Specialist Briseño-Alvarez was struck and killed by a CWIED. *Id.* As noted above, CWIEDs are "designed to be triggered at a distance by a terrorist." *Id.* at 58. After investigating the attack, the Army's Explosive Ordinance Disposal team "assessed that while the triggerman may have at first left the scene when the first vehicles [of Specialist Briseño-Alvarez's patrol] and dismounts passed through the area, there was significant time for them to come back to the trigger site and fire the IED on the last vehicle in the convoy." *Id.* at 420 (cleaned up).

The location, method, and subsequent U.S. Army investigation of the September 25, 2011, attack each indicate the Taliban's culpability. First, the Taliban "was the strongest insurgent group in Laghman province" in 2011. *Id.* at 37; *see also* Oct. 18 Tr. 171:18–172:16 (Clarke); Clarke Rep. 60 ("When the attacks at issue occurred in Laghman Province from 2009 to 2011, the Taliban likely had area of operations dominance[.]" (emphasis omitted)). Second, the attack was carried out using a CWIED. As described above, CWIEDs were commonly used by the Taliban to target vehicles and personnel from a distance. Gartenstein-Ross Rep. 58, 421. Finally, the U.S. Army's subsequent investigation report "suggest[s] the Taliban was present and imposed a threat upon forces in the area." *Id.* at 421. Moreover, "[t]he report, after describing the presence of an additional CWIED . . . stated that these are considered normal enemy TTP in this area." *Id.* (cleaned up). Given the documented dominance of the Taliban in Laghman province, the report's reference to the "enemy" appears to describe the Taliban. *See id.* at 12 (citing Oct. 4 Wood

Rep. 60). Based on this evidence, the Court concludes that the Taliban was likely responsible for the September 25, 2011, attack that killed Specialist Briseño-Alvarez.

This attack likewise meets the remaining requirements of the terrorism exception. It was likely committed by the Taliban, which received significant material support from Iran during the relevant period. Moreover, the form of Iran's support for the Taliban—which included weapons and training—indicates that Iran's support was likely a substantial factor in Specialist Briseño-Alvarez's death and that his death was a foreseeable result of Iran's support. And finally, Specialist Briseño-Alvarez's death was a deliberated extrajudicial killing carried out by the likely-Taliban-affiliated insurgents who set the CWIED and the triggerman who detonated it. After reviewing all the available evidence, the Court has no difficulty reaching the same conclusion as Judge Bates: The FSIA's terrorism exception permits this Court to exercise jurisdiction as to Iran's liability for the September 25, 2011, IED attack that killed Specialist Francisco Briseño-Alvarez. *See Cabrera IV*, 2024 WL 3225942, at *4, *6.

May 14, 2013, IED Attack in Kandahar (Gilbert Family)

The Plaintiffs Monica Gilbert and M.G. allege that Iran is liable for the May 14, 2013, IED attack that killed their husband and father, U.S. Army Specialist William Gilbert, in the Zhari District of Kandahar Province, Afghanistan. That morning, the Tactical Operations Center associated with Specialist Gilbert's platoon "observed three to six individuals . . . digging and appearing to emplace and mark potential IEDs." Gartenstein-Ross Rep. 227-28 (cleaned up). So later that morning, Specialist Gilbert's platoon went on patrol to interdict the IED-setters. *Id.* at 228. But soon after, the first IED exploded, severing the legs of Specialist Gilbert's platoonmate. *Id.* When Specialist Gilbert attempted to pull the injured soldier to safety, a second IED detonated,

killing him. *Id.* Ultimately, there were four IED attacks, which killed four U.S. soldiers (including Specialist Gilbert) and wounded five others. *Id.*

The Army's subsequent investigation determined that the insurgents that generally operated in the attack area were likely members of the Taliban. *Id.* at 229. In his expert report, Dr. Gartenstein-Ross relies on that finding to "help establish that the suspected three to six insurgents" who were "appearing to emplace and mark potential IEDs" were also affiliated with the Taliban. *Id.* at 230. The Court agrees. As the Court concluded above, the Zhari District was a Taliban stronghold within the Kandahar Province, which itself was generally dominated by the Taliban. *See id.* at 21 (citing *Cabrera I*, 2022 WL 2817730, at *13); Oct. 18 Tr. 168:25-169:9 (Clarke). Moreover, the attack itself—which was carried out using multiple IEDs—resembles the "multi-IED attacks [that] were a key Taliban TTP." Gartenstein-Ross Rep. 229; *see also id.* at 59 ("The Taliban often placed large numbers of IEDs around key locations."); Oct. 4 Wood Rep. 28 (describing the Taliban's use of "IED belts or minefields of IEDs" (cleaned up)). Thus, the Court concludes that the Taliban was likely responsible for the May 14, 2013, attack that killed Specialist Gilbert.

The May 14, 2013, IED attack satisfies the remaining elements of the terrorism exception. It was likely committed by the Taliban, and therefore—based on the above-described factual findings—likely materially supported by Iran. Moreover, Iran specifically provided weapons (including IEDs) to Taliban insurgents in Kandahar, where Specialist Gilbert was killed. Roggio Rep. ¶ 185. So the Court finds that Iran's support caused Specialist Gilbert's death. And finally, Specialist Gilbert's death was a deliberated extrajudicial killing, as confirmed by the fact that the victim-activated IED was constructed (or acquired) and set in advance. *See* Gartenstein-Ross Rep. 228. Like Judge Bates, the Court concludes that the Plaintiffs have met the requirements of

the terrorism exception with respect to the May 14, 2013, attack that killed Specialist William Gilbert. *Cabrera IV*, 2024 WL 3225942, at *4.

* * *

The evidence establishes that the FSIA's terrorism exception applies to the claims of each bellwether Plaintiff. Thus, the Court may exercise subject-matter jurisdiction over them.

### C. Personal Jurisdiction

Moving to personal jurisdiction, the Plaintiffs may satisfy that requirement if (1) the Court has subject-matter jurisdiction, and (2) Iran was properly served. *See* 28 U.S.C. § 1330(b). As explained above, the Court has subject-matter jurisdiction. *See supra* Section B.3.c. And, as explained below, the Plaintiffs properly served Iran through the State Department.

"The [FSIA] provides four methods of service in descending order of preference." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015); *see* 28 U.S.C. § 1608(a). "[A] plaintiff must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012) (cleaned up).

Here, the first two options are unavailable. The Plaintiffs have no "special arrangement for service" with Iran, *id.* § 1608(a)(1), and Iran is not party to an "applicable international convention on service," *id.* § 1608(a)(2). *Cf. Levinson*, 443 F. Supp. 3d at 175 ("Because Iran does not have a special arrangement for service with the [claimants], nor is it party to an international convention on service, the [claimants] did not need to attempt service in accordance with § 1608(a)(1) or (a)(2)."); *Adamkavicius,* 2025 WL 2159537, at *25 (same). The third method requires a plaintiff to ask a court to "send[] a copy of the summons and complaint and a notice of suit," with translations of each, "to the head of the ministry of foreign affairs" of Iran. 28 U.S.C. § 1608(a)(3).

The Plaintiffs attempted to serve Iran by this method. They requested that the Clerk of the Court mail copies of the requisite documents—with translations into Farsi, Iran's official language—to the Iranian Minister of Foreign Affairs. *See* First Aff. Requesting Foreign Mailing, ECF No. 10; First Letter Requesting Foreign Mailing, ECF No. 10-1. But service by the third method was not achieved within 30 days, so the Plaintiffs turned to the fourth method. *See* Second Aff. Requesting Foreign Mailing, ECF No. 14; Second Letter Requesting Foreign Mailing, ECF No. 14-1. Under that last resort, "service can be effected through diplomatic channels." *Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 81 (D.D.C. 2021) (citing § 1608(a)(4)).

The Plaintiffs' final attempt succeeded, and they served Iran through diplomatic channels in accordance with 28 U.S.C § 1608(a)(4). The Plaintiffs provided two copies of the Summons, Complaint, and Notice of the Suit, along with translations of each into Farsi, to the Clerk of the Court on May 16, 2025. *See* Second Letter Requesting Foreign Mailing. The U.S. Department of State, through the Embassy of Switzerland, effectuated service and confirmed that Iran was served on November 9, 2025. Return of Service, ECF No. 22. Although Iran refused to accept delivery of the documents, *see id.* at 7, 10, "the documents were in fact delivered," so "it is of no moment that Iran refused to accept them," *Adamkavicius*, 2025 WL 2159537, at *27 (first citing *Levinson*, 443 F. Supp. 3d at 175; then citing *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 89 (D.D.C. 2018); and then citing *Ben-Rafael*, 540 F. Supp. 2d at 52–53). Accordingly, the Plaintiffs adequately served Iran under Section 1608(a)(4), so the Court has personal jurisdiction over Iran.

**D. Causes of Action**

Having satisfied itself of its jurisdiction, the Court now considers whether each bellwether Plaintiff may sue to hold Iran liable. The Plaintiffs bring their claims under the FSIA's private right of action, which provides in part that "[a] foreign state that is or was a state sponsor of

terrorism . . . shall be liable to . . . a national of the United States . . . for personal injury or death caused by acts described in subsection (a)(1) of that foreign state . . . for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c); *see* Mem. Supp. Mot. Default J. 21–22.

As other courts in this District have recognized, Section 1605A(c) "creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity," so long as the Plaintiffs are U.S. nationals. *Adamkavicius*, 2025 WL 2159537, at *28 (quoting *Karcher*, 396 F. Supp. 3d at 59); *see also Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 93 (D.D.C. 2023). Here, each bellwether Plaintiff (but none of the nonbellwether Plaintiffs) has established their U.S. citizenship by evidence submitted under seal. *See* Damages Exs. 1-10, ECF Nos. 28-1 to 28-10.[5] Thus, the Court's subject-matter jurisdiction establishes the bellwether Plaintiffs' causes of action.

**E. Liability**

Because each bellwether Plaintiff has established jurisdiction and a private right of action under the terrorism exception, liability is straightforward. *See Est. of Majd Kamalmaz*, 2026 WL 1159653, at *7. The FSIA provides that a foreign government is liable to a U.S. citizen "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act[.]" 28 U.S.C. § 1605A(a)(1), (c). Accordingly, so long as one establishes their right of action, "a plaintiff that

[5] Importantly, nothing in Section 1605A(c) requires the claimant to prove that they were a U.S. national *at the time* of the alleged act of terrorism. This distinguishes Section 1605A(c) from the first element of the terrorism exception. 28 U.S.C. § 1605(a)(2)(A)(ii). Thus, because each bellwether Plaintiff was a U.S. citizen at the time of this suit, Section 1605A(c) provides a cause of action to each of them, including those who obtained U.S. citizenship (whether by birth or naturalization) after the acts for which they seek to hold Iran liable.

offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law[.]" *Levinson*, 443 F. Supp. 3d at 176 (cleaned up); *see also Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (finding liability under the FSIA when subject-matter jurisdiction and a cause of action were established). Because the bellwether Plaintiffs have met each of the Section 1605A requirements, they have established Iran's liability for each attack.

## CONCLUSION

For the foregoing reasons, the Court grants in part the Motion for Default Judgment, ECF No. 29. The Court finds Iran liable for each of the five bellwether attacks for which the ten bellwether Plaintiffs seek redress. The Court defers the adjudication of liability for the remaining attacks and the determination of damages for further proceedings.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: September 23, 2026